IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NOREX PETROLEUM LIMITED:**<br><br>Suite 530, 734 7th Ave., S.W.<br>Calgary, AB, T2P 3P8<br>Canada<br><br>    Petitioner,<br><br> v.<br><br>**CHUBB INSURANCE COMPANY OF CANADA**<br><br>One Financial Place,<br>16th Floor,<br>1 Adelaide Street East,<br>Toronto, ON, M5C 2V9<br>Canada<br><br>**INGOSSTRAKH INSURANCE COMPANY LTD,**<br><br>12, Pjatnitskaja Street,<br>115998,<br>Moscow, M-35<br>Russia<br><br>  and<br><br>**GREAT NORTHERN INSURANCE COMPANY**<br><br>15 Mountain View Road<br>P.O. Box 1615<br>Warren, NJ 07061-1615<br>USA<br><br>    Respondents. | NO. |

### PETITION FOR DISCOVERY IN AID OF A FOREIGN PROCEEDING
### PURSUANT TO 28 U.S.C. §1782

Petitioner Norex Petroleum Limited hereby petitions for discovery in aid of a proceeding pending before a foreign legal tribunal pursuant to 28 U.S.C. §1782, as follows:

1. On or about June 28, 2002, Petitioner Norex Petroleum ("Norex") filed a Statement of Claim (the "Claim" or the "Canadian Proceeding") in the Court of Queen's Bench of Alberta, Canada (the "Canadian Court") against the Chubb Insurance Company of Canada, Ingostrakh Insurance Company Ltd., and Great Northern Insurance Company.

2. A true and correct copy of the Claim is attached hereto as Exhibit A.

3. Pursuant to 28 U.S.C. §1782(a):

> The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal.... The order may be made ... upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court .... To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

4. The Canadian Court is a "foreign tribunal" within the meaning of 28 U.S.C. §1782.

5. Norex is an "interested person" within the meaning of 28 U.S.C. §1782.

6. Norex seeks to obtain evidence consisting of relevant and material records of various third parties for use in the Canadian Proceeding as provided by 28 U.S.C. §1782.

7. The persons from whom Norex seeks to obtain documents and testimony reside or may be found in this District as provided by 28 U.S.C. §1782.

8. Norex requests an order permitting it to serve the proposed subpoenas on BP-Amoco (Exhibit B), Hooper Owen Gould & Winborn ("Hooper") (Exhibit C); and the Center for Public Integrity (the "Center") (Exhibit D), all of which maintain places of business in the District.

9. Norex reserves its rights to seek depositions of relevant witnesses after reviewing documents which are produced pursuant to the subpoenas; the persons from whom Norex would likely seek depositions reside or may be found in this District.

## THE CLAIM

10. Pursuant to the Claim, Norex seeks to recover in excess of $11.8 million for a certain insured loss (the "Loss") as a beneficiary of insurance policies issued by Respondents over certain equipment. Claim, ¶5, 15, 31

11. The Claim alleges that Norex was the majority shareholder of Yugraneft, a Russian oil company, at the time. Claim, ¶6.

12. The Claim alleges that the Illegal Scheme was perpetrated by the Tyumen Oil Company ("TNK") and its affiliates. Claim ¶8-11.

13. The Claim alleges that the affiliated participants in the Illegal Scheme include Access Industries, Inc. and its principal Leonard Blavatnik; Renova, Inc. and its principal Victor Vekselberg; TNK and its officers and directors, including Simon Kukes and Joseph Bakaleynik, the "Crown Group" and its officers and directors, including Elliot Spitz; the "Alfa Group"; and various shell companies, such as LT Enterprises Limited, Eastmount Properties Limited, and Sandwell Enterprises Limited, located in offshore jurisdictions. Claim ¶11.

14. The Claim alleges that TNK claimed an interest in Yugraneft based upon its stripping of assets of Chernogorneft, the other shareholder in Yugraneft, as a result of a corrupt bankruptcy proceeding instigated by TNK. Claim ¶8.

15. The Claim alleges that Norex suffered insured loss as a result of the illegal seizure (the "Illegal Seizure") of its control over Yugraneft as well as the equipment owned by Yugraneft as referred to and defined in the Claim (the "Oilfield Equipment") as part of an overall fraudulent and illegal scheme (the "Illegal Scheme"). Claim, ¶8-10.

