**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NOREX PETROLEUM LIMITED** | |
| **Petitioner,** | **No.   1:04-MC-00281-CKK** |
| **v.** | |
| **CHUBB INSURANCE COMPANY OF CANADA**<br>**et al** | |
| **Respondents.** | |

**NOREX PETROLEUM LIMITED'S
MOTION AND SUPPORTING POINTS AND AUTHORITIES
TO COMPEL THE PRODUCTION OF DOCUMENTS
PURSUANT TO SUBPOENA DIRECTED TO BP AMERICA INC.**

Norex Petroleum Limited ("Norex") moves for an order to compel BP America, Inc.,

formerly BP-Amoco, (hereinafter "BP") to produce documents pursuant to a subpoena duces

tecum issued pursuant to this Court's order dated August 24, 2004.[1]

**I.   PRELIMINARY STATEMENT**

Norex filed claims against the Chubb Insurance Company of Canada ("Chubb"),

Ingosstrakh Insurance Company Ltd. ("Ingosstrakh"), and Great Northern Insurance Company

(the "Respondents") in Canada (the "Canadian Litigation") for insurance coverage and losses

related to oilfield equipment (the "Oilfield Equipment") owned by Yugraneft, a Russian oil

company of which Norex was the controlling shareholder, and in which Norex has an insurable

interest.   The Tyumen Oil Company ("TNK") (a) corrupted Russian bankruptcy proceedings in

---

[1] Bruce Marks, counsel for Norex, discussed the anticipated motion with Daryl Libow, counsel
for BP, by telephone on November 15 and November 18, 2004. Dan Libow indicated that BP
intends to oppose the instant Motion.

order to obtain its initial interest in Yugraneft; (b) corrupted Russian court proceedings in order to freeze shares of Yugraneft owned by Norex; and (c) used its security forces armed with machine guns to seize the Oilfield Equipment.  Defendant Chubb denied the allegations that TNK corrupted Russian proceedings; Defendant Ingosstrakh moved to dismiss the Canadian Litigation for *forum non conveniens*.

TNK's seizure of the Oilfield Equipment was part of an overall scheme to take over a substantial part of the Russian oil industry through corruption of the Russian courts and government officials.   BP was a victim of the same corrupted Russian bankruptcy and amassed substantial evidence of TNK's bribery and corruption.   Some of this evidence was presented to U.S. government officials as part of BP's successful effort to block an Export-Import Bank loan guarantee in favor of TNK until assets in which BP had an interest were returned.  Ultimately, TNK and BP settled their differences; BP purchased a 50% interest in TNK through the formation of a joint company known as TNK-BP, now the ultimate parent company of Yugraneft.

On May 27, 2004, Norex filed a Petition For Discovery In Aid of a Foreign Proceeding pursuant to 28 U.S.C. §1782 (the "Petition") to obtain information from BP regarding (a) bribery and corruption in Russia by TNK and (b) the Oilfield Equipment.  The Petition was served upon Respondents and their Canadian counsel, who filed no objections.  On August 24, 2004, this Court granted Norex's Petition.  That same day, Norex served a Subpoena Duces Tecum on BP. *See* Exhibit "A".  On September 17, 2004, BP served its objections and refused to produce any documents.  *See* Exhibit "B".

As explained herein, the motion to compel should be granted because the information sought is highly relevant to proving (A) TNK's corruption of court proceedings, including the

specific proceedings by which it seized control of Yugraneft and the Oilfield Equipment; (B) Russia is an inadequate forum because its courts are highly susceptible to corruption; and (C) the value of the Oilfield Equipment.

## II.   PROCEDURAL HISTORY

### A.   THE CANADIAN LITIGATION

On July 17, 2002 Norex filed a claim (the "Claim") against Respondents in Canada.  *See* Exhibit "C".   Norex seeks to recover in excess of $11.8 million for an insured loss (the "Loss") as a beneficiary of insurance policies issued by Respondents over the Oilfield Equipment. Claim, ¶5, 15, 31.  Norex was the majority shareholder of Yugraneft, a Russian oil company. Claim, ¶6.  Norex suffered an insured loss as a result of the illegal seizure (the "Illegal Seizure") of its control over Yugraneft and of the Oilfield Equipment owned by Yugraneft  as part of an overall fraudulent and illegal scheme (the "Illegal Scheme").  Claim, ¶8-10.  The Illegal Seizure was perpetrated by (a) corrupting the bankruptcy proceedings of Chernogorneft, a Russian oil company, in order to obtain an interest in Yugraneft; (b) corrupting court proceedings to freeze Yugraneft shares owned by Norex; and (c) and using TNK security forces armed with machine guns to seize the Oilfield Equipment.  Claim, ¶8-9.  The Illegal Scheme also involved obtaining the assets of Russian oil companies, such as Chernogorneft, in which BP had an interest.   The Claim alleges that Norex "has no effective access to the courts or government of the Nizhnevartovsk region as TNK and its principles, subsidiaries, and affiliates effectively control the courts and the government of the Nizhnevartovsk region by the exercise of corruption and bribery."  Claim, ¶10.

