Central Intelligence Agency



Washington, D.C. 20505

RECEIVED SEP 9 2003

2 September 2003

Gene M. Burd, Esq.
Marks & Sokolov
1835 Market Street, 28th Floor
Philadelphia, PA 19103

Reference: F-2003-00964

Dear Mr. Burd:

    In the course of processing your 19 October 2001 Freedom of Information Act (FOIA) request for documents related to allegations of violations of Russian laws by TNK, the Export Import Bank located a CIA document and referred it to us for review and direct response to you.

    We have reviewed the document and have determined that it can be released in segregable form with non-substantive deletions made on the basis of FOIA exemptions (b)(1) and (b)(3). A copy of the sanitized document numbered 985810 is enclosed. An explanation of exemptions is also enclosed.

    You have the right to appeal this decision by addressing your appeal to the Agency Release Panel within 45 days from the date of this letter, in my care. Should you choose to do this, please explain the basis of your appeal.

Sincerely,

*[signature]*
for

Robert T. Herman
Information and Privacy Coordinator

Enclosures

SECRET



## Alleged Violations in the Chernogorneft Bankruptcy Process

- TNK President Kukes said that he bribed local officials.

- Sputnik said that they were not permitted to participate in the Chernogorneft auction. They said that Chernogorneft did not provide them with the proper materials needed to bid on the auction.

- Following an appeal by Sputnik to the Nizhnevartovsk court, the court on 23 November granted an injunction stopping the Chernogorneft sale. The same court reversed itself two days later.

- Sidanko shareholders tried to stop the auction by filing suits in several Russian courts. Sidanko shareholders said that the auction organizers' armed guards did not allow bailiffs to deliver court orders postponing the sale from Moscow and Kemerovo district courts.

- Although the mechanics of the Chernogorneft auction did comply with the letter of the Russian law, according to a Russian company that examined the procedure, some aspects of the sale seem questionable.

    - Tyumen's winning bid of $176 million—about one-third of Chernogorneft's value according to oil analysts—was below the starting price of $200 million but well above the minimum allowable bid of $104 million.

    - Two of the four bidders did not appear to have the financial resources to participate. Neftegaz is a tiny oil firm that produces 0.1 of Russia's total oil and gas condensate, and another participant was a bank that the Central Bank had decided to allow to go bankrupt.

- The Federal Service for Financial Reconstruction and Bankruptcy (FSFO) revoked Gorshkov's license as bankruptcy manager, but an arbitration court in Moscow set aside the FSFO order. In October, head of the FSFO Georgiy Tal appealed the decision to the Supreme Arbitration Court and asked for revocation of the original order installing external management in Sidanko.

- Former trustee manager at Sidanko, Sergey Kitin, disputed the legitimacy of a creditors meeting where Gorshkov was nominated for external manager at Chernogorneft. An arbitration court in Khanty-Mansiysk named Gorshkov the manager in August. Kitin argues that former manager at Chernogorneft, Vasily Bikin, altered the register of creditors of Chernogorneft. The EBRD appealed the registry ruling to then-Premier Stepashin.

SECRET

## Explanation of Exemptions

**Freedom of Information Act:**

(b)(1) applies to material which is properly classified pursuant to an Executive order in the interest of national defense or foreign policy;

(b)(2) applies to information which pertains solely to the internal personnel rules and practices of the Agency;

(b)(3) applies to information pertaining to the CIA Director's statutory obligations to protect from disclosure intelligence sources and methods, as well as the organization, functions, names, official titles, salaries or numbers of personnel employed by the Agency, in accordance with the National Security Act of 1947 and/or the CIA Act of 1949;

(b)(4) applies to information such as trade secrets and commercial or financial information obtained from a person on a privileged or confidential basis;

(b)(5) applies to inter- and intra-agency memoranda or letters which are predecisional and deliberative in nature, or consist of attorney work-product or attorney-client information;

(b)(6) applies to information, the release of which would constitute an unwarranted invasion of the personal privacy of other individuals; and

(b)(7) applies to investigatory records, the release of which could: (A) interfere with enforcement proceedings, (C) constitute an unwarranted invasion of the personal privacy of others, (D) disclose the identity of a confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of an individual.

**Privacy Act:**

(d)(5) applies to information compiled in reasonable anticipation of a civil action or proceeding;

(j)(1) applies to polygraph records; documents or segregable portions of documents, the release of which would disclose intelligence sources and methods, including names of certain Agency employees and organizational components; and documents or information provided by foreign governments;

(k)(1) applies to material properly classified pursuant to an Executive order in the interest of national defense or foreign policy;

(k)(2) applies to investigatory material compiled for law enforcement purposes;

(k)(5) applies to investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment, or access to classified information, the release of which would disclose a confidential source; and

(k)(6) applies to testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service, the release of which would compromise the testing or examination process.

January 2001