Action No.:0201 11097
Deponent: Peter Solomon
Date Sworn: 24 June, 2004

IN THE COURT OF QUEEN'S BENCH OF ALBERTA
JUDICIAL DISTRICT OF CALGARY

BETWEEN:

**NOREX PETROLEUM LIMITED and ZAO YUGRANET CORPORATION**

Plaintiffs

And

**CHUBB INSURANCE COMPANY OF CANADA, INGOSSTRAKH INSURANCE COMPANY LTD. and GREAT NORTHERN INSURANCE COMPANY**

Defendants

## AFFIDAVIT No. 2

I, Peter Solomon, of Toronto, Ontario, Professor of Political Science and Law, MAKE OATH AND SAY THAT:

1.     I have personal knowledge of the matters herein after deposed to except or otherwise stated to be on information and belief. Throughout my career I have studied and written about the reform of courts and law in the USSR and post-Soviet Russia, and in recent years participated directly in this process.

2.     I am a Professor in the Department of Political Science, cross-appointed to the Faculty of Law, and Director of the Centre for Russian and East European Studies, all at the University of Toronto. I have specialized in Soviet and Post-Soviet law for thirty-five years. My experience includes a year at the Law Faculty of Moscow State University as well as many research trips to Russia as a guest of the Institute of State and Law in Moscow. I am fluent in Russian and follow closely both the legal journals and the

{17/06/2004,E0329270.DOC;1}

popular press of Russia. As further evidence of my qualifications to offer an expert opinion on this matter, attached hereby and marked as Exhibit "A" is my curriculum vitae.

3.  In the past five years I have been actively involved in judicial reform in Russia through work with the World Bank and the Canada-Russia Judicial Partnership (a CIDA funded project based at the Office of the Commissioner for Federal Judicial Affairs). In this context I have helped to develop three model district courts, and designed and taken part in activities involving judges on the Constitutional, Supreme, and Supreme *Arbitrazh* Courts. I am personally acquainted with many of the judges on these courts and lower courts, as well as with leading legal scholars in the Russian Federation.

4.  In addition, I am a member of the Board of Trustees of one of the leading legal NGOs in Russia, the Institute of Law and Public Policy. I write frequently for publication in Russian journals.

5.  I have served as an expert witness in a series of court cases in Canada and the United States, especially relating to criminal and immigration disputes, as well as in refugee claims heard by the Immigration and Refugee Board of Canada.

6.  The Defendant in this Alberta, Canada action, Ingosstrakh Insurance Company Ltd., has requested my opinion on the adequacy of the courts of the Russian Federation. Based on my personal knowledge and experience with Russian law in action, I do not believe that there is any reason to conclude that courts in Russia would not provide an adequate forum. The Russian courts are competent to adjudicate the Plaintiffs' claim for breach of an insurance contract. The determination of the meaning of the insurance contract with Ingosstrakh also depends upon Russian expertise. In fact, on all matters connected to this case, the Russian courts (especially the *Arbitrazh* courts) represent the most competent forum for reviewing the matters under dispute.

{17/06/2004,E0329270.DOC;1}

7. The *Arbitrazh* courts that began work in 1991 grew out of the system of "state *Arbitrazh*" in the former USSR. The state *Arbitrazh* tribunals were established in 1930 to hear and resolve disputes between state-owned enterprises with respect to their contractual relations. While once envisioned as an informal means of dispute resolution (hence the use of the Russian word for arbitration in its name), the tribunals quickly acquired all of the characteristics of a formal court. When the Soviet regime began legalizing private entrepreneurial activity in the late 1980s, bodies of state *Arbitrazh* became the logical venue for handling legal disputes among private firms. In July 1991 the Russian Federation "Law on *Arbitrazh* Courts" codified this role, and in the 1992 the first of three *Arbitrazh* Procedure Codes was promulgated. The Federal Constitutional Law on *Arbitrazh* courts of 1995 established a three-tier system of courts for dealing with commercial disputes, including bankruptcy and taxation matters. Amendments to that law of July 4, 2003, provided for a fourth tier (more below). The use of the word *arbitrazh* in the name of these courts exists only for historical reasons. As the RF Constitution of 1993 explains, *Arbitrazh* courts are full-fledged courts, fully the equal of other courts. Some English translations describe them as Commercial Courts, a name that captures many of their functions. A publication of the U.S. Department of Commerce, *Handbook on Commercial Dispute Resolution in the Russian Federation*, provides a helpful review of the *Arbitrazh* court system, as well as courts of general jurisdiction, as of 2001.

