SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

TPT Ltd. on its own behalf, TPT Ltd. on behalf
of Kantupan Holdings Co., Ltd. and Siberian
Far Eastern Oil Company,

                              Plaintiff,

                  -against-

Leonard Blavatnik, Access Industries, Inc.,
Renova, Inc., Tyumen Oil Company,

                              Defendants,

Kantupan Holdings Co. Ltd., and Siberian Far
Eastern Oil Company,

                              Nominal Defendants.

Index No. _____

**COMPLAINT**

Plaintiff TPT Ltd. ("TPT") for its complaint against Defendants Leonard
Blavatnik, Access Industries, Inc. ("Access"), Renova, Inc. ("Renova"), and Tyumen Oil
Company ("TNK") alleges, based on facts where known and in all other instances upon
information and belief, as follows:

## NATURE OF THIS ACTION

1.      This is a commercial dispute largely concerning decisions and actions
taken in New York regarding assets located in Russia.

2.      Plaintiff TPT is a single purpose investment vehicle designed to invest, on
behalf of American and foreign investors, in the Siberian Far Eastern Oil Company ("Sidanco"),
through Kantupan Holdings Co. Ltd. ("Kantupan"), another single purpose investment vehicle
that owns an interest representing more than 40% of Sidanco.

3.      Sidanco is currently being victimized by one of the most bizarre and
brazen acts of corporate theft in recent memory. Defendants literally have stolen one of
Sidanco's key assets – Kondpetroleum, an oil production company that formerly accounted for

approximately 13% of Sidanco's oil production. Defendants are further poised to purloin another Sidanco subsidiary – Chernogorneft, an oil production company that controls much of the famed Samotlor, "an almost mythic field" (Wash. Post, Oct. 27, 1999) that is believed to contain the world's second largest oil deposit. Defendants also have stolen massive quantities of oil produced by both Kondpetroleum and Chernogorneft.

    4.     Defendants' vehicle for this grand-scale theft is the Russian bankruptcy process. As reported in the October 19, 1999 Moscow Times, "Russian business is notoriously criminalized, and the bankruptcy process often opens up incredible vistas of theft." The typical blueprint for "bankruptcy theft" in Russia incorporates the following elements:

    a)   The perpetrator becomes a creditor of the target company in order to force it into receivership or to infiltrate an existing bankruptcy.

    b)   The process invariably moves forward with the assistance of corrupt judges and regional officials who protect the scheme against legal attacks and secure the appointment of an External Manager (i.e., under Russian law, the administrator of the bankrupt company akin to a trustee under a U.S. bankruptcy proceeding) allied with the perpetrator.

    c)   In complete defiance of his duties and using his far-reaching and absolute powers under Russian bankruptcy law, the External Manager thereafter facilitates the perpetrator's ability to obtain assets of the bankrupt company at bargain-basement prices (in effect, to steal the company's assets).

    d)   Finally, the target company is either stripped of valuable assets and left to die, or alternatively, wholly absorbed by the perpetrator.

    5.     Defendants' attack on Sidanco and its subsidiary entities strikingly illustrates this practice. In September 1998, Defendant TNK, a Russian oil company "which [Defendant Leonard] Blavatnik jointly controls with one of Moscow's banking tycoons" (Wash. Post, October 27, 1999), inspired the bankruptcy of Kondpetroleum. With the assistance of a

TNK-controlled External Manager and a corrupt court, TNK proceeded to steal Kondpetroleum
oil through a transfer pricing scheme in which the External Manager illegally sold the oil at rock
bottom prices to TNK-related entities, who then resold the oil at a tremendous profit. TNK
ultimately misappropriated Kondpetroleum in its entirety by virtue of a rigged bankruptcy
"auction."

     6.     Chernogorneft's bankruptcy also was initiated in September 1998. TNK
soon thereafter commandeered the Chernogorneft bankruptcy, plundered Chernogorneft oil, and
caused the External Manager to schedule a sham "auction" of Chernogorneft for November 26,
1999. The TNK-controlled bankruptcies were utterly devoid of any attempts to maximize the
value of the companies or to serve the purpose of the bankruptcy process and return the
companies to solvency. To the contrary, every action undertaken by Defendants has been
calculated to steer the companies toward liquidation by so-called "auctions." These auctions are,
in reality, one-horse races designed to result in asset liquidation "sales" at fire-sale prices
determined by Defendants.

     7.     The sham nature of the Chernogorneft bankruptcy and the illegality of the
bankruptcy process are amply illustrated in the report accompanying the order suspending the
license of the current External Manager Alexander Gorshkov, issued by the Federal Service of
Russia for Insolvency Proceedings and Financial Rehabilitation ("FIS") on September 21, 1999
(attached hereto as Exhibit "A"; translation of order attached hereto as Exhibit "B"), in which the
FIS made numerous findings, including the following:

> Basing on the estimates made, OAO "Chernogorneft" is able
> during the external management period to regain its solvency in
> full and repay the total amount of the debts being under
> moratorium. In this situation the sale of the enterprise (business)
> of OAO "Chernogorneft", provided for by the plan of external
> management, cannot be considered as substantiated. The said acts,
> and the fulfillment by the debtor of contracts for delivery of oil at
> the known low prices will be detrimental to the debtor
> organization, its creditors, and will also damage the interests of the
> shareholders of OAO "Chernogorneft." (emphasis added)

     8.     The FIS's findings did nothing to deter either the court in which the
Chernogorneft bankruptcy is pending or the TNK-controlled creditors' committee from allowing

Gorshkov to move the bankruptcy process inexorably toward the illegal transfer of Chernogorneft to a company affiliated with Defendants.

        9.    Defendants' maneuvering has prompted them to declare victory regarding the "auction" of Chernogorneft before the auction itself. On November 17, 1999, more than one week before the so-called "auction," Defendants, through Alexander Knaster, the Chief Executive Officer of Alfa Bank, a member of the Alfa Group Consortium (Leonard Blavatnik's partner in TNK), made the following offer to Sidanco's shareholders: "We are prepared to step away from the auction of Chernogorneft or (in case the agreement can not be reached in time) to contribute Chernogorneft back to Sidanco in exchange for a 35% share in Sidanco." (emphasis added).