16. The Illegal Seizure was achieved by corrupting a Russian court proceeding and through physical force when armed guards took over Yugraneft's facilities.

17. The Illegal Scheme also involved obtaining the assets of Russian oil companies in which BP-Amoco and others had an interest.

18. The Claim alleges that Norex "has no effective access to the courts or government of the Nizhnevartovsk region as TNK and its principles, subsidiaries, and affiliates effectively control the courts and the government of the Nizhnevartovsk region by the exercise of corruption and bribery." Claim, ¶10.

19. As described below, the Petition seeks evidence of bribery and corruption perpetrated by TNK and its affiliates in the Nizhnivartovsk region where Yugraneft is located and Russia generally as well as evidence related to the value, ownership, location and use of the Oilfield Equipment.

20. Subsequent to the Illegal Seizure, BP-Amoco and TNK resolved their dispute and BP-Amoco purchased a 50% interest in the assets of TNK, which included Yugraneft and, presumably, the Oilfield Equipment.

## THE "PRESERVATION SUBPOENA" ISSUED IN THE NEW YORK ACTION

21.  In February, 2002, Norex filed a complaint in the Southern District of New York against TNK and other defendants to recover for the illegal seizure of its control over Yugraneft. A copy of the complaint without exhibits is attached hereto as Exhibit E.

22.  The court permitted Norex to serve a subpoena to preserve the documents requested from BP-Amoco at its New York office.

23.  The case was dismissed on the grounds of forum non conveniens on February 18, 2004.

24.  Because that case has been closed and this, as well as other, evidence is most likely located in Washington, D.C., not New York, the instant petition is being filed *inter alia* as to BP-Amoco.

## BP-AMOCO'S KNOWLEDGE OF TNK'S CORRUPTION AND BRIBERY

25.  At the time relevant hereto BP-Amoco was a shareholder of Sidanco, a parent company of Chernogorneft.

26.  BP-Amoco's interests were harmed as a result of TNK corrupting the Chernogorneft bankruptcy proceeding.

27.  BP-Amoco CEO Lord Browne in his letter dated July 22, 1999 to then Prime Minister of Russia Stepashin stated:

> BP Amoco is the largest foreign direct investor in the Russian Federation…. I would welcome the clear commitment of yourself and your government in…close scrutiny by the Federal Service for Insolvency and Financial Rehabilitation of the conduct of bankruptcy cases against principal Sidanco subsidiaries including Chernogorneft, Varyeganneftegas and Kondpetroleum…. The Sidanco bankruptcy case is seen by international investors as a critical litmus test of investment prospects in the Russian Federation.

5

The letter from Lord Browne is attached hereto as Exhibit F.

28.     The "Information Note on BP Amoco in Russia," attached to the letter from Lord Browne to Prime Minister Stepashin referred to above, states:

> On 27th May 1999, the external manager [of Chernogorneft] was removed against the wishes of the overwhelming majority of creditors by a decision of the Federal Arbitration Court of the West Siberian Okrug (Cassation Instance) in Tyumen. The minority creditors who supported this action appear to be linked to the Tyumen Oil Company (TNK). TNK is a competitor of Sidanco and has openly declared its intention to acquire the Chernogorneft subsidiary…. Crude produced by [Kondpetroleum] subsidiary…has been diverted by the external manager to companies associated with Tyumen Oil Company and the Al[f]a Group…. The Sidanco holding company is the largest non-State creditor of Kondpetroleum. However, the courts have systematically excluded Sidanco from its legitimate rights as a creditor and thus from any influence over the bankruptcy process…. Crude [of Varyegannefetgas] have …been diverted from Sidanco through other trading companies…. It should also be clear that such abuse of bankruptcy proceedings has a damaging impact on broader investor confidence.

29.     The above allegations indicate that TNK corrupted the relevant court proceedings.

30.     Attached hereto as Exhibit G is a copy of a letter dated August 25, 1999 from Michael Townshend, BP-Amoco's Director of Foreign Affairs in its Washington, D.C. office, to James Harmon of the U.S. Export Import Bank setting forth that:

> Today, an offer was made by BP Amoco and other shareholders of Sidanco to purchase the registered debt of all the creditors of Chernogorneft. … If the offer is rejected it will call into question the motives and intent behind the bankruptcy ruling of Chernogorneft on August 3rd.