Respondent Chubb's Statement of Defence denied Norex suffered a loss as a result of TNK corrupting Russian court proceedings. *See* Chubb Defence ¶16, Exhibit "D".  Respondent

Ingosstrakh filed a motion to dismiss based on *forum non conveniens* grounds, arguing that Russia is an adequate alternative forum .  Chubb did not join Ingosstrakh's motion to dismiss. *See* Exhibit "E".

### B.  BP'S KNOWLEDGE OF TNK'S CORRUPTION

During 1999, through corrupted Russian proceedings, TNK took control of the assets of Chernogorneft, a subsidiary of Sidanco, a Russian oil company partially owned and managed by BP, through bribery of officials and corrupted court proceedings in Russia.[2]  TNK's illegal conduct included bribery and corruption of the bankruptcy proceedings of Chernogorneft.   TNK used this same proceeding to obtain its initial interest in Yugraneft.  Details of TNK's illegal conduct are set forth in a lawsuit filed in New York state court by various investors in Sidanco who were allied with BP.  *See* Exhibit "R".

In an effort to pressure TNK to return these assets, BP launched a media and lobbying campaign in the United States using TNK's pending application for a $500 million credit guarantee with the U.S. Export-Import Bank as leverage.[3]  During the course of the campaign, BP amassed considerable information and documentation of TNK's illegal conduct and disseminated it to various governmental entities and news organizations.[4]  Further, it is believed that BP provided information detailing TNK's criminal activities to the C.I.A. as reflected in "top secret" document titled Alleged Violations in the Chernogorneft Bankruptcy Process, which was produced by the C.I.A. in response to Norex's F.O.I.A. request.   The document states:

- TNK President Kukes said that he bribed local officials.

---

[2] From Russia, With Bankruptcy; A High Cost for BP-Amoco's Investment in an Oil Concern, The New York Times, August 13, 1999, Exhibit "F".

[3] Washington Lobbying Oils Russian Capitalism, The Washington Post, October 27, 1999, Exhibit "G".

[4] Ex-Im Bank delays Russia Oil Credit Debate, Reuters, December 16, 1999 (A State Department official commented on complaints by BP against TNK, "We understand TNK has been accused of unlawful conduct when it competed against BP-Amoco for control of [] Chernogorneft."), Exhibit "H".

- Sputnik [another investor in Sidanco] said that they were not permitted to participate in the Chernogorneft auction.  They said that Chernogorneft did not provide them with the proper materials needed to bid on the auction.

- Following an appeal by Sputnik to the Nizhnevartovsk court, the court on 23 November granted an injunction stopping the Chernogorneft sale.  The same court reversed itself two days later.

- Sidanko shareholders tried to stop the auction by filing suits in several Russian courts.  Sidanco shareholders said that the auction organizers' armed guards did not allow bailiffs to deliver court orders postponing the sale from Moscow and Kemerovo district courts.

*See* Exhibit "I".

As a result of BP's lobbying and public relations campaign, the U.S. government blocked the $500 million Export-Import Bank loan guarantee to TNK which caused TNK to agree to return the purloined assets to Sidanco.[5]  In return, on April 6, 2000, the Export-Import Bank approved the loan guarantees for TNK.[6]  Ultimately, after TNK seized control of Yugraneft, BP purchased a 50% interest in TNK through a joint venture known as BP-TNK, which is now the ultimate parent company of TNK and Yugraneft and operated by BP.

**C.  THE NEW YORK LITIGATION**

In 2001, Norex filed a complaint against TNK and other defendants in the Southern District of New York (the "New York Litigation)".    The court granted Norex's discovery requests in part and compelled BP to preserve certain documents.    *See* Exhibit "M".   These documents would include documents responsive to the instant subpoena.   The matter was dismissed for *forum non conveniens* and is on appeal.