8. The *Arbitrazh* court system, as noted in the previous paragraph, is expanding from three to four levels. The lowest level, the *Arbitrazh* courts of the regions and republics, are now meant to be exclusively first instance cases. The ten Federal Circuit *Arbitrazh* courts perform cassation review over decisions of the lower courts. The 2003 amendments to the Law on *Arbitrazh* Courts (Article 33 of Chapter 3) calls for the establishment of twenty *Arbitrazh* appeals courts, to which persons unhappy with the results of first instance hearings must resort before asking for cassation review. As of early summer 2004, these new courts were being set up, and they will ensure that appeals of first instance judgments will be heard at a different court. Finally, the Supreme (or Higher) *Arbitrazh* Court in Moscow has original jurisdiction over a small number of

disputes, exercises supervisory review of the other *Arbitrazh* courts, and can reopen cases in the light of newly discovered circumstances.

9. The jurisdiction of the *arbitrazh* courts extends to disputes over the fulfilment of contracts, including over non-payments, other violations of the rights of business firms, bankruptcy proceedings, and tax disputes involving business firms.

10. The *Arbitrazh* Procedure Code of the RF (2002) provides that the court system is to operate under principles of legality and independence. Article 4 protects interested (concerned) persons' right of access to the courts; Article 5 guarantees the independence of judges; Article 6 establishes the principle of legality; Article 7 prescribes the principle of equality before the law; and Articles 8 and 9 ensure equal rights to all parties on the basis of adversarialism. Article 12 protects the rights of persons who do not know the Russian language and Article 11 requires open proceedings at trial with some exceptions. Article 44 describes the procedural rights of participants in *Arbitrazh* court proceedings, including the rights to present evidence, ask questions, and object to the evidence and questions presented by other parties. Article 56 establishes the right of the court to summon witnesses to give evidence and Article 66(4) gives participants the right to petition the court to obtain summons of witnesses and other evidence. Article 59 guarantees the right of participants to have legal representatives act on their behalf in court.

11. The procedural rules for *Arbitrazh* courts provide for the full discovery of evidence relevant to matters before them. The mechanisms for discovery, described in Chapter 7 of the *Arbitrazh* Procedure Code closely resemble those available in European courts, such as those of Germany and France (Russian law generally belongs to the civil law tradition that was borne in Western Europe rather than the common law world, and its civil law had points in common with that of Quebec). *Arbitrazh* courts have clear authority under articles 66(4), 75, and 76 of the *Arbitrazh* Procedure Code to procure and preserve all evidence for which a party makes a showing of relevance.

12. In practice, courts in post-Soviet Russia, including the *Arbitrazh* courts, have not operated perfectly all of the time. Russia has been involved in a difficult transition process involving the privatization of state owned firms and the replacement of state control over the economy with a system of law-based commercial relations. From 1992 the country's leadership, with significant international support, has invested in strengthening and protecting the integrity of the judicial system, including the *Arbitrazh* courts. My work with judges, court administrators, and other actors in Russian courts and extensive study of their operations leads me to conclude that the leaders of the Russian judicial community are committed to making the legal guarantees contained in the procedural codes a reality for all participants. It is realistic for persons who litigate in these courts to expect a fair and disinterested resolution of business disputes based on the law and the evidence.

13. In addition, the *Arbitrazh* courts can handle the dispute in question expeditiously. Article 153 of the *Arbitrazh* Procedure Code imposes a one month time limit on the consideration of a case by the trial court, a period that starts when the court accepts a case for hearing. There are analogous regulations for the cassation and appeals processes. To be sure, exceptions to the strict time limits exist, but in general courts in Russia (including the *Arbitrazh* courts) process the cases that come before them expeditiously and in much less time than do Canadian courts with analogous civil disputes.