        10.    Defendants' actions are so transparent that many aspects of their assaults on Sidanco and its subsidiaries are well-documented by the international press. For example, in reporting on "TNK's vulterine campaign to tear apart rival Sidanco," the Moscow Times recently noted that "TNK has already purchased one Sidanco subsidiary, Kondpetroleum, and will undoubtedly walk away with Chernogorneft, despite evidence of breaches in legal procedures surrounding the bankruptcy of these two Companies." (Moscow Times, Nov. 16, 1999). Similarly, the International Herald Tribune noted on October 25, 1999 that, in the view of many industry analysts, TNK "has used the bankruptcy process to strip away Sidanco assets like Kondpetroleum at exceedingly low prices." As David Kramer, Associate Director of the Russian and Eurasion Program at the Carnegie Endowment for International Peace, noted in the October 21, 1999 edition of the Washington Times:

> Two months ago, on the eve of a crucial creditors' meeting, [TNK] paid the $15 million Chernogorneft owed Ex-Im into an escrow account; on Sept. 9, Ex-Im after initial hesitation, accepted the money and closed its books on Chernogorneft. This violates bankruptcy principles that call for all debts to be settled simultaneously as well as Russian Insolvency law. It also means that with its debts covered, Ex-Im abdicates its responsibility as a major creditor and loses its vote on Sidanco's future. Other creditors including BP Amoco. suspicious that [TNK] is influencing bankruptcy courts behind-the-scenes, not surprisingly have objected to [TNK's] move.

In buying two-thirds of Chernogorneft's creditors, including
settling Ex-Im's share, [TNK] has increased its chances of
acquiring all of Chernogorneft, liquidating it and stripping its
assets. Without Chernogorneft, Sidanko becomes worthless.

. . . . The court-appointed external manager for the bankruptcy,
who is clearly sympathetic with [TNK], has proposed the sale of
Sidanko assets through closed tender with no guarantee that
creditors will be repaid. [TNK], following months of shady
activity, now appears positioned to acquire its long-sought prize,
leaving BP Amoco and other investors out in the cold.

11.      Incredibly, Defendants now are attempting to obtain U.S. taxpayer money

to, in the words of a Moscow Times commentator, "financ[e] TNK's hostile bid for

Chernogorneft." (Moscow Times, Sept. 9, 1999). As detailed in the October 27, 1999 edition of

the Washington Post, Defendant Leonard Blavatnik is actively pursuing from U.S. Export-Import

Bank ("Eximbank") loan guarantees totaling almost $500 million:

In the last two years, Blavatnik has demonstrated that he can also
play the Washington game, as he fights to nail down nearly $500
million in U.S.-backed credits critical to his Russian venture.

. . . . Blavatnik and his companies have made thousands of dollars
in political contributions, hired a Washington lobbyist and
employed a U.S. public relations firm to help plead their case. The
U.S. Export-Import Bank is in the final stages of approving the
loans, the first major American assistance for a Russian enterprise
since last year's collapse of the ruble.

. . . . None [among the Russian tycoons] have more at stake in the
Washington connection than Blavatnik, a U.S. citizen who
exemplifies a new breed of Russian-born business executives who
can maneuver with equal ease in Moscow and Washington.

"The American connection is of crucial importance," says
Blavatnik, who, together with relatives and associates, has
contributed at least $20,000 to House International Relations
Committee Chairman Benjamin A. Gilman (R-N.Y.) since 1996.
His New York-based company, Access Industries, gave $20,000 to
the House Republican campaign organization last year and
followed up with $20,000 to the Republican National Committee
last month.

The Washington strategy has borne fruit for Tyumen Oil Co.,
which Blavatnik jointly controls with one of Moscow's banking
tycoons. [T]he Ex-Im Bank -- with Gilman's backing and Akin,
Gump's lobbying on Blavatnik's behalf -- is on the verge of
guaranteeing $489 million of credits for [TNK].

. . . . So far, Blavatnik has been winning the fight. In May, the Ex-
Im Bank tentatively agreed to guarantee a $197 million loan to

5

modernize one of Tyumen Oil Co.'s aging refineries using U.S.
equipment and suppliers. The following month. it did the same for
a $292 million credit that would enable Halliburton Co. of Houston
to refurbish [TNK's] Samotlor field . . . .

A Russian who came to the United States in 1978 at 18, Blavatnik
attended Harvard Business School, then made several million
dollars in New York real estate and other ventures. The political
changes in the Soviet Union drew him back to Russia in 1991, and
into the lucrative but notoriously violent metals trading business.

Then in 1997 he teamed with one of Russia's leading oligarchs,
Mikhail Fridman of Alfa-Bank, to take control of a privatized
Tyumen Oil Co. The acquisition gave him and his partner control
of Samotlor, an almost mythic field.

. . . . Political connections are crucial in Russia's new capitalism,
so Blavatnik and his partners placed local Siberian politicians –
including the governor of the Tyumen region – on their company's
board.

[TNK] officials acknowledge helping to arrange bankrupt
Chernogorneft's repayment of a $17 million Ex-Im Bank loan
several months ago. As a result, Ex-Im Bank was dropped from
the creditor's committee and [TNK] acquired effective control.
Moreover, some congressional aides note, control of
Chernogorneft, which adjoins [TNK's] own holdings, could help
[TNK] repay the proposed U.S.-backed loans for Samotlor by
generating cash.

12.     Plaintiff brings this derivative action to enforce the tort claims of Sidanco

arising from Defendants' unrelenting effort to strip Sidanco to the bone.

## PARTIES, JURISDICTION, AND VENUE

### Plaintiffs

13.     Plaintiff TPT is a limited liability company organized under the laws of

the Cayman Islands with its principal place of business in the Cayman Islands. TPT is a "single

purpose" investment vehicle designed specifically to invest in Sidanco – on behalf of American

and foreign investors (such as various funds for whom Soros Fund Management L.L.C. is the

principal investment advisor, Harvard University Endowment Fund, and Uni-Fund S.A. of

Switzerland) – through Kantupan, a single purpose investment vehicle designed specifically to

purchase shares in Sidanco. TPT holds a 25% interest in Kantupan, which in turn holds more

than a 40% ownership interest in Sidanco. Other direct shareholders in Sidanco include BP

Amoco and Interros Group/Unexim Bank.