31.     The above offer was subsequently rejected and, upon information and belief, BP-Amoco obtained evidence that such rejection was obtained through corruption.

32. In a letter dated October 1, 1999 from Michael E. Townsend of BP-Amoco's Washington, D.C. office to the Export Import Bank, he wrote: "As part of our own investigation we have collected considerable data detailing the diversion of funds from Sidanco subsidiaries under external management." A copy of the letter is attached hereto as Exhibit H.

33. It has widely been reported that the diversion of funds was effected through corruption and bribery.

34. Attached hereto as Exhibit I is a document titled Alleged Violations in the Chernogorneft Bankruptcy Process released by the CIA pursuant to the Freedom of Information Act request in connection with the alleged violations of Russian laws by TNK, setting forth that:

- TNK President Kukes said that he bribed local officials.

- Sputnik said that they were not permitted to participate in the Chernogorneft auction. They said that Chernogorneft did not provide them with the proper materials needed to bid on the auction.

- Following an appeal by Sputnik to the Nizhnevartovsk court, the court on 23 November granted an injunction stopping the Chernogorneft sale. The same court reversed itself two days later.

- Sidanko shareholders tried to stop the auction by filing suits in several Russian courts. Sidanco shareholders said that the auction organizers' armed guards did not allow bailiffs to deliver court orders postponing the sale from Moscow and Kemerovo district courts.

35. It is believed that the information contained in this document was provided by BP-Amoco and the Sputnik Group, described below.

## HOOPER'S KNOWLEDGE OF TNK'S CORRUPTION AND BRIBERY

36.    At the time relevant hereto, Hooper Owen Gould & Winburn ("Hooper") represented private investors in the Sputnik group, which was a shareholder in Sidanco, a parent company of Chernogorneft.

37.    The investors' interests were harmed as a result of the corrupt Chernogorneft bankruptcy proceeding.

38.    In a letter dated November 30, 1999 from Charles Wilson of Hooper's Washington, D.C. office to the Export-Import Bank, he wrote:

> The debt purchase offer made by BP Amoco on Chernogorneft was not only rejected by the external manager of Chernogorneft, who never even read the offer, but he also refused even to give a list of the creditors (there are some five hundred of them).... Despite this, BP Amoco still sought to take off the debt of Chernogorneft creditors. One of the creditors who came forward then requested two days later that BP Amoco reinstate his debt as his family had been threatened. Again, you have to draw your own conclusions as to how clean this has been.

A copy of the Charles Wilson's letter is attached as Exhibit J.

39.    The document released by the CIA referred to above sets forth Sputnik's related statements related to corruption and bribery in the course of Chernogorneft bankruptcy.

## THE CENTER FOR PUBLIC INTEGRITY'S KNOWLEDGE OF TNK'S CORRUPTION AND BRIBERY

40.    The Center for Public Integrity ("CPI") is an organization engaged in investigative research and reporting on public policy issues in the United States and around the world.

41. In August 2000, CPI published an article describing connections between Alfa Group, a co-owner of TNK, and organized crime and corruption. A copy of the article is attached hereto as Exhibit K.

42. The article sets forth that:

[BP-Amoco] and others claimed that through fraud and other unsavory practices in a Russian bankruptcy proceeding, [TNK] had effectively "stolen" a vast oil field in which they held substantial equity.

BP-Amoco commissioned a private investigative report on [TNK], which was slipped to the CIA through an intermediary.

That report, a CIA official confirmed, contained 2 ½ pages labeled "criminal situation. (sic) The CIA promptly classified the report "secret and passed it along to the Ex-Im Bank. Further, the CIA briefed Ex-Im about its own material on [TNK] in December and told the bank that the BP-Amoco investigative report "tracked" with its own information.

43. Subsequently, CPI was sued by the principals of Alfa Group, Mikhail Fridman and Pyotr Aven, for defamation based on the allegedly falsity of these statements.