**D.  THE ALFA GROUP V. CENTER FOR PUBLIC INTEGRITY LITIGATION**

---

[5] BP, TNK End Feud And Spilt Sidanko, The Moscow Times, December 23, 1999 ("[A] $500 million US Eximbank loan guarantee  program for TNK … has been linked to BP Amoco's lobbying efforts with the U.S. government"), Exhibit "J"; Russian Firms And BP Amoco Settle Feud, The Wall Street Journal, December 23, 1999 ("[T]he settlement could held Tyumen win $500 million in loan guarantees from the Export-Import Bank…"), Exhibit "K".
[6] Ex-Im Bank Approves Financing For U.S. Oil Industry Exports To Russia's Tyumen Oil Company, Ex-Im Bank Press Release, April 6, 2000, Exhibit "L".

In *OAO Alfa-Bank v. Center for Public Integrity*, Case No. 1:00CV02208 (D.D.C.)("CPI Action"), Mikhail Fridman, a controlling shareholder in TNK during the relevant time period, commenced a defamation action in this court against the Center for Public Integrity ("CPI") based on a magazine article which it published concerning TNK.   The article stated, *inter alia*:

> [BP-Amoco] and others claimed that through fraud and other unsavory practices in a Russian bankruptcy proceeding, [TNK] had effectively "stolen" a vast oil field in which they held substantial equity.
>
> BP-Amoco commissioned a private investigative report on [TNK], which was slipped to the CIA through an intermediary.
>
> That report, a CIA official confirmed, contained 2 ½ pages labeled "criminal situation. (sic)  The CIA promptly classified the report "secret and passed it along to the Ex-Im Bank.  Further, the CIA briefed Ex-Im about its own material on [TNK] in December and told the bank that the BP-Amoco investigative report "tracked" with its own information.

Cheney Led Halliburton To Feast At Federal Trough, The Public I, September 14, 2000, Exhibit "N".

On January 23, 2001, CPI served a subpoena upon BP to obtain information related to TNK's corruption of Russian courts and officials.  BP did not file a motion to quash or for a protective order, but rather, CPI and BP entered into a confidentiality agreement and, upon information and belief, BP produced relevant documents, including documents regarding TNK's corruption of Russian courts and officials, including the BP report to the CIA.  The Confidentiality Agreement was not approved by the District Court.  *See* Exhibit "O".

**E.   THE SUBPOENA ON BP**

Pursuant to the Court's order, Norex served a subpoena on BP, which seeks documents related to (A) corruption and bribery by TNK in Russia (Requests Nos. 1-8) and (B) the value, ownership, location, use, and insurance of the Oilfield Equipment (Requests Nos. 9-11). Requests Nos. 3-8 specifically seek documents provided by BP to third parties, such as the U.S.

Export Import Bank, U.S. Department of State, C.I.A., Congress, Russian government, and British government.   *See* Exhibit "A".

### F.   BP'S OBJECTIONS

In response to the subpoena, BP served 16 general objections and three objections related to the definition of the Oilfield Equipment; BP refused to produce a single document.  *See* Exhibit "B".  BP <u>admits</u> "possession, custody and control" of requested documents as it has "directed its employees to ensure that the documents requested by the Subpoena are properly preserved and, on a voluntary basis, its ultimate parent, B.P. p.l.c. a U.K. company, has directed employees of BP America's overseas affiliate to do the same."  <u>BP Objections</u> at 3, Exhibit "B".

III.    **LEGAL ARGUMENT**

28 U.S.C. Section 1782 in pertinent parts provides:

**Assistance to foreign and international tribunals and to litigants before such tribunals**

(a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign … tribunal … . The order may be made … upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. … To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

28 U.S.C. §1782.

"Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel Corp. v. Advanced Micro Devices, Inc.*, 124 S.Ct. 2466, 2473 (2004). "§1782's twin aims … [are] providing efficient assistance to participants in international litigation and encouraging foreign countries by example to provide similar assistance to our courts." *Id.* at 2476 (quotation marks omitted). As explained below, the Court should grant the motion in order to fulfill the purposes of Section 1782.

A.   **SECTION 1782 DOES NOT REQUIRE SERVICE OF THE PETITION TO THE PERSON AGAINST WHOM A SUBPOENA IS TO BE ISSUED**

BP's first "general objection" that it was "constitutional error" to not be served with the Petition is baseless .

First, BP is not a named party to the Petition. Neither Section 1782 nor any procedural rule required Norex to serve the Petition upon future recipients of a third-party subpoena.  As in

8

any litigation matter, recipients of third party subpoenas are not served copies of pleadings or motions, nor is there any requirement to do so.

Second, even if BP had notice of the Petition, it would have no standing to appear and oppose the Petition as it not a named party to the proceeding.

Third, BP's constitutional concerns regarding its opportunity to be heard regarding the subpoena are satisfied by Fed.R.Civ.P. 45(c)(2)(B) which permits it to object to the subpoena. Further, in the exercise of constitutional sensitivity, this Court's August 24, 2004 Order states that nothing prevents the person upon whom Norex serves a subpoena from filing a motion to quash. The docket reflects BP chose not to file a motion to quash, but instead filed objections.