14. The courts of general jurisdiction, the other hierarchy of courts that deal with civil (as well as criminal and administrative) cases, were developed by Soviet authorities after the Revolution along the lines of courts existing in Europe. Basically, these courts had jurisdiction over all legal disputes except those among state enterprises. Each of the fifteen union republics had its own court system, and that of the Russian federation comprised of district (or peoples) courts, regional courts, and the Supreme Court of the Russian Federation. After the dissolution of the USSR and the creation of the *Arbitrazh* courts, the courts of general jurisdiction continued to operate. Based on legislation from 1998, a new lower layer of these courts was established--the so-called Justices of the Peace--that assumed responsibly for a large part of the civil cases previously heard by

Case 1:04-mc-00281-CKK   Document 7-17   Filed 11/18/04   Page 6 of 15

6

district courts (especially divorce and property disputes of small value). Under the Code of Civil Procedure, courts of general jurisdiction hear cases involving tort, contract, and other private disputes. In particular, if a dispute involves an individual acting in his or her own capacity rather than as agent of an organization, and who is not a registered individual entrepreneur, then a court of general jurisdiction, and not an *Arbitrazh* court, will hear the case. The leaders of the *Arbitrazh* courts and courts of general jurisdiction try to coordinate their activity to ensure that the jurisdiction of the two court systems is clear and does not overlap.

15. Like the *Arbitrazh* courts, courts of general jurisdiction operate under the principles of legality and independence. Judges have the authority to compel production of evidence, including testimony from third parties and experts. In all significant respects, the procedural rights of persons who participate in the civil proceedings in these courts are the same as those who appear before the *Arbitrazh* courts. Stringent time limits apply to civil cases within these courts, as specified in Article 154 of the Civil Procedure Code of 2002. Judges of these courts, like their colleagues on the *Arbitrazh* courts, have benefited from programs supported by international agencies such as the World Bank and TACIS and foreign governments (including Canada) to improve their operations and protect their integrity. At the same time, the Program for the Development of the Courts, 2002-2006, initiated by President Putin, has led to a revolution in funding for the courts and a whole series of changes that enhance the efficiency and fairness of their operations. It is realistic for persons who litigate in courts of general jurisdiction, as in *Arbitrazh* courts, to expect a fair and disinterested resolution of business disputes based on the law and evidence.

16. The Russian courts are entitled to hear disputes against all persons at any place where at least one of those persons is located. In situations where a person, or firm, has multiple locations or there are several defendants with different locations, the plaintiff may choose among those locations. Suits against Russian citizens and organizations that have foreign locations may be brought at the place of the plaintiff's location or wherever the respondent has property. Foreign firms with a representative office or subsidiary in

Russia are subject to a court's jurisdiction at the location of the office or subsidiary. Suits against foreign persons who do not have a representative office or a subsidiary in Russian may be brought before the courts if the claim involves a contract that is to be carried out in Russia, is based on a tort or unjust enrichment that occurs in Russia, or the foreign person has consented to jurisdiction.

17. The complaint in this case involves allegations that various legal persons (or entities) and individuals acted together to harm the plaintiffs. Disputes between legal entities are heard in the *Arbitrazh* court alone (according to Article 27 of the *Arbitrazh* Procedure Code of 2002). Moreover, Resolution of the Plenum of the Supreme Court of the RF of January 20, 2003 clarifies that according to Article 33 of the *Arbitrazh* Procedure Code disputes between shareholders and companies or other economic organizations (excluding labor disputes) belong to the jurisdiction of the *Arbitrazh* courts. This point includes disputes about takeovers and it would seem that it applies to this case. At the same time, the plaintiffs can select any venue in Russia in which one of the defendants was located. But since the main office of Ingosstrakh is in the city of Moscow, where the *Arbitrazh* court is used to handling major disputes, this would seem to the most likely choice. In any event, a single court handles the entire case (as long as it remained only civil and did not involve criminal charges).