14.    TPT also sues on behalf of Kantupan, in order to enforce Kantupan's derivative claims to Sidanco's tort claims against Defendants. Plaintiff TPT made a demand upon Kantupan to bring this action on Sidanco's behalf. Kantupan expressly rejected that demand.

15.    TPT also sues on behalf of Sidanco, in order to enforce Sidanco's tort claims against the Defendants described herein. Sidanco has been injured by Defendants' tortious conduct resulting in the theft of Sidanco's ownership interest in its subsidiary Kondpetroleum, the imminent theft of, and loss of possessory interest in, Chernogorneft, and the theft of Kondpetroleum and Chernogorneft oil. Sidanco is currently in bankruptcy. The External Manager of Sidanco is the only individual with authority to pursue Sidanco's tort claims alleged herein. TPT made a demand upon Sidanco to assert Sidanco's tort claims as set forth in this complaint. The External Manager of Sidanco expressly rejected that demand.

### Defendants

16.    Defendant TNK is a corporation organized under the laws of the Russian Federation with its principal place of business in the Russian Federation. The majority interest in TNK is held by Novy Kholdings, Inc. and Novy Petroleum, Inc., which together hold a 50.10% interest in TNK on behalf of a U.S.-Russian joint venture consisting of Defendant Leonard Blavatnik's New York companies Access and Renova on the one hand, and Alfa Group Consortium on the other hand. The balance of TNK stock is held almost entirely by the Russian government. TNK knowingly participated in the conspiracy alleged herein with Defendants Blavatnik, Access and Renova to commit the tortious acts alleged herein, and Defendants Blavatnik, Access and Renova took action in New York critical to, and in furtherance of, the conspiracy.

17.    Defendant Leonard Blavatnik is an individual and a citizen and domiciliary of the State of New York. Mr. Blavatnik currently is, and at all times relevant to this action has been, the President of and sole shareholder in Defendant Access, which in turn is the sole owner of Defendant Renova. Mr. Blavatnik has acted in New York on behalf of Defendant

TNK, and TNK has acted on Mr. Blavatnik's behalf at his direction and control, with respect to the matters alleged herein.

18.    Defendant Access Industries, Inc. is a corporation organized under the laws of the State of New York with its principal place of business in New York, New York. Access is the sole owner of Defendant Renova.

19.    Defendant Renova, Inc. is a corporation organized under the laws of the State of New York with its principal place of business in New York, New York.

### Nominal Defendants

20.    Nominal defendant Sidanco is a corporation organized under the laws of the Russian Federation with its principal place of business in Moscow.

21.    Nominal defendant Kantupan is a limited liability company organized under the laws of Cyprus with its principal place of business in Nassau, Bahamas.

### Jurisdiction and Venue

22.    This Court has jurisdiction over the subject-matter of this action under New York Judiciary Law § 140-b and Article 6, § 7 of the Constitution of the State of New York.

23.    This Court has personal jurisdiction over Defendants under NY CPLR §§ 301, 302, and 313 because Defendants are (i) corporations organized and existing under New York law and/or doing business in the State of New York; (ii) individuals who are present or domiciled in the State of New York; and/or (iii) individuals and entities who are subject to the New York long-arm statute, including, but not limited to, because they have participated in wrongful conduct which took place in the State of New York.

24.    Venue is proper in this county under NY CPLR § 503 because it is a county in which at least one of the parties resides at the time that this action is commenced.

## GENERAL ALLEGATIONS

### Privatization of Sidanco

25.   The Soviet Union collapsed in 1991. In its wake, the new Russian government took steps to decentralize the Soviet oil industry and open Russian industry to foreign investment. In 1992, the new government began privatizing the oil sector by restructuring the industry into 12 vertically-integrated companies ("VICs") and a small number of independent producers. The VICs are holding companies, and each VIC typically includes a number of subsidiaries: several oil production units, several refineries; and marketing units.

26.   The VICs initially were established as state-owned entities to be fully privatized through successive sell-offs of the state's controlling stake. Sidanco was established as one of these VICs in 1994, and it initially was comprised of a number of subsidiaries, including (i) Chernogorneft, an oil production unit which controls the newer, less developed portion of the Samotlor oil field and – prior to Defendants' tortious conduct – accounted for more than 30% of Sidanco's oil production, and (ii) Kondpetroleum, an oil production facility that accounted for 13% of Sidanco's oil production. Sidanco formerly owned the majority stake in Kondpetroleum, and currently holds a 73% interest in Chernogorneft.

27.   Sidanco and its subsidiaries were privatized through a series of auctions between 1995 and 1997. Western entities, including those represented by Kantupan and TPT, invested hundreds of millions of dollars for their stakes in Sidanco.

### Defendants' Decision to Strip Sidanco

28.   TNK – reportedly Russia's sixth largest oil company – was partially privatized in 1997. The controlling stake in TNK was purchased by Defendant Leonard Blavatnik's related New York companies Access and Renova ("Access/Renova") and Alfa Groupe Consortium ("Alfa") through their U.S.-Russian joint investment vehicles, Novy Kholdings, Inc. and Novy Petroleum. Access/Renova is heavily involved in the lucrative Russian metals industry. In partnering with Alfa to purchase a controlling stake in TNK,

Defendant Leonard Blavatnik sought to aggressively expand the reach of his activities to include the massive Russian oil industry.

29.     TNK's primary oil producing subsidiary is Nizhnevartovskneftegas ("NNG"), which controls the non-Chernogorneft portion of the Samotlor oil field (NNG and Chernogorneft control all of Samotlor). In stark contrast to Chernogorneft's portion of Samotlor, NNG's portion of the oil field is relatively non-productive and consequently NNG is in bankruptcy. Defendants have made no secret of their designs to gain full control over Samotlor. For example, TNK's President Simon Kukes was quoted, in the August 25, 1999 edition of the Moscow Times, as follows: "In May, we announced our intentions. We started to accumulate the debts and we have a program for [the] hostile takeover [of Chernogorneft]." Defendants have executed this plan with a barrage of aggressive and illegal acts aimed at seizing control of Sidanco's key oil producing assets, including Kondpetroleum and Chernogorneft.