44. Upon information and belief, CPI obtained a copy of the report which BP-Amoco provided to the CIA either prior to publication of the above article or through discovery in the above proceeding.

45. Upon information and belief, CPI has obtained additional evidence of corruption and bribery by TNK either prior to publication of the above article or through discovery in the above proceeding.

### THE SUBPOENAS

46. The Subpoenas are identical in scope and limited to documents which evidence knowledge of the corruption and bribery of Russian courts and government officials in the Nizhnivartovsk region and Russia generally; the Subpoenas also seek

9

documents relating to the value, ownership, location and use of the Oilfield Equipment, as defined in the Claim.

47. Specifically, the Subpoenas seek:

(a) All documents related to any bribes which TNK has paid to Russian government officials;

(b) All documents related to allegations that TNK corrupted court proceedings concerning the Chernogorneft Oil Company;

(c) All documents submitted to the Export-Import Bank related to allegations that TNK engaged in corruption and bribery in the Nizhnivartovsk region of Russia and Russia generally;

(d) All documents submitted to the U.S. Department of State related to allegations that TNK engaged in corruption and bribery in the Nizhnivartovsk region of Russia and Russia generally;

(e) All documents submitted to the Central Intelligence Agency related to allegations that TNK engaged in corruption and bribery in the Nizhnivartovsk region of Russia and Russia generally;

(f) All documents submitted to members of Congress related to allegations that TNK engaged in corruption and bribery in the Nizhnivartovsk region of Russia and Russia generally;

(g) All documents submitted to the Russian government related to allegations that TNK engaged in corruption and bribery in the Nizhnivartovsk region of Russia and Russia generally;

(h) All documents submitted to the British government related to allegations that TNK engaged in corruption and bribery in the Nizhnivartovsk region of Russia and Russia generally;

(i) All documents evidencing the value of the Oilfield Equipment, including, but not limited, to documents evidencing the value placed on the Oilfield Equipment by BP-Amoco in regard to its purchase of assets of TNK and Yugraneft;

(j) All documents evidencing any insurance of the Oilfield Equipment from 2001 to date;

(k) All documents evidencing the ownership, location and use of the Oilfield Equipment from 2001 to date.

48. Granting the Petition permits Norex to obtain important evidence in the form of relevant and material records for use in the Canadian Proceeding in order to prove that TNK and its affiliates engaged in corruption and bribery of Russian government officials so that Norex can prevail on its Claim and to establish the value, ownership, location and use of the Oilfield Equipment.

Wherefore, Petitioner requests that this Court grant the Petition and permit service of the proposed subpoenas.

                                                    Cooper & Kirk, PLLC

By: _____
     Charles J. Cooper
     D.C. Bar No.: 218070
     Vincent J. Colatriano
     D.C. Bar No.: 429562
     Suite 200
     1500 K Street, N.W.
     Washington, D.C.  20005
     Phone:  202-220-9600


                                                    Marks & Sokolov, LLC

By: Bruce S. Marks /by Vin't J. Col___
     Bruce S. Marks
     1835 Market Street
     Philadelphia, PA 19103
     Phone:  215-569-8901

Dated:  May 27, 2004

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of May, 2004, I caused to be served by Federal Express, copies of the foregoing document on the following:

> LeeAnn Boyd
> Dome Tower, Suite 2100,
> 333-7th Avenue SW,
> Calgary, AB
> Canada  T2P 2Z1
>
> *Chubb Insurance Company of Canada*
> *Registered Attorney for Service in Alberta*
>
>
> Brownlee LLP
> #2200, 10155 - 102 Street
> Edmonton, AB
> Canada  T5J 4G8
> Attention:  Havelock Madill
>
> *Chubb Insurance Company of Canada*
> *Solicitors of Record in Alberta*
>
>
> Brownlee LLP
> #2200, 10155 - 102 Street
> Edmonton, AB
> Canada  T5J 4G8
> Attention:  Robert Black
>
> *Ingosstrakh Insurance Company Ltd.*
> *Solicitors of Record in Alberta*
>
> Great Northern Insurance Company
> 15 Mountain View Road
> P.O. Box 1615
> Warren, NJ 07061-1615
> USA

_____
Vincent J. Colatriano