Finally, case law is replete with courts approving applications under Section 1782 to issue Rule 45 subpoenas without requiring the third party to be served with the underlying actions. *See In re Al Fayed*, 91 F. Supp. 2d 137 (D.D.C. 2000) (court granted ex parte application for the issuance of a subpoena); *In Re Letters Rogatory from Tokyo Dist.*, 539 F.2d 1216, 1219 (9th Cir. 1976) ("The witnesses can and have raised objections and exercised their due process rights by motions to quash the subpoenas.").[7]

## B.  BP' OBJECTIONS BASED ON RELEVANCY ARE WITHOUT MERIT

### 1.   BP Lacks Standing To Object on Relevance Because It Has No Interest in the Outcome of the Canadian Litigation

---

[7] *See also Esses v. Hanania* (*In Re Esses*), 101 F.3d 873 (2d Cir. 1996); *In Re Application of Aldunate*, 3 F.3d 54 (2d Cir. 1993); *In Re Request for Assistance from Ministry of Legal Affairs*, 848 F.2d 1151 (11th Cir. 1988),  *overr'd on other grounds by Intel Corp. v. Advanced Micro Devices, Inc.,* 124 S. Ct. 2466 (2004); *John Deere, Ltd. v. Sperry Corp.*, 754 F.2d 132, 134 (3d Cir. 1985); *In Re Phillips*, Docket No. M 19-96, 2004 U.S. Dist. LEXIS 16426 (S.D.N.Y.  Aug. 19, 2004).

BP's general objections Nos. 2 and 3 based on relevance should be denied because it has no standing to make this objection because it is not a party to the Canadian litigation (nor a named Respondent to the Petition) and as such has no interest in the outcome of that litigation.

> … having no interest in the outcome of the case, arguments as to 'relevancy' and 'materiality; are not appropriate concerns to these witnesses. … Therefore, I conclude that, ordinarily, when a subpoena duces tecum is issued to *a person not party to the action* there is *no standing* on his part to raise … *questions of relevancy and materiality*."

*Shore Acres Nursing Home, Inc. v. Continental Medical Sys.*, Docket No. 91-0067, 1991 U.S. Dist. LEXIS 4425, 7-8 (E.D. Pa. 1991) *quoting Cooney v. Sun Shipbuilding & Drydock Co.*, 288 F.Supp. 708, 717 (E.D.Pa. 1968) (emphasis ours).

As the Supreme Court observed in *Intel Corp. v. Micro Devices*, courts are not required to delve into issues such as whether the sought discovery could be obtained in the foreign country or even the U.S., noting that "comparison of that order can be fraught with danger." *Id.* at 2471. Nor does Section 1782 impose the burden on this Court to determine whether the sought discovery would be "relevant" under the laws of a foreign jurisdiction. Rather, absent some type of undue burden, the instant discovery – which, in any case, is plainly relevant -- should be granted.

### 2. BP's Relevance Objections Are Facially Insufficient

BP's "general objections" numbers 2 and 3 based upon relevance, with no explanation as to why the requested documents are not relevant to the Canadian litigation, are insufficient on their face. *In re Vitamins Antitrust Litig.*, Docket No. 99-197, 2002 U.S. Dist. LEXIS 25813, at *26 (D.D.C. Aug. 7, 2002) ("A general objection to a discovery request is not sufficient to preserve an objection on relevance grounds…") (underscore ours); *Chubb Integrated Sys. Ltd. v.*

*Nat'l Bank of Washington*, 103 F.R.D. 52, 58 (D.D.C. 1984) ("[Plaintiffs'] bare objection, that the requested information is 'irrelevant', does not meet the standard for a successful objection.").

### 3.  Alternatively, The Requested Documents Are Plainly Relevant

Assuming, *arguendo*, BP has standing to object on the basis of relevance, the requested documents are plainly relevant to the Canadian litigation.[8] Fed.R.Civ.P. 26 provides:

> (1) In General. Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Rule 26 (b)(1).  "Clearly the 'relevance' standard was intended to permit discovery of materials useful in case preparation, though not directly admissible in evidence." *Smith v. Schlesinger*, 513 F.2d 462, n. 37 (D.C.Cir.1975) *quoting 4 Moore's Federal Practice* para. 26.55[1], at 113 (2d Ed. J. Moore & J. Lucas 1974).