18. Russian law would recognize claims of the sort raised by the plaintiffs in this case. To be sure, during much of the Soviet period, the regulation of economic activity was handled outside of the Civil Code of the RSFSR, itself based upon the German Civil Code. But since the breakup of the USSR, and with it the expansion of private commerce and return of commercial property rights, Russia has enacted a new Civil Code that resembles the basic private law in modern capitalist countries. The first part of the new Civil Code went into effect on January 1, 1995; the second part on March 1, 1996, and the third part on March 1, 2002.

19. Russian law has had a long connection with the private law of property and contract, even if during the Soviet period its state-run economic did not operate along

these lines. The Soviet Union also maintained a strong academic expertise in civil law, which was reflected in the training of the judges who came to work at the *Arbitrazh* courts. For example, Dr. Veniamin Iakovlev, the chairman of the Supreme *Arbitrazh* Court, is a distinguished professor of civil law with a particular expertise in the law of property.

20. The Russian Civil Code provides full remedies for conversion of property and breaches of contract, including for indirect involvement or participation in conversion and for injuries due to fraud. The courts have broad remedial powers to make the victims of such injuries whole, and in particular the authority to award damages for loss of profits and other types of injuries. Although Russian law may not provide an exact counterpart to civil liability in Canada, in all salient respects it offers equivalent causes of action and remedies to those sought by plaintiffs. Similarly, Russian law would provide a means of compensating injuries caused by illegal interference with contractual rights, even though it is not the exact equivalent to the common law tort of intentional interference with contractual rights.

21. In light of the above, I am confident that the plaintiffs, if they could prove that the defendants failed to act in good faith in pursuing their claims, could obtain a satisfactory and sufficient remedy from Russian courts. Moreover, only Russian courts are in a position to assess the nature of the change in ownership of the property in question.

22. For all these reasons, I believe that Russia would provide an appropriate forum for litigation of the sort brought against the defendants in this action.

23. I make this Affidavit in support of an application to set aside the service of the Statement of Claim, or in the alternative to strike out, dismiss or stay this action on the basis that Alberta is *forum non conveniens*.

SWORN BEFORE ME AT the City of
Toronto, Ontario this 24th day of
June, 2004

_____
Peter Solomon

_____

NEIL HAROLD DOBBS, Notary Public,
City of Toronto, limited to the attestation of instruments
and the taking of affidavits, for the University of Toronto.
Expires April 22, 2005.

This is Exhibit " A " referred to in the
Affidavit of

Peter H. Solomon, Jnr

Sworn before me this 24th day
of June A.D., 20 04

N H Dobbs

NEIL HAROLD DOBBS, Notary Public,
City of Toronto, limited to the attestation of Instruments
and the taking of affidavits, for the University of Toronto.
Expires April 22, 2005.

# PETER H. SOLOMON, JNR.

## Short Curriculum Vitae
### (June 2004)

1. **Present Positions**

    Professor of Political Science, Law, and Criminology, University of Toronto, and Director of the Centre for Russian and East European Studies, University of Toronto.

2. **Education**

    B.A. (History) - 1964 - Harvard College - *magna cum laude*
    M.A. (Political Science) - 1967 - Columbia University
    Certificate of the Russian Institute - 1967 - Columbia University
    Ph.D. (Political Science) - 1973 - Columbia University

3. **Major Fellowships and Current Activities**

    Exchange student/scholar, Law Faculty, Moscow State University, 1968-1969, supported by a Fulbright Hays Fellowship.

    National Fellow, Kennan Institute of Advanced Russian Studies, 1978.

    Lady Davis Professorial Fellow, Hebrew University, 1985.

    Exchange Scholar at Institute of State and Law, Moscow, May-June, 1986 (IREX); April, 1990 (IREX); May, 1991 (AUCC); May, 1992; October, 1993; October, 1995.

    Coeditor and managing editor, *Bulletin on Current Research in Soviet and E.E. Law* (published 3 times a year, 1981-present).

    Research Contract, Soviet Interview Project, University of Illinois, 1985-1987, to support interviews with émigré jurists from the USSR.

    Member, ACLS-SSRC, Joint Committee on Soviet Studies, Subcommittee on Soviet Politics, 1986-1992

    Coorganizer of Conference, "Shostakovich and the Politics of Soviet Culture" (Jan., 1988).