30.     Defendants have used the Arbitration Court of Khanty-Mansisk (which is akin to a trial court in the U.S. judicial system) as the primary venue from which to mount their assault on Sidanco's assets. Both the Kondpetroleum and Chernogorneft bankruptcies were initiated and held in that court. Defendants have been able to influence the Khanty-Mansisk court to facilitate Defendants' scheme. The Governor of the Tyumen Region, in which the appellate court with authority over the Khanty-Mansisk court sits, is Leonid Roketsky – the Chairman of TNK's Board of Directors. As reported by the Washington Post: "Political connections are crucial in Russia's new capitalism, so Blavatnik and his partners placed local Siberian politicians – including the governor of the Tyumen region – on their company's board." (Wash. Post, Oct. 27, 1999). At all times relevant to this action, Mr. Roketsky has served simultaneously as the Governor of the Tyumen region and the Chairman of TNK's Board of Directors. As reported by the Russian press, it is believed that Mr. Roketsky has been skillfully using his position to "rig" the bankruptcy process in the Khanty-Mansisk court.

31.     Moreover, the Khanty-Mansisk judges have facilitated the Defendants' scheme. Judicial corruption in Russia is notorious. The Russian press has reported on the

"epidemic of corruption and misconduct, with more than 322 judges ousted from their posts in the last 3 ½ years" (Moscow Times, July 31, 1997); "Western investors, battling to impose shareholders' rights or contract law in Russia, have complained bitterly of blatantly biased decisions by local courts" (id.); "Judges have been murdered . . . and threats are commonplace" (Moscow Times, July 30, 1997); "Russia ranked among the most corrupt countries in the world" (Moscow Times, Aug. 1, 1997). Consistent with the widespread epidemic of judicial corruption in Russia, press reports are replete with stories concerning TNK's improper relationship with the Khanty-Mansisk judges. For instance, the following excerpt is from a Moscow Times article (Aug. 17, 1999):

> In Moscow, experts suggest that [TNK] has influenced the regional courts in the Sidanko subsidiaries' bankruptcies to vote against creditor recommendations. The company adamantly denies this. Still, after court-appointed outside managers arrived, two Sidanko units moved to sell their oil through a trading firm thought to be closely linked to [TNK's] main shareholder, Alfa Group. Previously, the units sold their oil through Sidanko. Russian newspapers have also printed photos of [TNK] executives socializing with bankruptcy judges.

32.     For any judge that attempted to break rank, it is believed that TNK would resort to violence. For example, the Russian paper Slovo reported that one of the Khanty-Mansisk judges was beaten "unmercifully" in the street after she was "imprudent enough" to support an adversary of TNK in court proceedings. (Slovo, June 11-15, 1999).

33.     As documented in the Russian press, TNK has resorted to intimidation and violence to achieve its goals. For instance, Slovo notes that in the Tyumen region, "after a number of explosions [people] prefer not to mess with TNK." (Slovo, Oct. 15, 1999). The Russian oil journal Nefte Compass noted that Nizhnovartousk (in the Tyumen region) "is a city where the mayor has survived two assassination attempts – the last one leaving him in intensive care for a month – oil executives can be shot while walking a dog, and hotel rooms are blown up for reasons unknown." (Nefte Compass, Aug. 5, 1999). Versia notes in its June 15-21 edition that, during a discussion about oil, TNK's First Vice President Germän Khan waived a pistol in front of the alarmed Nizhnovartousk mayor in an act of intimidation. The Russian press

describes Khan as a "key character" in the fight for Sidanco's assets. (Vedemosti, Sept. 9, 1999).

## Defendants Steal Kondpetroleum

34.   Defendants engineered their theft of Kondpetroleum by manipulating the bankruptcy process with ruthless efficiency. TNK selected the Arbitration Court of Khanty-Mansisk as the venue for its scheme, and influenced a Russian federal agency, the Federal Pension Fund, to initiate bankruptcy proceedings in that court on September 14, 1998. As the Moscow Times reported on July 9, 1999: "Kondpetroleum's woes began last August, when the tax police seized 1.5 million metric tons of the company's crude over tax debts. The majority of the seized oil volumes have been either shipped to the Ryazan refinery affiliated with the Tyumen Oil Co., or TNK, or traded by Crown Trade and Finance, said Denis Davydov, a Sidanko spokesman. Crown Trade and Finance, which ships oil for TNK, is a Gibraltar-based affiliate of Alfa-Eko, a part of Alfa Group. Alfa controls a major stake in TNK."

35.   Once in their chosen venue, Defendants used their influence with the court to ensure that an External Manager loyal to TNK would be appointed. On October 5, 1998, Boris Ivanovich Nuriev, "known for his loyalty to TNK" (Nezavisimaya Gazeta), was appointed as External Manager. Kommersant Daily reported that Nuriev is close to Leonid Roketsky, Governor of the Tyumen Region and Chairman of the Board of Directors of TNK. Nuriev moved quickly to exclude Sidanco, a major creditor of Kondpetroleum, from the bankruptcy process. Once in control of the bankruptcy, Defendants caused numerous events beneficial to Defendants to take place.

36.   **Theft of oil and suppression of cash flow**: Prior to the bankruptcy, Kondpetroleum accounted for 13% of Sidanco's oil production, and Sidanco was the most significant purchaser of Kondpetroleum oil. Upon his appointment as Kondpetroleum's External Manager, however, Nuriev immediately canceled all oil sales contracts with Sidanco. As directed by Defendants, all sales of oil instead were diverted to TNK subsidiaries or affiliates, including Crown Trade and Finance, at drastically reduced prices. As Nefte Compass reported,

"Kondpetroleum's crude exports have been handled by Crown Trade and Finance, an offshore affiliate of Alfa Eco, which is part of Alfa Group, one of TNK's owners." (Nefte Compass, Aug. 12, 1999). According to Nezavisimaya Gazeta, from December 1998 through early January 1999 alone, the External Manager sold 165 thousand tons of crude oil to Crown Trade and Finance "in direct violation of the bankruptcy law." (Nezavisimaya Gazeta, Jan. 6, 1999). Those TNK-related companies subsequently resold the oil at a substantially higher price than the price at which they purchased it. Kondpetroleum's domestic sales were also made to TNK affiliates at prices drastically below their market value. The net effect of this scheme was the loss to Kondpetroleum of millions of dollars. This, in turn, ensured that creditors of Kondpetroleum (including Sidanco) would not be paid, and that Kondpetroleum would remain insolvent, thereby propelling Kondpetroleum through the bankruptcy process toward a TNK-controlled auction.