Professor Wright states the rule of relevance governing discovery as follows:

> Discovery cannot be limited to evidence that would be relevant at the trial. The concept at the discovery stage is much broader, as was made specific by a 1946 amendment to Rule 26(b), stating that it is not ground of objection that the testimony will be inadmissible at the trial if the testimony sought appears reasonably calculated to lead to the discovery of admissible evidence.  Certainly the requirement of relevancy should be construed liberally and with common sense, rather than in terms of narrow legalisms. Indeed it is not too strong to say that discovery should be considered relevant where there is any possibility that the information sought may be relevant to the subject matter of the action.

---

[8] BP has not suggested nor is there any reason to believe that the Canadian standard of relevance would be different than the standard utilized by this Court.

*See* C. Wright, Law of Federal Courts at 403 (3d Ed. 1976) (footnotes omitted). "The rule has

been stated by the Court of Appeals in this Circuit as providing for discovery of information if it

'will have some probable effect on the organization and presentation of the moving party's

case.'" *Tavoulareas v. Piro*, 93 F.R.D. 11, 30 (D.D.C. 1981) *quoting Smith v. Schlesinger*, 513

F.2d 462, 473 (D.C.Cir.1975).  *See also Donovan v. Prestamos Presto Puerto Rico, Inc.*, 91

F.R.D. 222 , 224 (D.P.R. 1981) ("[T]the fact that the information sought may be inadmissible at

trial does not bar discovery if it is relevant to the subject matter of the action and there is a

reasonable possibility that the information sought may provide a lead to other evidence that

would be admissible."); *United States v. International Business Machines Corp.*, 66 F.R.D. 215,

218  (S.D.N.Y. 1974) ("This court has emphasized that discovery is to be considered relevant

where there is *any possibility* that the information sought may be relevant to the subject matter of

the action.").

  First, the core issue in the Canadian litigation is TNK's bribery and corruption of Russian

court proceedings.  In the Canadian Litigation, Norex claims:

> On or about June 29, 2001, Norex was a victim of a fraudulent and illegal
> scheme of corruption and conspiracy designed to enable Tyumen Oil
> Company ("TNK") and its subsidiaries and affiliates to acquire control of
> Yugraneft and take over Yugraneft's property and assets including the
> Oilfield Equipment for the benefit of TNK and it's subsidiaries and
> affiliates.  TNK claimed to have acquired the minority shares of Yugraneft
> from Norex's partner, Chernogorneft, a company organized under the laws
> of the Russian Federation, which was stripped of its assets, including its
> shares of Yugraneft, **as the result of a corrupt bankruptcy proceeding
> instigated by TNK.**  Norex had a right of first refusal upon the minority
> shares of Yugraneft held by Chernogorneft which TNK ignored.  So far as
> is known to the Plaintiffs, Chernogorneft was the registered owner of the
> minority shares of Yugraneft up to June 29, 2001.

Statement of Claim at ¶8, Exhibit "C", emphasis ours.

  Chubb directly disputed the issue of corruption stating:

> The alleged loss to Norex is merely a civil dispute between two competing shareholders over ownership and control of Yugraneft. Norex has lost majority ownership and control of Yugraneft through corporate commercial and legal proceedings carried out in Russia. **These proceedings have been carried out in accordance with the applicable laws and regulations and under the direction and control of governmental or judicial bodies of Russia.** Such a loss or dispute does not constitute fortuitous direct loss of, or damage to, the property insured by the Chubb Policy.

Chubb Statement of Defence, ¶16, Exhibit "D", emphasis ours.

Thus, on the face of the Canadian litigation pleadings, information regarding TNK's corruption of Russian judicial proceedings in which BP was also involved is directly at issue, both as to the specific proceedings related to Yugraneft as well as to TNK's general ability to corrupt Russian courts and officials, which may lead to information which shows how TNK corrupted proceedings affecting Yugraneft.

Second, Ingosstrakh filed a *forum non conveniens* motion arguing that Russia is an adequate alternative forum. *See* Exhibit "E". Directly germane to the adequacy of Russia as an alternate forum is whether Russian courts are subject to corruption, particularly by TNK, making them not fair and impartial tribunals and thus not an adequate alternative forum to Canada. Accordingly, any information regarding bribery of Russian officials and corruption of legal proceedings is relevant.