    Director, First, Second, Third, Fourth, Fifth, Sixth and Seventh Annual Workshops on Soviet Domestic Politics and Society, held in Toronto, sponsored by the Social Sciences Research Council and funded by the Carnegie Corporation, 1988, 1989, 1990, 1991, 1992, 1993, 1994.

    Consultant, Supreme Court of Canada, 1988. In connection with visit of members of the USSR Supreme Court.

    Consultant, Department of Justice, Canada, 1990-1992.

    Acting Director, Centre for Russian and East European Studies, Univ. of Toronto, 1991; 1995-1996.

John Simon Guggenheim Memorial Fellowship, 1991-92.

Consultant and expert witness for refugee claims, 1991-present.

Consultant/Contributor to programs providing assistance to newly independent states of the Former Soviet Union (especially re: legal development and training in social science): Central and East European Law Initiative of the American Bar Association, the Rule of Law Consortium (Checqui-ARD), Chemonics International, the Civic Education Program (New Haven), Research and Training for Reform (AUCC, Ottawa), 1992-.

Principal Investigator (with four other scholars) for the Stalin-Era Research and Archives Project, a long-term, multidisciplinary, collaborative research project devoted to reinterpreting Politics and Society of the USSR under Stalin and funded by the Social Sciences and Humanities Research Council of Canada 1994-2000.

Organizer of Conference, "Judicial Reform in Russia: An Historical Perspective, 1864-1994," Toronto (March-April 1995).

Expert Consultant, Constitutional and Legislative Policy Institute (Budapest), 1997, to help with the preparation of a new commentary on the Russian Constitution of 1993.

Research Consultant, Constitutional and Legislative Policy Institute (Budapest), 1997-1998, to write a policy analysis paper on court reform in Russia.

Co-Director, Seminar on "Legal Research in the Former Soviet Union," MacArthur Foundation, Moscow, 2-4 June 1997.

Research Consultant, National Institute of Justice/University of Kansas, to write concept paper "Crime, Criminology and Criminal Justice in Ukraine" (with Todd Foglesong), spring-summer 1999.

Member of Editorial Board, *East European Constitutional Review*, 1999-2003

Consultant, World Bank, 1999 and 2003, to evaluate and develop judicial reform programs in Russia.

Consultant, Canada-Russia Judicial Partnership Programme, 2000-

Expert Consultant, Constitutional and Legislative Policy Institute (Budapest), 2001- to supervise monitoring of judicial independence in four post-Soviet states.

Member, Board of Trustees, Institute of Public Policy and Law, Moscow, 2000-

Consultant, DIAND, 2002- (organizing conferences on law and federalism in Russia and Canada and editing the proceedings)

4.  **Selected Recent Publications**

    **Books:**

*Soviet Criminologists and Criminal Policy: Specialists in Policy-Making* (N.Y.: Columbia University Press, and London: Macmillan, 1978).

*Criminal Justice Policy; From Research to Reform* (Toronto: Butterworth's, 1983).

*Soviet Criminal Justice under Stalin* (Cambridge: Cambridge University Press, 1996); and in Russian as *Sovetskaia iustitsiia pri Staline* (Moscow: Rosspen, 1998).

*Reforming Justice in Russia, 1864-1996: Power, Culture, and the Limits of Legal Order* (Armonk, M.E.Sharpe, 1997), editor and author of two chapters.

*Courts and Transition in Russia: The Challenge of Judicial Reform*, coauthor with Todd S. Foglesong (Boulder, Colorado: Westview, 2000).

*Crime, Criminal Justice, and Criminology in Post-Soviet Ukraine*, coauthor with Todd S. Foglesong (Washington, D.C.: National Institute of Justice, 2001).

*Making Federalism through Law: Canadian Experience and Russian Reform under Putin*, editor (Toronto: Centre for Russian and East European Studies, 2003).

*The Dynamics of "Real Federalism": Law, Economic Development, and Indigenous Communities in Russia and Canada* (Toronto: Centre for Russian and East European Studies, 2004).