37. **Sham auction of Kondpetroleum**: Defendants were able to engineer an auction in which only they could prevail. On December 7, 1998, the Khanty-Mansisk court ruled to initiate the liquidation of Kondpetroleum, despite serious violations of the bankruptcy process, including the exclusion of the votes of Sidanco in key creditors' meetings, even though Sidanco was the largest non-tax creditor of Kondpetroleum (holding approximately 30% of all of the claims). The TNK-controlled creditors' committee voted to liquidate Kondpetroleum via an "open auction." Bidders other than TNK, however, were wrongfully obstructed from participating in the auction. On October 21, 1999, Kondpetroleum was auctioned to TNK-Nyagan, a TNK affiliate. The purchase price was approximately one-third of Kondpetroleum's appraised value, and the proceeds were sufficient only to satisfy the claims of the State – no other creditors received payment, and the shareholders of Kondpetroleum, including Sidanco (which held a majority stake), lost their ownership interests outright. As reported by the Russian press: "Having bought Kondpetroleum oil producing company for $52m at an auction, Tyumen Oil Company made one of the most profitable deals in the history of the Russian oil industry. TNK's press release says Kondpetroleum reserves are estimated at 823.8 mtes, making the

purchase price $0.06 per tonne. At the world market, current price of Russian crude is about
$150 per tonne." (Vedomesty, Oct. 22, 1999).

### TNK Maneuvers To Steal Chernogorneft

38.     Defendants have engineered the imminent theft of Chernogorneft through
a scheme virtually identical to the theft of Kondpetroleum. Chernogorneft's bankruptcy was
initiated on September 25, 1998. Defendants' primary strategy focused on the placement of
External Managers allied with TNK. On May 27, 1999, Vasili Ivonovich Bikin was appointed
Temporary External Manager. According to Kommersant Daily, Bikin represented the interests
of TNK, which won him the Temporary External Manager appointment. Kommersant Daily also
reported that a TNK subcontractor and Leonid Roketsky, Governor of the Tyumen Region and
Chairman of the Board of Directors of TNK, secured the post for Bikin. Fiunansovye Izvestia
reported that Roketsky met with a Deputy Chairman of the Supreme Court of Arbitration of
Russia to lobby for Bikin's appointment as Temporary External Manager. On July 29, 1999,
Alexander Gorshkov was appointed External Manager because, like Bikin, he represented the
interests of TNK. In addition to causing the appointment of loyal bankruptcy managers,
Defendants utilized numerous strategies to take control of the Chernogorneft bankruptcy process,
including, but not limited to, the following:

- **Purchase of claims**: Soon after the initiation of Chernogorneft's
  bankruptcy, TNK began purchasing creditor claims or intimidating
  creditors into surrendering to TNK their vote at Chernogorneft's creditor
  meetings. As reported in the Moscow Times: "Others said Tyumen was
  already playing dirty. 'Tyumen Oil forced us to give away our powers of
  attorney to vote at Chernogorneft's shareholder meetings,' said Eduard
  Shchapkis, president of Garant, one of Chernogorneft's contractors. 'They
  said we either cooperate with Tyumen Oil or lose our business and our
  jobs.'" (Moscow Times, May 29, 1999).

14

- **Unilateral reduction of claims**:

  a) On July 29, 1999, the day before a meeting of the Chernogorneft creditors' committee, Bikin moved to preferentially repay an Eximbank loan, which was a violation of Russian bankruptcy laws. The funds used to repay Eximbank were loaned to Chernogorneft by Vneshtorgbank and guaranteed by TNK. Due to the suspicious nature and timing of the payment, Eximbank refused to immediately accept it and the money was held in an escrow account. However, on September 10, 1999, Eximbank reversed its decision and accepted the money in full payment of Chernogorneft's debt. As reported by the Washington Post, "Tyumen officials acknowledge helping to arrange bankrupt Chernogorneft's repayment of a $17 million Ex-Im Bank loan several months ago. As a result, Ex-Im Bank was dropped from the creditor's committee and Tyumen acquired effective control." (Wash. Post, Oct. 27, 1999).

  b) Bikin also petitioned the Khanty-Mansisk court to unilaterally change the creditor rights of the European Bank for Reconstruction and Development ("EBRD"). On July 30, 1999, the court ruled, over EBRD's protest, that EBRD's $35 million claim be offset by $9 million with money held in an escrow account used to store funds for future payments of the loan. (Exhibits "C" – "E" hereto set forth EBRD correspondence to Russian authorities protesting the unilateral reduction of its debt and the rampant illegality in the Chernogorneft bankruptcy generally.)

- **Exclusion of creditors**: After the illegal reduction of these foreign creditors' claims by the TNK-controlled External Manager, TNK was able to control more than 60% of Chernogorneft's debt. This effectively secured TNK's control over the voting in the creditors' meetings by

reducing the power of Western creditors. Moreover, TNK's majority stake empowered it to outright exclude Chernogorneft's major creditors from participating in key creditors' meetings.

39.      Defendants' illegal scheme to take control of Chernogorneft is succeeding. As reported by the Russian oil journal Nefte Compass on August 12, 1999: "TNK president Simon Kukes had boasted that his company, together with 'affiliated structures,' now controls $45 million of Chernogorneft's debt, equivalent to some 60% of its total obligations following the reduction of debt outstanding to the EBRD and U.S. Eximbank. Kukes also noted that TNK had acquired most of the debt at significant discount to its face value." After seizing control, Defendants caused numerous actions beneficial to Defendants to take place.