Third, "[i]n addition to discovering information pertaining to a party's case in chief, it is entirely proper to obtain information for other purposes such as cross-examination of adverse witnesses." *Kerr v. U.S. Dist Court for Northern Dist. California*, 511 F.2d 192, 196 (1975), *aff'd* 426 U.S. 394 (1976). Ingosstrakh 's expert, Peter Solomon contends that "It is realistic for persons who litigate in [Russian commercial] courts to expect a fair and disinterested resolution of business disputes based on the law and evidence." Peter Solomon's Affidavit No. 2, ¶12,

Exhibit "P".  He further states that "It is realistic for persons who litigate in [Russian] courts of general jurisdiction, as in [commercial] courts, to expect a fair and disinterested resolution of business disputes based on law and evidence."  Peter Solomon's Affidavit No. 2, ¶15, Exhibit "P".  Igor Petrukhin, another Ingosstrakh expert is of an opinion that "… there is no compelling argument or reason to believe that the Russian Judicial System is unable to act independently or adequately on order to determine [the Canadian Action]."  Igor Petrukhin's Declaration, ¶24, Exhibit "Q".   Thus the requested information related to bribery of Russian officials or corruption of legal proceedings is highly relevant for cross-examination and impeachment of Ingosstrakh's expert witnesses for whom depositions are pending.

### C.  BP'S CONTENTION THAT NOREX MAY SEEK TO USE THE REQUESTED DOCUMENTS FOR OTHER PURPOSES IS MERITLESS

BP speculates at "general objection" number 3 that Norex may use the requested documents for a purpose "other" than for the Canadian Litigation.  This objection is meritless.

First, BP fails to actually articulate what it believes this "other" purpose might actually be while going on to state that Norex sought many of the same documents that are subject to the subpoena in the New York action.  So what?  The New York matter was dismissed on *forum non conveniens* grounds and on appeal.  As such, information obtained through subpoena will have no impact on that proceeding.

Second, as set forth above, the requested documents are relevant to the Canadian Litigation.  BP's innuendo of an "other" purpose is scurrilous.

### D.   MERE PRESERVATION OF DOCUMENTS IS INSUFFICIENT

At "general objection" number 4, BP suggests that the Canadian court might dismiss the Canadian litigation for *forum non conveniens*, and that BP's voluntary preservation of documents would be sufficient. BP is wrong.

First, only Ingosstrakh moved to dismiss based upon *forum non conveniens*. Thus, no matter what the outcome of the *forum non conveniens* motion, the Canadian Litigation will continue with Chubb and mere preservation of documents would not be "assistance" to Norex because Norex would be unable to use the documents in the Canadian Litigation. Therefore, BP's objection is contrary to the purpose of Section 1782 which requires "efficient means of assistance to participants in international litigation in our federal courts". *Ishihara Chem. Co. v. Shipley Co., L.L.C. (In Re Ishihara Chem. Co.)*, 251 F.3d 120, 123 (S.D.N.Y. 2001).

Second, as set forth above, the subpoenas are tailored to issues raised in Ingosstrakh's *forum non conveniens* motion and will be useful in defending that motion. As such, mere preservation of the documents is insufficient.

Third, even if the claim against Ingosstrakh is dismissed to Russia, Norex's need for the requested information would not end as the requested documents would be useful in any forum to challenge the validity of TNK's seizure of the Oilfield Equipment and to determine Norex's right to insurance cover and loss payment.

## E. BP IS REQUIRED TO PRODUCE DOCUMENTS UNDER ITS CONTROL

### 1. BP Must Produce Documents Wherever Located

BP at "general objection" numbers 5 and 6, refuses to produce documents because they may be located outside of the United States or are held by entities "legally separate" from BP. Such objections are groundless.

First, Rule 45(a)(1)(c) requires a non-party to produce the documents in its "possession, custody, or control."  "Control" has been construed broadly by the courts as the legal right, authority, or practical ability to obtain the materials sought upon demand." *SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471 (S.D.N.Y. 2000) (citations omitted).  "The location of the documents, whether within the territorial jurisdiction of the court or not, is irrelevant."  *Gerling Int'l Ins. Co. v. Commissioner*, 839 F.2d 131, 140 (3d Cir. 1988) ; *see also Marc Rich & Co., A.G. v. United States*, 707 F.2d 663, 667 (2d Cir. 1983) ("Neither may the witness resist the production of documents on the ground that the documents are located abroad."); *Dietrich v. Bauer*, Docket No. 95 Civ. 7051, 2000 U.S. Dist. LEXIS 11729, *6 (S.D.N.Y. Aug. 16, 2000) ("It is also immaterial that the documents sought may be located abroad, as the test for production of documents is control, not location.")(citations omitted).

Second, control "applies where discovery is sought from one corporation regarding materials which are in the physical possession of another, affiliated corporation." *SEC v. Credit Bancorp, Ltd.*, 194 F.R.D. 469, 471 (S.D.N.Y. 2000) (citations omitted).  *See United States v. International Union of Petroleum and Indus. Workers*, *AFL-CIO,* 870 F.2d 1450, 1452 (9th Cir. 1989) ("A corporation must produce documents possessed by a subsidiary that the parent corporation owns or wholly controls.")   There can hardly be a dispute that BP should be able to produce the documents which it already provided to the U.S. government, for example.  Further, BP can hardly dispute that it cannot obtain documents from its parent in England.