*Model District Courts in Action: Achievements and Lessons in a Russian-Canadian Collaboration*, coauthor with Pamela Ryder-Lahey (Ottawa:: Federal Judicial Affairs, 2004).

**Articles:**

"Soviet Penal Policy, 1917-1934: A Reinterpretation," *Slavic Review* (June, 1980), 195-217.

"The Policy Process in Canadian Criminal Justice," *Canadian Journal of Criminology* (January, 1981), 5-25.

"Criminalization and Decriminalization in Soviet Criminal Policy, 1917-1941," *Law and Society Review*, Vol. 16, No. 1 (1981), pp. 9-43, and in *Perspectives on Soviet Law for the 1980s* (edited F.J.M. Feldbrugge and W. Simons; Leiden, 1982), 123-151.

"Government Officials and the Study of Policy-Making," *Canadian Public Administration*, 26, no. 3 (Fall, 1983), 420-440.

"Local Political Power and Soviet Criminal Justice, 1922-1941," *Soviet Studies*, 36, no. 3 (Summer, 1985), 305-329.

"The Law Reform Commission of Canada's proposals for Reforms of Police Powers: An Assessment," *Criminal Law Quarterly* (June, 1985), 321-351.

"Legal Journals and Soviet Social History," in *Russian History*, 12:2-4 (Summer-Fall-Winter, 1985), 265-282.

"Soviet Criminal Justice and the Great Terror," *Slavic Review*, 46:3-4 (Fall-Winter, 1987), 391-413.

"The Case of the Vanishing Acquittal: Informal Norms and the Practice of Soviet Criminal Justice," *Soviet Studies*, 39:4 (October 1987), 531-555. Preprinted as Soviet Interview Project Working Paper #28 (Jan. 1987).

"The Role of the Defense Counsel in the USSR: The Politics of Judicial Reform under Gorbachev," *Criminal Law Quarterly* (Dec., 1988), 1-18.

"The USSR Supreme Court: History, Role and Future Prospects" *American Journal of Comparative Law* (Winter, 1990), 201-215.

"Gorbachev, Judicial Reform and Soviet History", in Albert Schmidt, ed., *The Impact of Perestroika on Soviet Law*. (Dordrecht: Kluwer, 1990), 15-22.

"Laws and Administrative Acts: Sources and Finding Aids" to appear in *Sources on the Social History of the Prewar Stalin Period*, edited by Sheila Fitzpatrick and Lynne Viola, (White Plains: Myron Sharpe, 1990).

"Gorbachev's Legal Revolution," *Canadian Business Law Journal*, 17:2 (Dec., 1990), 184-194.

"Politics and Crime: A Survey", prepared for *Criminology: A Reader's Guide*, Edited by Jane Gladstone, et al., (Toronto: Centre of Criminology, 1991), 157-76.

"Legality in Soviet Political Culture: A Perspective on Gorbachev's Reforms," in *Stalinism and its Aftermath* (Ed. N. Lampert and G. Rittersporn; London: Macmillan, 1991), 260-287.

"Soviet Politicians and Criminal Justice: The Logic of Party Intervention", in James Millar, ed., *Cracks in the Monolith* (Armonk: Sharpe, 1992), 3-32.

"Reforming Criminal Law under Gorbachev," in *Toward the Rule of Law in Russia?* (Ed. Donald Barry; Armonk: Sharpe, 1992).

"Criminal Justice and Soviet Industrialization," in *Social Dimensions of Soviet Industrialization*, (Edited by Lewis Siegelbaum and Bill Rosenberg; Bloomington: Indiana Univ. Press, 1992), 223-247.

"The Limits of Legal Order in Post-Soviet Russia," *Post-Soviet Affairs*, 11:2 (1995); updated and expanded in Russian edition, as a booklet *Problemy razvitiia pravovogo stroia v post-Sovetskoi Rossii* (Moscow: Tsentr konstitutsionnykh issledovanii, 1997).

"Courts and their Reform in Russian History," in Solomon, ed., *Reforming Justice in Russia* (1997).

"The Bureaucratization of Criminal Justice under Stalin," in Solomon, ed., *Reforming Justice in Russia* (1997).