40.    **Theft of oil and suppression of cash flow**: Prior to the initiation of Chernogorneft's bankruptcy, Sidanco received more than 30% of its oil from Chernogorneft. After the initiation of bankruptcy, however, Sidanco was cut-off completely from Chernogorneft's oil supply, which was diverted to other entities. Under the management of Bikin and Gorshkov, all oil sales were diverted to TNK-affiliated companies, and all sales were made at prices far below the average market price. For example, Bikin immediately diverted sales of all export oil to Crown Trade and Finance, a company owned by Alfa. Bikin also diverted sales of all domestic crude oil to TNK-affiliated entities. Gorshkov continued selling oil to TNK-affiliated companies such as Crown Trade and Finance at below market prices after his appointment as External Manager. Gorshkov also reduced sales of Chernogorneft oil in July 1999, and exported no oil whatsoever in August and September 1999 to further suppress cash flow and support the facade of insolvency. These actions of Bikin and Gorshkov ensured that creditors of Chernogorneft (including Sidanco) would not be paid, and ensured that Chernogorneft would appear to be insolvent, thereby pushing Chernogorneft through the bankruptcy process toward a TNK-controlled auction. Defendants' transfer scheme resulted in the loss to Chernogorneft of tens of millions of dollars, with the corresponding benefit inuring to Defendants.

41. *Sham insolvency determination and auction:* Ultimately, Gorshkov made the "determination" that Chernogorneft itself must be sold in order to pay Chernogorneft's creditors. The creditors' committee controlled by TNK approved the plan. That determination was a sham. The External Managers themselves created much of the purported debt in order to create the pretense that Chernogorneft was hopelessly insolvent (for instance, they authorized unnecessary capital expenditures, failed to pursue accounts receivable, and intentionally took losses on oil sales or transferred export rights to TNK-affiliated companies to suppress cash flow). Moreover, in August 1999, several of Chernogorneft's creditors offered to guarantee or purchase all of the company's debts at full face value in order to assure its solvency. The External Manager rejected those offers. Thus, Chernogorneft's "insolvency" is a mirage. Chernogorneft could repay all of its creditors in a matter of months from oil revenue alone, assuming sales at average market prices. As noted in the August 12, 1999 edition of Nefte Compass: "For a company embroiled in bankruptcy proceedings, Chernogorneft has a remarkably healthy balance sheet."

42. On September 21, 1999, the Federal Service of Russia for Insolvency Proceedings and Financial Rehabilitation ("FIS") suspended the license of the current External Manager Alexander Gorshkov, and found:

> Thus, the period of repayment of the debts of the debtor organization plus any interest due, being under moratorium, from the operating income alone, regardless of the possibility of recovery of accounts receivable, sale of a part of the assets (blocks of shares), or finance from other sources, will not exceed 7 or 8 months.

> Basing on the estimates made, OAO "Chernogorneft" is able during the external management period to regain its solvency in full and repay the total amount of the debts being under moratorium. In this situation the sale of the enterprise (business) of OAO "Chernogorneft", provided for by the plan of external management, cannot be considered as substantiated. The said acts, and the fulfillment by the debtor of contracts for delivery of oil at the known low prices will be detrimental to the debtor organization, its creditors, and will also damage the interests of the shareholders of OAO "Chernogorneft." (emphasis added)

43.    The FIS revoked the External Manager's license on October 11, 1999.

The Khanty-Mansisk court and the TNK-controlled creditors' committee, however, ignored the

FIS actions and gave the External Manager full authority to proceed with the "auction" of

Chernogorneft; in late October 1999, the FIS's revocation of Gorshkov's license was overturned

by a Moscow Arbitration court on Gorshkov's motion despite the findings of the FIS. As noted

by Hart's Asian Petroleum News (Nov. 1, 1999), the decision reversing the FIS's determination

"confirms that Russian oligarch intrigues can effectively reach into every corner of the Russian

Federation's political and legal systems."

44.    There is no pretense of an open, competitive bidding process in the

auction of Chernogorneft. As noted in the United Financial Group Oil & Gas Monthly (Nov.

1999):

>    The choice of bank for the auction also appears to be interesting.
>    Rumours suggest that it may be a small bank with only limited
>    capital, although that has proven impossible to confirm. We also
>    understand that approximately $20 mn will need to be deposited
>    with the bank to take part in the auction as well as a letter of credit
>    which we understand will need to be between $130-150 mn.
>    Depositing $20 mn in a bank with only limited capital might put
>    off some of the bidders. . . . In addition, we understand that no
>    schedule of assets for Chernogorneft is available as yet and that
>    none may be available until the sale, or perhaps even until the bid
>    has been made and accepted. If true, talk about buying "sight
>    unseen", suggesting that any potential buyer would have to have a
>    high degree of confidence that they would be getting what they
>    were paying for. That too might restrict the number of potential
>    buyers for the company.

45.    Not surprisingly, the External Manager has taken remarkably transparent

steps to preclude bona fide bidders from competing with TNK in the auction. For example,

Sidanco and Sputnik IV, L.P. (which owns a significant interest in TPT) informed the External

Manager that they wished to participate in the auction, and requested a complete list of all assets

for sale in the auction. Gorshkov failed to comply with the request, ultimately claiming that

Chernogorneft did not have enough paper to copy the requested documents. Sidanco and

Sputnik were not provided with the documents as of November 19, 1999, the last day for bid

submission according to the terms of the auction. This obstruction orchestrated by Gorshkov at

Defendants' behest effectively precluded these entities from submitting bona fide bids. Predictably, the only three bids that are to be considered for the "auction" were submitted by TNK-affiliated companies. Notably, Gorshkov has set the opening bid at $200 million, but has stated that $103 million would be an acceptable floor. Chernogorneft has an estimated worth up to $1 billion or more, which is dramatically more than the figure the External Manager has stated he would accept in a bidding process that will be limited to affiliates of Defendants.

## COUNT I

### Common Law Conversion of Kondpetroleum Oil

(Against Defendants Access, Renova, TNK, Leonard Blavatnik)

46.     Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 45.

47.     Kondpetroleum owned and possessed oil while it was a subsidiary of Sidanco.

48.     Kondpetroleum had an immediate right of possession in such oil.

49.     In defiance of Kondpetroleum's ownership and possessory rights in the oil, Defendants, through their exertion of power and control over the Kondpetroleum External Manager, wrongfully caused the sale of the oil at below market prices and conveyed the property to outside sources, including entities that were affiliated with Defendants. The transferees, after paying below market prices for the oil, resold the oil at a significant profit. Accordingly, Defendants obtained sufficient dominion and control over the ownership and possessory interests in the oil for their own use so as to exclude Kondpetroleum from exercising its rights in that property.