Third, BP <u>has admitted</u> "possession, custody and control" of requested documents as it has "directed its employees to ensure that the documents requested by the Subpoena are properly preserved and, on a voluntary basis, its ultimate parent, B.P. p.l.c. a U.K. company, has directed employees of BP America's overseas affiliate to do the same."  *See* BP Objections, at 3, Exhibit

"B".  In addition, BP acknowledged the continued preservation of documents sought by Norex in

the New York matter.  BP Objections at 5, Exhibit "B". Obviously, such preservation is not

possible without having <u>control</u> of the documents.

Fourth, BP has "possession, custody and control" of requested documents as it has

already produced certain documents in a case currently pending in this District.  *See OAO Alfa-*

*Bank et al v. Center for Public Integrity*, Case No. 1:00CV02208 (RWR); Confidentiality

Agreement, Exhibit "O".

## F.  BP'S OBJECTION BASED UPON THE ATTORNEY-CLIENT PRIVILEGE IS IMPROPER

BP's "general objection" number 7 to the production of documents based on the attorney-

client privilege is improper and, thus, waived.

First, BP waived any objection based upon the attorney-client privilege by failing to

comply with Rule 45(d)(2):

> When information subject to a subpoena is withheld on a claim that it is privileged or
> subject to protection as trial preparation materials, the claim shall be made expressly and
> shall be supported by a description of the nature of the documents, communications, or
> things not produced that is sufficient to enable the demanding party to contest the claim.

*Id.  See Avery Dennison Corp. v. Four Pillars*, 190 F.R.D. 1, 5 (D.D.C. 1999) ("Failure to

produce a privilege log may be deemed a waiver of the privilege."); *First American Corp. v. Al-*

*Nahyan*, 2 F. Supp. 2d 58, 63 (D.D.C. 1998) (magistrate judge could permissibly base

determination that privilege had been waived on failure to submit privilege log);  *Bregman v.*

*District of Columbia*, 182 F.R.D. 352, 363 (D.D.C. 1998) ("Plaintiff's failure to comply with

Fed. R. Civ. P. 26(b)(5), requiring him to file a privilege log, bars in itself any claim of privilege,

whatever its basis.").

Second, the subpoena encompasses documents either obtained from or given to third parties including, but not limited to the Export-Import Bank, Central Intelligence Agency, news organizations, private investigators and public relations firms and are, thus, outside any privilege. *Brinton v. Department of State*, 636 F.2d 600, 604 (D.C. Cir. 1980), *cert. denied*, 452 U.S. 905 (1981) ("[W]hen an attorney conveys to his client facts acquired from other persons or sources, those facts are not privileged.").

Third, "[a]ttorney-client communications concerning business matters are not within the attorney-client privilege." *Western Trails, Inc. v. Camp Coast to Coast*, 139 F.R.D. 4, 9 (D.D.C. 1991).

Fourth, as discussed above, BP has already produced certain documents in the CPI Action and, thus, waived any privilege with respect to these documents.   In addition, BP has preserved documents in the *Norex v. Access Industries* litigation, which should also be produced.

## G.  THE SUBPOENA DOES NOT SEEK CONFIDENTIAL COMMERCIAL INFORMATION

BP's "general objection" number 8 based upon "confidential commercial information" is groundless.

First, "[t]rade secrets and other confidential commercial information enjoy no privilege from disclosure although courts may choose to protect such information." *United States v. International Business Machines Corp.*, 67 F.R.D. 40, n. 1 (S.D.N.Y. 1975).  *See  Natta v. Zletz*, 405 F.2d 99 (7th Cir. 1968), ("[t]here is no privilege against discovery of trade secrets (4 Moore's Federal Practice (2d ed.) para. 34.15 at p. 2519 and cases cited), … no absolute right to refuse to divulge … information on trade secrecy grounds in view of the public interest in seeking the truth…") *cert. denied*, 395 U.S. 909 (1969).  BP has made no showing the requested documents contain confidential commercial information.

Second, the requested information regarding bribes and corruption of Russian courts is not on its face "confidential commercial information" because such information is not a trade secret nor would its disclosure be harmful to BP by providing some type of competitive edge to Norex. *Echostar Communications Corp. v. News Corp. Ltd.* 180 F.R.D. 391, 394 (D.Colo.1998) ("In order to resist discovery on ground of trade secrecy, objector must establish that the information sought is a trade secret, and demonstrate that its disclosure might be harmful …")

Third, BP waived any claim of confidentiality by sharing its information with third parties such as the British government, Export-Import Bank of the United States, the Central Intelligence Agency and public relations firms and news organization.