"The Persistence of Judicial Reform in Post-Soviet Russia", *East European Constitutional Review*, 6:4 (Fall 1997), 50-56; published in French as "La difficile reforme de la justice en Russie," *Esprit*, 7 (July, 1998), 112-125; in Russian in *Konstitutsionnoe pravo: vostochnoevropeiskoe obozrenie*, No.2 (1999), 38-43.

"The Two Faces of Crime in Post-Soviet Ukraine," (with Todd S. Foglesong), *East European Constitutional Review*, 9:3 (Summer 2000), 72-76; published in Russian in *Konstitutsionnoe pravo: vostochnoevropeiskoe obozrenie*, No.3 (2000), 26-30.

"The Procuracy and the Courts in Russia," *East European Constitutional Review*, 8:4 (Fall 2000), 105-108; published in Russian in *Konstitutsionnoe pravo: vostochnoevropeiiskoe obozrenie*, No.1 (2001).

"Putin's Judicial Reform: Making Judges Accountable as well as Independent," *East European Constitutional Review*, 11:1-2 (Winter-Spring, 2002), 101-107; and in Russian in *Konstitutsionnoe pravo: vostochnoevropeiiskoe obozrenie*, No.38 (2002).

"Sudebnaia reforma v Rossii: Dvizhenie skvoz vakuuma," ("Judicial Reform in Russia: More than Meets the Eye but Hard to Achieve in a Vacuum"), *Otechestvennye zapiski*, 11 (2003), 79-86.

"Prodvizhenie i obogashchenie sudebnoi reformy v Rossii: Vzgliad so storony," (Advancing and Enriching Judicial Reform in Russia: An Outside View), *Rossiiskaia iustitsiia*, 2003, no.6.

"The New Justices of the Peace in the Russian Federation: A Cornerstone of Judicial Reform?" *Demokratizatsiya*, 11:3 (Summer 2003), 363-380.

"Sudebnaia vlast v Rossii: skvoz prismu admnistrativnoi iustitsii," (Judicial Power in Russia: Through the Prism of Administrative Justice), *Konstitutsionnoe pravo: vostochnoevropeiskoe obozrenie*, 2003, no3 (44), 108-124.

"Sudi i Konstitutsiia Rossiiskoi Federatsii: desiat let spustia," (Courts and the Constitution of the Russian Federation: A Ten Year Restrospective), *Konstitutsionnoe pravo: vostochnoevropeiskoe obozrenie*, 2003, no.4 (45), 140-148.

5. **Research in Progress**

   a) "Judicial Reform in Post-Soviet Russia"
      An inquiry into the politics of reforming the courts and expanding the role of law in Russia since 1985. To date, this project has produced fourteen articles, an edited book, and a coauthored book, *Courts and Transition in Russia.*. I also plan to write a scholarly book on courts and court reform in Russia for a series on contemporary Russian governmental institutions.

   b) "Legal Transitions in Comparative Perspective"
      An investigation of the conditions that facilitate the development of legal order, especially in countries trying replace authoritarian institutions with democratic ones.

   c) "Citizenship in Post-Soviet States: Law and Politics".
      The making and implementation of new laws on citizenship in the successor states, with special emphasis on the legal and administrative treatment of minorities

Deponent: Peter Solomon
Date Sworn: June 24, 2004

Action No.: 0201 11097

IN THE COURT OF QUEEN'S
BENCH
OF ALBERTA
JUDICIAL DISTRICT OF CALGARY

BETWEEN:

**NOREX PETROLEUM LIMITED and
ZAO YUGRANEFT CORPORATION**

Plaintiffs

and

**CHUBB INSURANCE COMPANY OF
CANADA, INGOSSTRAKH
INSURANCE COMPANY LTD. and
GREAT NORTHERN INSURANCE
COMPANY**

Defendants

## AFFIDAVIT NO. 2

*Brownlee LLP*
Barristers and Solicitors
2200, Commerce Place
10155 - 102 Street
Edmonton, Alberta T5J 4G8

**J. ROBERT BLACK**
Phone: 497 - 4826
Fax: 424 - 3254

File#: 75797-001/JRB



# 63159.

{23/06/2004,E0130519.DOC;1}