50.     Defendants' wrongful possession of the oil directly caused injury to Kondpetroleum by depriving Kondpetroleum of the economic benefit that would have resulted from arms-length sales of oil at fair-market prices.

19

## COUNT II

### Common Law Conversion of Kondpetroleum

(Against Defendants Access, Renova, TNK, Leonard Blavatnik)

51. Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 50.

52. Prior to the improper auction of Kondpetroleum and its conveyance to a TNK-affiliated entity, Sidanco owned a majority interest in Kondpetroleum, and consequently, Sidanco had an immediate right of possession of its ownership interests in Kondpetroleum.

53. In defiance of Sidanco's ownership and possessory rights in Kondpetroleum, Defendants garnered dominion and control over the Kondpetroleum bankruptcy so as to manipulate the process. Through their illegal manipulation of the Kondpetroleum bankruptcy, Defendants wrongfully caused the conveyance of Kondpetroleum in its entirety to Defendants themselves, at a price far below market value. Accordingly, Defendants obtained sufficient dominion and control over the ownership and possessory interest in Kondpetroleum for their own use so as to exclude Sidanco from exercising its rights in that property.

54. Defendants' wrongful possession of Kondpetroleum directly caused injury to Sidanco by depriving it of the fair market value of its ownership interest.

## COUNT III

### Common Law Conversion of Chernogorneft Oil

(Against Defendants Access, Renova, TNK, Leonard Blavatnik)

55. Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 54.

56. Chernogorneft has owned and possessed oil while it has been a subsidiary of Sidanco.

57. Chernogorneft had an immediate right of possession in such oil.

58.     In defiance of Chernogorneft's ownership and possessory rights in the oil, Defendants, through their exertion of power and control over the Chernogorneft External Manager, wrongfully caused the sale of the oil at below market prices to entities that were affiliated with Defendants. The transferees, after paying below market prices for the oil, resold the oil at a significant profit. Accordingly, Defendants obtained sufficient dominion and control over the ownership and possessory interests in the oil for their own use so as to exclude Chernogorneft from exercising its rights in that property.

59.     Defendants' unauthorized possession of the oil directly caused injury to Chernogorneft by depriving Chernogorneft of the economic benefit that would have resulted from arms-length sales of oil at fair-market prices.

## COUNT IV

## Common Law Conversion of Chernogorneft

### (Against Defendants Access, Renova, TNK, Leonard Blavatnik)

60.     Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 59.

61.     Prior to the sham bankruptcy of Chernogorneft and Defendants' wrongful exercise of dominion and control over the bankruptcy, Sidanco owned a majority interest in Chernogorneft, and consequently, Sidanco had an immediate right of possession of its ownership interests in Chernogorneft.

62.     In defiance of Sidanco's ownership and possessory rights in Chernogorneft, Defendants garnered dominion and control over the Chernogorneft bankruptcy so as to manipulate the process. Through their illegal manipulation of the Chernogorneft bankruptcy, Defendants wrongfully have obtained sufficient dominion and control over the ownership and possessory interest in Chernogorneft for their own use so as to exclude Sidanco from exercising its rights in that property.

63.     Defendants' unauthorized possession of Chernogorneft directly caused injury to Sidanco by depriving it of the fair market value of its ownership interest.

## COUNT V

### Fraudulent Conveyance of Kondpetroleum Oil (NY Debt & Cred. § 276)

(Against Defendants Access, Renova, TNK, Leonard Blavatnik)

64.     Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 63.

65.     Prior to the improper auction of Kondpetroleum and its conveyance to a TNK-affiliated entity, Sidanco owned a majority interest in Kondpetroleum, and consequently, Sidanco was at all times relevant to this action a creditor of Kondpetroleum.

66.     Kondpetroleum owned and possessed oil while it was a subsidiary of Sidanco.

67.     The Kondpetroleum External Manager, on behalf and at the direction of Defendants, conveyed the Kondpetroleum oil at below market prices to entities that were affiliated with Defendants. The transferees, after paying below market prices for the oil, resold the oil at a significant profit.

68.     The Kondpetroleum External Manager conveyed the Kondpetroleum oil with the intent to defraud Kondpetroleum's creditors, including Sidanco.

69.     Defendants, at all times, were aware of the Kondpetroleum External Manager's intentions and actions regarding the conveyance of the Kondpetroleum oil.

## COUNT VI

### Fraudulent Conveyance of Kondpetroleum (NY Debt & Cred. § 276)

(Against Defendants Access, Renova, TNK, Leonard Blavatnik)

70.     Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 69.

71.     Prior to the improper auction of Kondpetroleum and its conveyance to a TNK-affiliated entity, Sidanco owned a majority interest in Kondpetroleum, and consequently, Sidanco was at all times relevant to this action a creditor of Kondpetroleum.

72. Kondpetroleum was placed into bankruptcy in Russia.

73. Defendants illegally garnered dominion and control over the Kondpetroleum bankruptcy process.

74. Through their illegal manipulation of the Kondpetroleum bankruptcy, Defendants caused the conveyance of Kondpetroleum in its entirety to an entity affiliated with Defendants at a price far below market value.

75. Defendants caused the Kondpetroleum conveyance with the intent to defraud Kondpetroleum's creditors, including Sidanco.

## COUNT VII

### Fraudulent Conveyance of Chernogorneft Oil (NY Debt & Cred. § 276)

(Against Defendants Access, Renova, TNK, Leonard Blavatnik)

76. Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 75.

77. Prior to the sham bankruptcy of Chernogorneft and Defendants' wrongful exercise of dominion and control over the bankruptcy, Sidanco owned a majority interest in Chernogorneft, and consequently, Sidanco is and at all times relevant to this action has been a creditor of Chernogorneft.

78. Chernogorneft has owned and possessed oil while it has been a subsidiary of Sidanco.

79. The Chernogorneft External Manager, on behalf and at the direction of Defendants, conveyed the Chernogorneft oil at below market prices to entities that were affiliated with Defendants. The transferees, after paying below market prices for the oil, resold the oil at a significant profit. Accordingly, Defendants received benefits, both directly and indirectly, from the conveyance of the oil.

80. The Chernogorneft External Manager conveyed the Chernogorneft oil with the intent to defraud Chernogorneft's creditors, including Sidanco.