## H. BP'S OBJECTION THAT PRODUCTION IS UNDULY BURDENSOME IS WITHOUT MERIT

BP's "general objection" number 9 on the grounds that the request is unduly burdensome, overly broad and seek to impose obligations that are not imposed by the Rules and Section 1782 is without merit.

First, BP failed to set forth why the production of the requested documents is unduly burdensome. *See United States Ex Rel. Fisher v. Network Software Assocs.*, 217 F.R.D. 240, 246 (D.D.C. 2003) (The responding party cannot "merely state, in conclusory fashion, that the requests are unduly burdensome."); *Alexander v. FBI*, 192 F.R.D. 50, 53 (D.D.C. 2000) ("An objection must show specifically how an interrogatory is overly broad, burdensome or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden."). Frankly, given that the subpoena mainly seeks documents which BP has already provided to third parties, such as the U.S., Russian, and British governments, it is hard to see how BP could make this objection in good faith. *See* Requests Nos. 2 to 8.

Second, BP has already identified and preserved documents pursuant to the subpoena in the New York action.  Thus there is nothing unduly burdensome about actually producing the preserved documents.

Third, BP has already produced certain of the requested documents in the CPI action. Thus, there is nothing unduly burdensome about producing these documents again.

## I.   BP AMERICA'S OBJECTIONS TO THE INSTRUCTIONS AND LANGUAGE OF THE REQUESTS ARE WITHOUT MERIT

BP lodges seven objections (Nos. 10 to 16) to the instructions and language of the requests.  These objections are without merit as the definitions and language of the subpoena are plain on their face.    BP's failure to produce <u>any</u> documents, including documents preserved in the New York case, actually produced in the CPI case, or provided to third parties, such as the U.S., Russian, and British governments, underscores its bad faith in making these objections.

## J.   BP'S SPECIFIC OBJECTIONS TO REQUESTS NOS. 9, 10, AND 11 ARE WITHOUT MERIT

BP's objection to requests Nos. 9, 10, and 11 claiming that the term "Oilfield Equipment" is too vague is without merit as the meaning is plain on its face.   BP through its joint venture with TNK is now a controlling shareholder of Yugraneft and easily provide information related to the Oilfield Equipment at issue.

WHEREFORE, Petitioner Norex Petroleum Limited requests that this Court grant the

motion and compel BP to produce the documents requested by the Subpoena within ten days.

By:   /s/ Bruce S. Marks
       Bruce S. Marks, Esq.
       Gene M. Burd, Esq.
       MARKS & SOKOLOV, LLC
       1835 Market Street
       28th Floor
       Philadelphia, PA 19103
       215-569-8901

       Charles J. Cooper, Esq.
       D.C. Bar ID: 248070
       Vincent J. Colatriano, Esq.
       D.C. Bar ID: 429562
       COOPER & KIRK, PLLC
       Suite 200
       1500 K Street, N.W.
       Washington, D.C.  20005
       Phone:  202-220-9600

Dated: November 18, 2004       Attorneys for Petitioner
       Norex Petroleum Limited

## CERTIFICATE OF SERVICE

I, Maria Temkin, hereby certify that a true and correct copy of the Petitioner Norex Petroleum Limited's Motion and Supporting Points and Authorities to Compel the Production of Documents Pursuant to Subpoena Directed to BP America, Inc. along with supporting exhibits and Proposed Order were served on November 18, 2004, via first class mail upon the following persons:

Gene J. Bodnar, Esquire
Macleod Dixon LLP
3700 Canterra Tower
400 Third Avenue SW
Calgary, Alberta
Canada T2P 4H2

J. Robert Black, Esquire
Havelock B. Madill, Esquire
BROWNLEE, LLP
Suite 2200, Commerce Place
10155 –102nd Street
Edmonton, AB, Canada T5J 4G8

CHUBB INSURANCE COMPANY OF
CANADA
One Financial Place, 16th Floor,
1 Adelaide Street East,
Toronto, ON, M5C 2V9 Canada

INGOSSTRAKH INSURANCE
COMPANY LTD,
12, Pjatnitskaja Street,
115998, Moscow, M-35 Russia

GREAT NORTHERN INSURANCE COMPANY
15 Mountain View Road
P.O. Box 1615
Warren, NJ 07061-1615 USA

Daryl A. Libow
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue N.W.
Suite 800
Washington, D.C. 20006


MARKS & SOKOLOV, LLC


By: _____
Maria Temkin


Date: _11/18/04_____