81. Defendants, at all times, were aware of the Chernogorneft External Manager's intentions and actions regarding the conveyance of the Chernogorneft oil.

## COUNT VIII

### Fraudulent Conveyance of Kondpetroleum Oil (NY Debt & Cred. § 273)

(Against Defendants Access, Renova, TNK, Leonard Blavatnik)

82. Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 81.

83. Prior to the improper auction of Kondpetroleum and its conveyance to a TNK-affiliated entity, Sidanco owned a majority interest in Kondpetroleum, and consequently, Sidanco was at all times relevant to this action a creditor of Kondpetroleum.

84. Kondpetroleum owned and possessed oil while it was a subsidiary of Sidanco.

85. The Kondpetroleum External Manager, on behalf and at the direction of Defendants, sold the Kondpetroleum oil at below market prices to entities that were affiliated with Defendants. The transferees, after paying below market prices for the oil, resold the oil at a significant profit. Accordingly, Defendants received benefits, both directly and indirectly, from the conveyance of the oil.

86. Defendants, at all times, were aware of the Kondpetroleum External Manager's actions regarding the conveyance of the Kondpetroleum oil.

87. The conveyance of the Kondpetroleum property lacked good faith as is evidenced by the relationship between the transferor – the External Manager who acted on behalf of and at the direction of Defendants – and the transferees – entities who were affiliated with Defendants.

88. At the time the oil was conveyed, Kondpetroleum was in the midst of bankruptcy proceedings in Russia and thus, was officially recognized in Russia as an insolvent entity.

89.    Due to the illegal pricing scheme arranged by Defendants, the conveyance was made without fair consideration. Accordingly, the conveyances were fraudulent as against the Kondpetroleum creditors.

## COUNT IX

### Fraudulent Convevance of Kondpetroleum (NY Debt & Cred. § 273)

(Against Defendants Access, Renova, TNK, Leonard Blavatnik)

90.    Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 89,

91.    Prior to the improper auction of Kondpetroleum and its conveyance to a TNK-affiliated entity, Sidanco owned a majority interest in Kondpetroleum, and consequently, Sidanco was at all times relevant to this action a creditor of Kondpetroleum.

92.    Kondpetroleum was placed into bankruptcy in Russia and thus was officially recognized in Russia as an insolvent entity prior to its sale at the bankruptcy auction.

93.    Defendants illegally garnered dominion and control over the Kondpetroleum bankruptcy process.

94.    Through their illegal manipulation of the Kondpetroleum bankruptcy and a series of interested party transactions, Defendants have caused the conveyance of Kondpetroleum in its entirety to Defendants themselves, at a price far below market value.

95.    Because Kondpetroleum itself was conveyed to a TNK-affiliated entity in exchange for an amount far below its fair market value, the conveyance was made without fair and adequate consideration. Accordingly, the conveyance was fraudulent as against the Kondpetroleum creditors.

## COUNT X

### Fraudulent Conveyance of Chernogorneft Oil (NY Debt & Cred. § 273)

#### (Against Defendants Access, Renova, TNK, Leonard Blavatnik)

96.   Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 95.

97.   Sidanco owns a majority interest in Chernogorneft, and consequently, Sidanco is and at all times relevant to this action has been a creditor of Chernogorneft.

98.   Chernogorneft has owned and possessed oil while it has been a subsidiary of Sidanco.

99.   The Chernogorneft External Manager, on behalf and at the direction of Defendants, sold the Chernogorneft oil at below market prices and conveyed the property to outside sources, including included entities that were affiliated with Defendants. The transferees, after paying below market prices for the oil, resold the oil at a significant profit. Accordingly, Defendants received benefits, both directly and indirectly, from the conveyance of the oil.

100.   Defendants, at all times, were aware of the Chernogorneft External Manager's actions regarding the conveyance of the oil.

101.   The conveyance of the Chernogorneft property lacked good faith as is evidenced by the relationship between the transferor – the External Manager who acted on behalf and at the direction of Defendants – and the transferees – entities who were affiliated with Defendants.

102.   At the time that the oil was conveyed, Chernogorneft was in the midst of bankruptcy proceedings in Russia and thus, was officially recognized in Russia as an insolvent entity.

103.   Due to the illegal pricing scheme arranged by Defendants, the conveyance was made without fair and adequate consideration. Accordingly, the conveyances were fraudulent as against the Chernogorneft creditors.

## COUNT XI

### Common Law Conspiracy

(Against Defendants Access, Renova, TNK, Leonard Blavatnik)

104.   Plaintiff realleges and reincorporates the allegations in paragraphs 1 through 103.

105.   During the period including 1997 through 1999, Defendants acted together to unlawfully exercise dominion and control over Sidanco's subsidiaries Chernogorneft and Kondpetroleum and the subsidiaries' assets. To effect their scheme, Defendants conspired to illegally manipulate the bankruptcies of both Chernogorneft and Kondpetroleum for their own benefit, to divert Chernogorneft's and Kondpetroleum's assets, and to convert and to cause the illegal fraudulent conveyance of both Chernogorneft and Kondpetroleum to themselves. Each of the Defendants, with full knowledge of the facts, participated in and furthered this conspiracy.

106.   The acts and transactions alleged in this Complaint were committed to the detriment of Sidanco, and were all committed in pursuit of and in furtherance of this conspiracy.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(a)   enter judgment in favor of Plaintiff and against Defendants for damages sustained by Plaintiff in an amount to be determined at trial;

(b)   award punitive damages in an amount to be determined at trial;

(c)   order Defendants to pay prejudgment interest;

(d)   award Plaintiff the costs and expenses of this action, including reasonable attorney fees; and

(e)  grant such other and further relief as the Court finds is just under

the circumstances.

LATHAM & WATKINS
Attorneys for Plaintiffs

By: _____
    Job Taylor III
    Mark D. Beckett
    James S. Blank
    885 Third Avenue
    Suite 1000
    New York, New York  10022-4802
    (212) 906-1200

Of Counsel
    Thomas L. Patten
    Richard A. Conn, Jr.
    David A. Barrett
    LATHAM & WATKINS
    1001 Pennsylvania Avenue, N.W.
    Suite 1300
    Washington, D.C.  20004