Westlaw.

304 F.Supp.2d 570                                                                                         Page 1
304 F.Supp.2d 570, RICO Bus.Disp.Guide 10,680
**(Cite as: 304 F.Supp.2d 570)**

H
Motions, Pleadings and Filings

United States District Court,
S.D. New York.

NOREX PETROLEUM LTD., Plaintiff,
v.
ACCESS INDUSTRIES, INC., et al., Defendants.

**No. 02 Civ. 1499(LTS)(KN).**

Feb. 18, 2004.

**Background:** Canadian oil corporation sued various corporations and individuals, alleging claim that massive racketeering and money laundering scheme was orchestrated to take control of Russian oil industry, causing injury to corporation. Defendants moved to dismiss.

**Holdings:** The District Court, Swain, J., held that:
(1) nonresident's choice of United States forum would be afforded little weight in making forum non conveniens decision;
(2) court could consider expert declarations on Russian law without regard to federal evidence rule restrictions on expert testimony;
(3) Russian courts were adequate alternative forum, for forum non conveniens purposes;
(4) public interest factors favored dismissal on forum non conveniens grounds; and
(5) private interest factors favored dismissal.
Case dismissed.

See, also, 2003 WL 21872389.

West Headnotes
**[1] Federal Courts** ☞45
170Bk45 Most Cited Cases
In deciding whether case is to be dismissed, on forum non conveniens grounds, court is to (1) determine level of deference to which plaintiff's choice of forum is entitled, (2) consider whether there is an adequate alternate forum for litigation, and (3) balance public and private interest factors to ascertain whether plaintiff's chosen forum or defendant's proposed alternative forum is more convenient.
**[2] Federal Courts** ☞45
170Bk45 Most Cited Cases
Plaintiff's choice of forum would be entitled to little weight, in determining whether to dismiss on forum non conveniens grounds suit brought by Canadian oil company alleging that it was injured by massive racketeering and money laundering scheme orchestrated to take control of Russian oil industry, despite claim that United States would be more convenient forum than Russia.
**[3] Action** ☞17
13k17 Most Cited Cases
Court was empowered under federal procedure rule to consider expert declarations regarding adequacy of Russian forum, in connection with claim that massive racketeering and money laundering scheme was orchestrated to take control of Russian oil industry, without regard to whether declarations satisfied federal evidence rule requirement for expert testimony. Fed.Rules Evid.Rule 702, 28 U.S.C.A.; Fed.Rules Civ.Proc.Rule 44.1, 28 U.S.C.A.
**[4] Federal Courts** ☞45
170Bk45 Most Cited Cases
Russian courts were adequate alternative forum, for purpose of motion to dismiss on forum non conveniens grounds Racketeer Influenced and Corrupt Organizations Act (RICO) claim that massive racketeering and money laundering scheme was orchestrated to take control of Russian oil industry, despite claim that some relief akin to RICO was now time barred, some procedural safeguards available in United States were unavailable in Russia, and Russian judiciary was corrupt. 18 U.S.C.A. § 1961 et seq.
**[5] Federal Courts** ☞45
170Bk45 Most Cited Cases
Public interest factors favored dismissal, on forum non conveniens grounds, of Racketeer Influenced and Corrupt Organizations Act (RICO) suit claiming that massive racketeering and money laundering scheme was orchestrated to take control of Russian oil industry; case was largely of Russian concern, with virtually no impact on United States, and Russian law would have to be applied.
**[6] Federal Courts** ☞45
170Bk45 Most Cited Cases
Private interest factors favored dismissal, on forum non conveniens grounds, of Racketeer Influenced and Corrupt Organizations Act (RICO) suit claiming that massive racketeering and money laundering scheme was orchestrated to take control of Russian oil industry; evidentiary center of gravity of litigation

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

was Russia, and unwillingness of some of claimant's personnel to return to Russia to testify, out of fear of criminal actions being commenced against them, did not alter result. 18 U.S.C.A. § 1961 et seq.

*571 Marks & Sokolov, LLC, Philadelphia, PA by Bruce S. Marks, Blank Rome, LLP, New York, NY, by Harris N. Cogan, Farrell Fritz, P.C., Uniondale, NY, by George C. Pratt, for Plaintiff.

White & Case LLP, New York, NY by Robert M. Kelly, Owen C. Pell, Akin Gump Strauss Hauer & Feld LLP, New York, NY by Kim Koopersmith, Nathaniel P.T. Read, The Law Offices of Eric J. Grannis, New York, NY by Eric J. Grannis, Curtis, Mallet-Prevost, Colt & Mosle LLP, New York, NY by Myles K. Bartley, Morrison Foerster LLP, New York, NY by Oliver Metzger, Salans, New York, NY, by John F. Cambria, for Defendants.

*OPINION AND ORDER*

SWAIN, District Judge.

This is a case involving alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. section 1961, *et seq.* Specifically, Plaintiff contends that Defendants orchestrated a massive racketeering and money laundering scheme to take control of the Russian oil industry, including Plaintiff's business. Defendants move to dismiss the Complaint on various grounds, among which is, the doctrine of *forum non conveniens*. The Court has considered thoroughly all arguments and submissions in connection with *572 the instant motion. For the following reasons, Defendants' motion is granted.

*BACKGROUND*

Plaintiff's principal material allegations, and the undisputed facts pertinent to the instant motion, can be summarized as follows. The summary takes as true the allegations and undisputed factual assertions, but does not in any way constitute factual findings by the Court. Plaintiff Norex Petroleum Limited ("Norex") is organized under the laws of Cyprus, maintains a representative office in Calgary, Canada, and is owned by J.I.V. LLC, which is organized under the laws of California. [FN1] (*Id.* ¶ 32.) Alexander Rotzang, a Canadian individual, is the beneficial owner of Norex's parent. (Rotzang Decl. ¶ ¶ 2, 4.)

FN1. In affidavits submitted in opposition to the instant motion, Plaintiff alleges that its parent is Appalachia Investments Ltd., also a California entity. (Decl. of Philip Murray ¶ 53; Decl. of Alexander Rotzang ¶ 4.)

*Allegations Regarding the "Illegal Scheme" and "Illegal Takeover"*

In its Complaint, Norex alleges that the Defendants are participants in a widespread racketeering and money laundering scheme whose principal purpose is to take over a substantial portion of the Russian oil industry, principally through the use of Tyumen Oil Company ("TNK"), a Russian oil company, and subsidiaries of TNK. [FN2] (Compl.¶ 1.) According to Norex, the Russian oil industry is riddled with corruption, and Russian oligarchs exercise undue influence over government and judicial officers in aid of their own economic goals.

FN2. The Complaint identifies five groupings of defendants, defined as follows: (1) the Access/Renova Defendants (including Access Industries, Inc. ("Access"), Renova, Inc. ("Renova"), Leonid Blavatnik ("Blavatnik"), and Victor Vekselberg ("Vekselberg")); (2) the Alfa-Crown Defendants (including Alfa Group Consortium ("Alfa Group"), Crown Finance Foundation ("CFF"), CTF Holdings Ltd ("CTF Holdings"), Alfa Finance Holdings, SA ("Alfa Finance"), Crown Luxembourg Holdings, S.A. ("Crown Luxembourg"), OAO Alfa Bank ("Alfa Bank"), Alfa Capital Markets (USA), Inc. ("Alfa Capital Markets"), Crown Commodities Ltd ("Crown Commodities"), Crown Trade and Finance Limited ("CTF Ltd"), Crown Resources A.G. ("Crown AG"), Crown Resources (USA) Inc. ("Crown Resources"), Elliot Spitz ("Spitz"), and OOO Alfa-Eco ("Alfa-Eco")); (3) the TNK Defendants (including TNK), Joseph Bakaleynik ("Bakaleynik"), German Khan ("Khan"), Igor Nam ("Nam"), Alexander Berman ("Berman"), OAO TNK-Nyagan ("TNK-NG"), and OAO TNK-Nizhnevartovsk ("TNK-NV"); (4) the "Slush Fund" Companies (including LT Enterprises Limited ("LT"), Sandwell Enterprises Limited ("Sandwell"), and Eastmount Properties Limited ("Eastmount")), which were allegedly used to launder funds related to the illegal scheme; and (5) Astons Corporate Management ("Astons"), which allegedly managed the "Slush Fund"

Companies. (Compl.¶¶ 35-91.)

Several of the Defendants are United States citizens or conduct business here, and the conspiracy is alleged to have been directed from the United States. American and other international banking facilities have allegedly been used to conceal financial transactions through which Defendants have diverted oil and related revenues from Russian companies to their own offshore affiliates and have committed tax fraud in several countries. In seeking to show the scope of the alleged conspiracy and sufficient United States connections to support the exercise of subject matter jurisdiction to hear Plaintiff's RICO claims, Norex describes a range of worldwide activities alleged to have been part of this overall "Illegal Scheme," including transactions involving companies in which Norex held no equity interest but which have (or had) United States or other international investors. Those investors include BP-Amoco and the Harvard University Endowment Fund. (*Id.* ¶ 8.)

*573 Norex claims that, pursuant to this scheme, it was deprived of its majority ownership stake in Yugraneft, a Russian oil company, and of certain quantities of oil owed to it by Yugraneft and other Russian oil entities, through a series of unlawful actions that included influence wielded through bribery of Russian governmental officials and corrupt Russian bankruptcy proceedings.

TNK, which was privatized in two stages beginning in 1997, is owned, directly or indirectly, by Defendants Access/Renova and Alfa Group in approximately equal shares. Defendants' interests in TNK were obtained through corrupt privatization proceedings. (*Id.* ¶¶ 75, 121-38.) Norex alleges that the Defendants' Illegal Scheme utilized TNK, improper influence of Russian government and judicial officials, and threats of violence to 1) divert oil flows from other Russian oil companies to TNK and its affiliates, 2) achieve an "Illegal Takeover" of Yugraneft, and 3) launder illegally diverted oil profits and achieve massive United States, United Kingdom, and Russian tax fraud through offshore "Slush Fund" arrangements involving certain of the Defendants and their affiliates.

In 1997, after acquiring their initial interest in TNK, Access/Renova and Alfa Group arranged through corrupted government officials to divert the flow of oil from Nizhnevartovsk Nefte Gaz ("NNG") (a Russian oil company that owed oil to Yugraneft) to TNK, thereby forcing NNG into bankruptcy and stripping NNG of assets that were subsequently transferred to TNK or its affiliates. (*Id.* ¶¶ 144-47.) Through the corrupt bankruptcy proceedings and asset-stripping, Norex, which was one of NNG's creditors, was deprived of an oil debt owed to it by NNG.

Some or all of Defendants also utilized TNK to corrupt the bankruptcies of Kondpetroleum and Chernogorneft, two oil companies that were subsidiaries of OAO Siberian Far Eastern Oil Co. ("Sidanco"), an entity in which BP-Amoco and the Harvard University Endowment Fund were investors. Through the strategically manipulated appointment of bankruptcy managers who were loyal to TNK, as well as improper payoffs of certain of Chernogorneft's debts that resulted in TNK's ability to control the creditors' committee in the Chernogorneft bankruptcy, TNK and its affiliates obtained the assets of Kondpetroleum and Chernogorneft at below-market prices. Those assets included shares of Yugraneft that had been owned by Chernogorneft. The bankruptcy transfer of Chernogorneft's Yugraneft shares violated a shareholder agreement right-of-first-refusal provision in Norex's favor to which Norex and Chernogorneft were parties. The Chernogorneft asset sale also violated several Russian court decisions prohibiting the sale of Chernogorneft's assets. (*Id.* ¶¶ 148-74.) Complaints by BP-Amoco and others to American government officials arising from the Chernogorneft proceedings led to a State Department block on Export-Import Bank loan guarantees to TNK for purchasing equipment from the United States. (*Id.* ¶¶ 175-78.)

Following the bankruptcy proceedings, Chernogorneft did not fully repay a prebankruptcy oil debt to Yugraneft. (*Id.* ¶¶ 185-89.) A TNK official threatened Norex's board chair and general director when they attempted to obtain full payment of the oil debt to Yugraneft, and at least one of the threats was communicated to Norex's board chair, Rotzang, while Rotzang was in the United States. (*Id.* ¶¶ 198-206.) The TNK official, German Khan, told Yugraneft's general director that TNK "own[ed] people at all levels of government" and that TNK "controlled" Russia's Supreme Arbitration Court, where commercial disputes are decided. (*Id.* ¶¶ 200-206.) Norex further alleges that Khan threatened a Yugraneft officer *574 and attempted to bribe her to cooperate with TNK's efforts, and that the bribe was refused. (*Id.* ¶¶ 212-216.)

In June 2001, a few days before a scheduled Yugraneft shareholders meeting, TNK-NV (the TNK

304 F.Supp.2d 570
304 F.Supp.2d 570, RICO Bus.Disp.Guide 10,680
(Cite as: 304 F.Supp.2d 570)

Page 4

affiliate that had acquired Chernogorneft's interest in Yugraneft) filed a complaint in Russian court, petitioning to arrest a substantial portion of the Yugraneft shares held by Norex. (*Id.* ¶¶ 217-18.) TNK-NV's petition was premised on the false representations that it had acquired its shares legally in the Chernogorneft bankruptcy and that Norex had been served properly with the court papers. (*Id.* ¶¶ 217-19.) The Russian court enjoined Plaintiff from voting a major portion of its Yugraneft shares and prohibited Yugraneft from counting a major portion of Plaintiff's shares at any shareholders meeting. (Id.¶¶ 219-20.)

At the shareholders meeting, Norex voted its shares in favor of continuing current management. TNK and other Defendants, however, prepared fraudulent minutes reflecting the election of Alexander Berman, an officer of a TNK affiliate, as general director of Yugraneft. (*Id.* ¶¶ 222-26, 229-30.)

On the day after the shareholders meeting, Berman, along with six TNK attorneys and "at least 16 thugs" in military fatigues and armed with machine guns, took over Yugraneft's Nizhnevartovsk offices by force. (*Id.* ¶¶ 227-228.) TNK also sent armed security guards that same day to take over the Yugraneft oil field and field office and cut off phone and Internet service at the Yugraneft offices. (*Id.* ¶¶ 231-232.) The president of TNK went to Yugraneft's field office, told the employees that the company had been taken over, and instructed them to sign employment agreements with TNK or leave. (*Id.* ¶¶ 233-34.)

Yugraneft's pre-takeover management thereafter obtained a court order enjoining Berman from acting as Yugraneft's general director and went, along with a marshal and attorneys, to Yugraneft's offices to enforce the order. A TNK-affiliated guard at the offices threatened one of the attorneys, and a TNK officer who came on the scene with armed "thugs" instructed the local chief marshal to order the Yugraneft parties to leave the offices. He then "instructed someone" to call the chief judge of the Nizhnevartovsk Regional court and order the court to dismiss its order, stating that TNK controlled the local government. (*Id.* ¶¶ 236-43.) TNK personnel sought to bribe Yugraneft officers with offers of appointment to a local government post and TNK employment, and threatened the Yugraneft representatives. (*Id.* ¶¶ 243-52.) Defendants also used false criminal proceedings to intimidate Yugraneft officers and quell opposition to the takeover. (*Id.* ¶¶ 259-65.)

Following the takeover of Yugraneft, TNK stripped the company of its assets, including $40 million which was transferred to Alfa Bank for Defendants' use. (*Id.* ¶¶ 253-54.) TNK and the Crown Group have also converted and sold Yugraneft oil in the Russian domestic market and foreign markets, with profits being wired through American banks. (*Id.* ¶¶ 266-68.)

*Use of "Slush Fund" Companies and Other Fraudulent Activities*

Defendants have channeled the oil supplies and revenues of companies owned or controlled by TNK to Defendants' affiliates, including the Crown Group companies and various off-shore entities that are referred to in the Complaint as "Slush Fund" companies. Through various fraudulent bookkeeping practices, including the use of false invoices for oil and services, the Slush Fund companies have made offshore compensation payments to various individuals, enabling those individuals to **\*575** evade United States, United Kingdom, and Russian taxes and have shifted profits illegally and facilitated the evasion of United Kingdom business taxes and penalties by Crown Group affiliates. Slush Fund monies were also used to pay bribes to Russian government officials. (*Id.* at ¶¶ 269-304.). The substantial financial transactions have involved numerous wire transfers through banks in the United States. (*Id.* ¶ 275.)

*Prior Russian Litigation*

A number of the issues raised by Plaintiff's allegations, including issues relating to the validity of bankruptcy proceedings and related asset transfers of which Plaintiff complains, the enforceability of the right of first refusal provision regarding Chernogorneft's Yugraneft shares, and the values of Chernogorneft's and Norex's respective equity interests in Yugraneft, have been the subject of Russian judicial proceedings, the results of all of which have been adverse to the positions taken here by Plaintiff. Norex was not a party to many of the proceedings, but was a party to: litigation challenging the transfer to the TNK affiliate of Chernogorneft's interest in Yugraneft as violative of the right-of-first-refusal provision of the Yugraneft shareholder agreement (the "Right of First Refusal Case"); litigation which was commenced by Norex one week before the instant case was filed in this Court and was promptly abandoned by Norex, seeking to set aside the Chernogorneft bankruptcy

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

auction (the "CNG Auction II Case"); and litigation addressing the validity of Norex's contribution to Yugraneft's charter capital (the "Dividends Return Case"). (Murray Decl. ¶¶ 45-49.) In June 2001, TNK-NV filed a Russian suit that ultimately invalidated a large proportion of Norex's interest in Yugraneft on the ground that Norex's capital contribution to Yugraneft, in the form of "know-how," was improperly valued (the "Know-How Case"), but Norex contends that it was never served properly in that action despite having notified the Russian court of its legal position concerning service of process. (Id. ¶¶ 7-32.)

Norex and its expert witnesses assert that Norex cannot obtain fair hearings or decisions in the Russian courts because of widespread corruption of political and judicial officials and the ability of powerful Russian oil interests to wield undue influence over the Russian courts. Norex acknowledges that the adverse decision in the Know-How Case (which Norex did not appeal in the Russian courts) would be preclusive of its claims premised on alleged deprivation of its majority ownership stake in Yugraneft were those claims to be pursued in the Russian system. Norex's time to appeal the Know-How Case decision expired two days before this case was commenced in this Court. (Decl. of Sergey B. Zaitsev ¶¶ 113-18.)

*DISCUSSION*
I. Choice of Forum

[1] Defendants move to dismiss the Complaint based on the doctrine of *forum non conveniens*, an equitable doctrine which allows a court to "resist imposition on its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute" [FN3] and determine "where litigation will be most convenient and will serve the ends of justice." *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir.1998). In making such a determination, the Court undertakes a three-step inquiry, which involves (1) determining the level of deference to which the plaintiff's choice of forum is entitled, (2) considering whether there is an adequate alternate forum for the litigation, and (3) balancing *576 the public and private interest factors to ascertain whether the plaintiff's chosen forum or the defendant's proposed alternative forum is more convenient. *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73-74 (2d Cir.2001).

FN3. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507, 67 S.Ct. 839, 91 L.Ed. 1055 (1947).

[2] As an initial matter, the Court must consider the level of deference to be provided to Plaintiff's choice of forum. *Iragorri*, 274 F.3d at 70-72. Generally, a plaintiff's choice of forum will not be disturbed; where the balance is strongly in favor of the defendant, however, and trial in the plaintiff's chosen forum "would be unnecessarily burdensome for the defendant or the court, dismissal is proper." *Id.* at 70-71. A plaintiff's choice is entitled to the highest level of deference where the plaintiff chooses to litigate it its home forum because it is assumed that the choice was one of convenience. *Id.* at 71. When a foreign plaintiff chooses a United States forum, however, that plaintiff's choice is entitled to less deference because of the potential for forum-shopping. *Id.*; see also *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981).

According to the Complaint, Norex is a Cypriot corporation that maintains a "representative" office and conducts, "through affiliates," business in Canada. (Compl.¶ 32.) Plaintiff argues that its "principal" place of business is Canada and that the United States is thus a more convenient forum for it than Russia. Plaintiff further asserts that the 1795 "Jay Treaty," which contains an "equivalent access" provision, entitles Norex to "the same 'substantial deference' provided to an American plaintiff." (Pl Mem. in Opp'n. at 29 (fn.omitted)). Even if Plaintiff is correct, however, in asserting that the equivalent access provision of the treaty entitles it to the same level of deference as a similarly-situated American, the principal focus of the deference analysis--the inquiry into the nexus between the plaintiff and the chosen forum--remains the same. "The greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*." *Iragorri*, 274 F.3d at 71-72. Like an expatriate American or one who chooses a United States forum other than the one in which he is resident, Plaintiff seeks to litigate in a forum that is not presumptively the most convenient one for it. *See Base Metal Trading SA v. Russian Aluminum*, 253 F.Supp.2d 681, 694 n. 9 (S.D.N.Y.2003); see also *Varnelo v. Eastwind Transport. Ltd.*, 2003 WL 230741, at *11-12 (S.D.N.Y. Feb.3, 2003). Thus, Plaintiff's choice is entitled to less than substantial deference, although the Court credits Plaintiff's representation that the United States is a more convenient forum for a

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

304 F.Supp.2d 570
304 F.Supp.2d 570, RICO Bus.Disp.Guide 10,680
**(Cite as: 304 F.Supp.2d 570)**

Page 6

Canadian citizen than is Russia, based on geographic proximity. The Court now turns to the other considerations relevant to the convenience analysis.

II. Adequate Alternate Forum

The Court must next determine whether there is an adequate alternate forum. *Piper,* 454 U.S. at 254 n. 22, 102 S.Ct. 252. An alternate forum is adequate where (1) the defendants can be served with process; and (2) "the forum permits 'litigation of the subject matter of the dispute.' " *Alfadda v. Fenn,* 159 F.3d 41, 45 (2d Cir.1998) (quoting *Piper* ). An identical cause of action need not be available in the alternative forum; in fact, the Second Circuit has expressly held that the nonexistence of a RICO statute in a foreign country does not, alone, preclude dismissal of a case on *forum non conveniens* grounds. *PT United Can Co.,* 138 F.3d at 74.

**\*577** Here, Defendants have expressed their willingness to consent to the jurisdiction of the courts of the Russian Federation, so the first prong of the alternative forum test is easily satisfied. *DiRienzo v. Philip Servs. Corp.,* 232 F.3d 49, 57 (2d Cir.2000); Joint Mem. of Law in Support of Defts.' Mot. to Dismiss at 27. Plaintiff argues that Russia is, nonetheless, an inadequate forum because (1) Russian law does not provide a cause of action for the claims at issue, (2) Russian court procedures are inadequate for this litigation, and (3) the Russian forum is corrupt.

[3] The parties have submitted opinions from several purported experts in Russian law discussing the adequacy of the Russian forum, among other issues. Plaintiff, citing Federal Rule of Evidence 702, has moved to strike the declarations of Defendants' experts Alexey Kostin and Paul B. Stephan III. Rule 702 sets forth standards for the admissibility of scientific, technical or other specialized evidence that may be helpful to the trier of fact. The Kostin and Stephan declarations deal, however, with issues of Russian law and have been presented to assist the Court in determining pertinent Russian legal issues. Federal Rule of Civil Procedure 44.1 provides that "[t]he court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1. The determination of foreign law is treated as a question of law. *Id.; Base Metal,* 253 F.Supp.2d at 700; *see also Curley v. AMR Corp.,* 153 F.3d 5, 13 (2d Cir.1998); *Norwest Financial, Inc. v. Fernandez,* 86 F.Supp.2d 212, 228 n. 15 (S.D.N.Y.2000). To the extent that the declarations constitute useful and informative testimony, the Court will consider them in evaluating the relevant questions of Russian law in this case. *See Base Metal,* 253 F.Supp.2d at 700. Plaintiff's motion to strike the Kostin and Stephan declarations is therefore denied.

Plaintiff and its experts also attack the Kostin and Stephan declarations as insufficiently grounded in practical experience in the Russian courts and/or naive as to the existence of alleged practical barriers to the assertion of certain of the litigation avenues those two proffer as potentially available to Plaintiff in the Russian courts. (*See generally* Mot. to Strike Defts' Expert Paul B. Stephan III; Mot. to Strike Defts' Expert Alexey Kostin; Zaitsev Decl. ¶ ¶ 162, 198-207; Decl. of Sergey A. Pashin ¶ ¶ 166-69.) The Court has weighed the criticisms of these two well-credentialed experts [FN4] as well as the respective opinions of the parties' experts in making its determinations regarding the adequacy of Russia as an alternative forum.

> FN4. Professor Stephan has taught Soviet and post-Soviet law at the University of Virginia School of Law since 1979 and holds an M.A. in Russian Studies from Yale University. He has worked for numerous businesses, government and non-government agencies on matters dealing with Soviet and Russian law. (Stephan Decl. ¶ ¶ 2-3.) His opinions on Russian law have been considered in a number of other cases in this Circuit. *See generally Base Metal; Films by Jove, Inc. v. Berov,* 154 F.Supp.2d 432 (E.D.N.Y.2001); *Pavlov v. Bank of New York Co.,* 135 F.Supp.2d 426 (S.D.N.Y.2001). Professor Kostin is the Senior Professor at the Private International and Civil Law Department of the Moscow State Institute of International Relations under the Ministry of Foreign Affairs of the Russian Federation and has been Vice President of the International Commercial Arbitration Court at the Russian Chamber of Commerce and Industry for over ten years. He is also a law practitioner, citizen, and permanent resident of Russia. (Kostin Decl. ¶ 1.)

[4] Defendants' experts posit that various causes of action are available to Plaintiff in Russia. Of these, the most **\*578** analogous to Plaintiff's RICO claims are Russian law claims of fraud or civil conspiracy.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

304 F.Supp.2d 570
304 F.Supp.2d 570, RICO Bus.Disp.Guide 10,680
**(Cite as: 304 F.Supp.2d 570)**

Page 7

(Decl. of Paul B. Stephan III ¶ 23; Decl. of Alexey Kostin ¶ ¶ 25, 27, 28.) Professor Stephan argues that Plaintiff would be able to bring a claim for damages in the Russian arbitrazh courts for injuries to Plaintiff's business interests. (Stephan Decl. ¶ 6.) Kostin opines that Plaintiff could also file claims in the courts of general jurisdiction or criminal courts. (Kostin Decl. ¶ ¶ 24-31.)

Plaintiff's expert, Sergey B. Zaitsev, concedes that Plaintiff could seek damages for general harm and unjust enrichment pursuant to Chapters 59 and 60 of the Russian Civil Code, [FN5] but argues that such remedies are practically unavailable to Norex as long as the Russian court's decision in the Know-How Case--voiding Norex' equity interest in Yugraneft--stands. (Pltf. Opp'n. at 32-33; Zaitsev Decl. ¶ ¶ 90-148.) It is undisputed that Norex, aware of the Russian court proceedings in the Know-How Case but contending that it was not served properly with process, declined to participate in those proceedings even to contest the court's jurisdiction, and allowed the time periods for normal appeals and collateral attack to lapse before filing the instant case in this District. (Zaitsev Dec. ¶ ¶ 110-48; Arbitrazh court decision, Decl. of Vladimir Kuznetsov, Ex. 16 (Norex "has provided no reference on the claim and declined to participate in the hearing of the claim despite having been notified of the place and time of the hearing in compliance with Article 10 of the Hague Convention of 1965."); *see also* Kostin Reply Decl. ¶ ¶ 32-38.) Moreover, to the extent Plaintiff's claims are barred in Russian courts, they are likewise barred here since this Court would also owe deference to the Russian court decision unless it is shown that the decision was rendered in a way that violated fundamental standards of procedural fairness. *See Base Metal, 253 F.Supp.2d at 702.*

FN5. (Decl. of Sergey B. Zaitsev ¶ 89.)

Zaitsev also acknowledges that, even after other means of collateral attack were time-barred, Plaintiff could have sought to raise newly revealed circumstances as a further basis for collateral attack, pursuant to Article 309 of the 2002 Arbitrazh Procedure Code of the Russian Federation. That article allows a petitioner to bring a challenge up to nine months after learning of the new circumstance. (Zaitsev Decl. ¶ ¶ 128-35.); *Accord Base Metal, 253 F.Supp.2d at 702* (discussing Article 309 as a valid means of pursuing appellate review). That such avenue may currently be unavailable to Norex because any "new circumstances" described in the Complaint in this action have clearly have been known to Plaintiff at this point for more than nine months (*see* Zaitsev Decl. ¶ 135) appears to be the product of Plaintiff's strategic choice to allow the time to lapse.

In addition, Articles 311(2) and (3) of the Arbitrazh Procedure Code provide for the reversal of a judicial act based on corruption, although a criminal conviction must first be obtained. (Zaitsev Decl. ¶ ¶ 136-39, 144.); *accord Base Metal, 253 F.Supp.2d at 703.* Zaitsev argues that, because Articles 311(2) and (3) require criminal conviction as a prerequisite, use of these provisions is very rare (Zaitsev Decl. ¶ 138; *see also* Pashin Decl. ¶ ¶ 71-73.) The corruption theory is, nonetheless, consistent with a principal factual premise of Plaintiff's claims in this Court. Finally, Professors Kostin and Stephan posit that Plaintiff might be able to bring a variety of other claims consistent with its factual allegations in the Russian courts, including claims based on Russian criminal, bankruptcy, and/or securities laws. (Stephan Decl. ¶ ¶ 25-27; Kostin Decl. ¶ ¶ 24-26, 29-31.)

**\*579** The doctrine of *forum non conveniens* does not require that the plaintiff be able to prevail on its claims; there simply must be a cause of action available. The fact that some of Norex's potential Russian law claims are now time-barred does not mean that Plaintiff does not have an adequate forum in Russia. Clearly, Plaintiff had a forum and waited for it to become unavailable.

Plaintiff also invokes alleged procedural differences between United States and Russian courts as grounds for a finding that the Russian forum is inadequate, arguing, among other things, that the Russian arbitrazh courts rarely, if ever, hear live testimony or permit cross-examination and that Russian discovery procedures are vastly more restrictive than those available in this country. (Zaitsev Decl. ¶ ¶ 149-161.) Defendants' expert, Kostin, identifies several procedural safeguards available in Russian civil and arbitrazh procedures including: an adversarial system; the court's obligation to notify parties about the time and place of hearings; the right of the parties to provide evidence to the court and the obligation of the parties to prove all allegations; the obligation of witnesses (party witnesses, non-party witnesses, and experts) to appear in court on request and give testimony; criminal liability of witnesses for refusal to testify, evasion of testimony, and perjury; appellate, cassation, and supervisory review; and the possibility of re-opening cases based on newly discovered circumstances. (Kostin Decl. ¶ 42.)

304 F.Supp.2d 570
304 F.Supp.2d 570, RICO Bus.Disp.Guide 10,680
**(Cite as: 304 F.Supp.2d 570)**

Page 8

Plaintiff's experts do not dispute that these procedural protections exist, although they do argue that some may not practically be available to the same degree as in the United States. A foreign court need not, however, provide the same procedures as United States courts in order to be considered an adequate forum. The Court finds that the procedural differences described by Plaintiff's expert do not render the Russian forum an inadequate one. *Cf. Base Metal,* 253 F.Supp.2d at 707 & n. 22 (rejecting argument that Russian procedures are inadequate to assure fair resolution of disputes because they are different from American procedures); *Parex v. Russian Savings Bank,* 116 F.Supp.2d 415, 423-25 (S.D.N.Y.2000) (same).

The third principal basis of Plaintiff's contention as to inadequacy of the Russian courts as an alternative forum is alleged widespread corruption of the Russian judiciary. Plaintiff proffers the declaration of Sergey Pashin, a retired Russian judge, who asserts that historical factors carrying over from Soviet times and susceptibility of courts to influence by corrupt local government officials stemming from national government underfunding of the judiciary, create an atmosphere in which corruption undermines the integrity of the Russian courts such that Norex cannot reasonably expect to receive a fair hearing in the Russian courts in its dispute with Defendants, who are alleged to be influential in Russia. (Pashin Decl. ¶¶ 31-59.) Pashin's declaration makes broad assertions regarding Russian courts' failure to follow principles of fair treatment and cites a hearsay account (which allegedly appeared in a newspaper report) of a court official's alleged acknowledgment of bribery as a problem in the courts. (*Id.* ¶ 46.) Pashin does not, however, provide evidence of corruption so widespread that an American court would be justified in rejecting any and all decisions of Russian courts as illegitimate, nor does Pashin proffer any evidence of corrupt influences on the judicial decisions at issue in this case. Zaitsev attempts to show the existence of corruption in the Know-How Case decisions by arguing that the decisions are so contrary to Russian law as to be explicable only on the basis of undue influence. (Zaitsev Decl. ¶¶ 2, 27, 66, 72, 85.) Zaitsev's principal evidence in this regard is his own *580 analysis of the respective provisions of two treaties, his assessment of ways in which Russian courts typically apply provisional remedies, and appellate decisions overturning lower court decisions similar to those reached in the Know-How Case. (Zaitsev Decl. ¶¶ 32, 41, 53-54, 59-72, 79-80.) Finally, Plaintiff cites risk factor provisions of disclosure documents apparently filed pursuant to United States securities laws, and a speech by Russian President Vladimir Putin citing corruption as a problem being addressed in connection with the court system, as evidence of corruption of the entire Russian legal system warranting rejection of Russia as an adequate forum. (Murray Decl. ¶¶ 311-14; Compl. ¶¶ 17-18.)

It is now axiomatic in the Second Circuit that "[i]t is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." *Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974, 982 (2d Cir.1993) (internal citations omitted). The sweeping generalizations, competing legal arguments, warnings in investment documentation, and hearsay acknowledgments of some degree of problems in a large court system cannot sufficiently support a finding that the Russian legal system as a whole lacks integrity, nor does Plaintiff's body of "evidence" warrant rejection on that basis of the Russian legal proceedings that Norex seeks to challenge here. The Court finds that Defendants have carried their burden of showing the existence of an adequate alternative forum. *Cf. Base Metal,* 253 F.Supp.2d at 708-09 (rejecting arguments that Russian forum is inherently unfair and corrupt and finding Russia to be an adequate alternative forum); *Pavlov,* 135 F.Supp.2d at 434 (same). [FN6]

> FN6. Plaintiff cites *Films By Jove, Inc. v. Berov,* 250 F.Supp.2d 156, 208, 216 (E.D.N.Y.2003) as a case that has declared the Russian judicial system to be corrupt. On the contrary, the plaintiffs in *Films By Jove* had proffered *specific evidence* of impropriety in the form of documents from the High Arbitrazh Court's file. Indeed, the trial judge in *Films By Jove* commented that "[a]lthough the alleged flaws in the Russian judicial system are troublesome, the present record does not support a sweeping condemnation of Russia's judiciary." *Id.* at 207.

III. *Gilbert Factors*

Having determined that an adequate alternate forum exists, the Court must now turn to weighing the relevant public and private interests examining factors originally articulated in *Gulf Oil Corp. v. Gilbert.* The public interests are: (1) the interest in having local disputes settled locally; (2) avoidance of problems in conflict of laws or application of foreign law; (3) administrative difficulties flowing

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

from court congestion; and (4) avoidance of burdening jurors with cases that have no impact on their community. *Piper,* 454 U.S. at 241 n. 6, 102 S.Ct. 252 (citing *Gilbert,* 330 U.S. at 509, 67 S.Ct. 839). The private factors are: (1) relative ease of access to sources of proof; (2) availability of compulsory process to procure witnesses; (3) the cost for witnesses to attend trial; (4) other factors " 'that make trial of a case easy, expeditious, and inexpensive.' " *Id.* (quoting *Gilbert,* 330 U.S. at 508, 67 S.Ct. 839).

A. *Public interest factors*

[5] The first public interest factor to be considered is that of having local disputes settled locally. Plaintiff seeks to focus on United States connections in its factual claims, arguing that the United States has a strong interest in preventing use of its banking system in connection with frauds and in preventing the orchestration of international frauds by United States persons. (Compl. ¶¶ 97-108; Pltf's Mem. in Opp'n. at 46.) Aside from its **581 conclusory allegations of overall direction and supervision of the alleged Illegal Scheme by United States persons and one specific allegation of a threat communicated to a person who was present in the United States at the time, however, the American connections identified by Plaintiff are merely financial channels allegedly used in the money laundering and tax fraud aspects of the Illegal Scheme. (Compl.¶¶ 80, 85, 86, 89.)

The central premise upon which all of Plaintiff's allegations of actionable harm rest is the allegation that Defendants have gained control of Russian entities and Russian company assets improperly, through frauds and violence carried out in Russia and involving Russian persons and institutions. This is clearly a matter that is principally of Russian concern; the viability of Plaintiff's contention that illegally-obtained assets have been concealed and manipulated through offshore entities' banking facilities (many of which are not located in the United States) is obviously largely dependent on a demonstration that the activities which took place in Russia were illegitimate. The public interest weighs in favor of resolution of these basic issues in the local Russian forum. *Cf. Base Metal,* 253 F.Supp.2d at 712-13 (holding that public interest factors favor Russia where controversy involved illegal takeover scheme of Russian aluminum industry). For the same reasons, the fourth factor, the burden on jurors, also weighs in favor of the Russian forum. Most of the parties are not United States persons, and the underlying events occurred largely in Russia.

American jurors have little interest in deciding these controversies, which are alleged to have had only limited and attenuated economic effects in the United States, and therefore, the burden on potential jurors is not justifiable. *See Varnelo,* 2003 WL 230741, at *32.

The second public interest factor, avoidance of problems in conflict of laws or the application of foreign law, likewise weighs in favor of the Russian forum, as resolution of this case would require extensive application of Russian law. Plaintiff's case is replete with allegations that Defendants have gained control of entities and assets through means prohibited by Russian law. (Compl. ¶¶ 124-74, 180-265, 269-81, 291-98; *see generally* Zaitsev Decl.; Decl. of Professor Bernard Black; Pashin Decl.; Decl. of Larisa Nukhimovna Ryabchenko; Expert Report of Marina V. Telyukina.) Nor is Plaintiff's focus on the putative need for analysis of RICO issues sufficient to cause this factor to favor an American forum. As previously noted, Plaintiff's allegations of corrupt behavior are premised principally on the illegitimacy of Defendants' actions under Russian law. While the need to apply foreign law is not a reason in and of itself to dismiss the case, this factor strongly favors the Russian forum. *Piper,* 454 U.S. at 260 n. 29, 102 S.Ct. 252.

Because there is no direct evidence that this court is more congested than the Russian courts, the third factor, court congestion, is neutral. *Cf. Varnelo,* 2003 WL 230741, at *31. On balance, the public interest factors taken as a whole, favor the Russian forum.

B. *Private interest factors*

[6] The first private interest factor, relative ease of access to sources of proof, weighs in favor of the Russian forum. As previously noted, the underlying "Illegal Scheme" largely involved Russian individuals and entities, and would have generated documents that likely remain in Russia, including documents created in connection with allegedly corrupt bankruptcies, allegedly corrupt Russian court decisions, and **582 the June 2001 Yugraneft shareholders' meeting and subsequent events.

Plaintiff instead chooses to focus its access to proof argument on evidence regarding the alleged "Slush Funds" and tax fraud. (Pltf. Opp'n. at 41-42.) To the extent that documents are located in the various alleged Slush Fund headquarters such as the Bahamas, the British Virgin Islands, and the Isle of Man, this factor is neutral as so applied. To the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

extent Plaintiff focuses on use of American banking institutions as conduits for transfers of allegedly illegitimate gains, the factor would appear to favor the American forum, particularly since Plaintiff purports to identify hundreds of financial institution-related witnesses and numerous financial transactions. This banking evidence is largely relevant, however, only to the extent Plaintiff is able to demonstrate the illegitimacy of Defendants' acquisition of the transferred funds. That basic demonstration requires, as explained above, the examination of proof concerning events in Russia.

Plaintiff has made no showing that proof of the alleged local and judicial corruption underlying the success of the Illegal Scheme is available outside of Russia. The banking evidence is thus secondary to the central issues involving the Illegal Scheme. As shown by the extensive submission of documents in connection with the briefing by both parties, many of the documents regarding these events are in Russian and would need to be translated into English for litigation in this Court. While this concern is not dispositive, it does present a burden that weighs in favor of proceeding in Russia. *Varnelo*, 2003 WL 230741, at *24. Considerations of ease of access to sources of proof therefore weigh in favor of the Russian forum.

As with its general arguments concerning access to sources of proof, Plaintiff's arguments regarding the location of documents focuses on its allegations of money laundering and wire fraud, asserting that numerous witnesses, including some 187 bank custodians, are located outside of Russia. (Pltf. Opp'n. at 42; *see also* Tr. Oral Arg. at 14.) A similar effort to focus on financial transactions in *Base Metal*, premised on similar allegations of corruption in Russian commodities transactions, was recently rejected:

> [T]he relevant allegations that may involve witnesses located in the United States pale in comparison to those involving persons and companies located in Russia. Furthermore, it is unlikely that testimony from bank officials would be necessary in any forum simply to document that funds were transferred through the use of banks in the United States.

253 F.Supp.2d at 711. Plaintiff's effort to divert this Court's attention is similarly unavailing. Plaintiff virtually ignores the factual issues and sources of proof that are central to the allegations raised in the Complaint-- the parties involved in the allegedly corrupt bankruptcies, the alleged bribes paid to Russian officials, the alleged corruption of Russian judges, the "thugs" who were allegedly used to seize control of Yugraneft's offices, and the allegedly intimidated local Yugraneft personnel. These events point to persons located in Russia whom this Court could not reach with compulsory process, and whom it would be quite costly to bring to New York for trial even if they were willing to attend voluntarily.

With respect to witnesses to the Russian events, Plaintiff represents that there are several third-party witnesses to the armed takeover of Yugraneft's offices who are located in the United States and Canada. Of the ten witnesses listed by Norex President Philip Murray in his declaration, only two are Americans; one is located in Cyprus, and the remaining seven are Canadian. (*583 Murray Decl. ¶ 127.) At best, the location of witnesses in Canada and Cyprus is neutral from the compulsory process standpoint. The existence of two U.S. witnesses to the alleged armed takeover does not tip the balance in Plaintiff's favor where the gravamen of the alleged impropriety has to do with court processes and Russian corporate governance rather than the physical means by which corporate and judicial actions adverse to Plaintiff were implemented.

Nor does the alleged unwillingness of Plaintiff's witnesses to travel to Russia constitute a private factor weighing significantly in favor of the American forum. Although the Second Circuit has held, in a case involving individual American plaintiffs who sued an American in their home forum for personal injuries and wrongful death sustained in a terrorist attack abroad, that the "substantial and unusual emotional burden on [those p]laintiffs if they were required to travel to Egypt provides additional support for keeping the case in their chosen forum of New York," [FN7] and although a judge of this District has, without elaboration, determined that Iran was an inadequate forum based on his lack of any "confidence whatsoever in the plaintiffs' ability to obtain justice at the hands of the courts administered by Iranian mullahs" and his conclusion that "if the plaintiffs returned to Iran to prosecute [their] claim they would probably be shot," [FN8] the dominant rule is that even a party's asserted fear of imprisonment or persecution in the alternate forum is insufficient to render that forum inadequate. *See Base Metal* 253 F.Supp.2d at 711.

FN7. *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147 (2d Cir.2000).

FN8. *Rasoulzadeh v. Associated Press*, 574 F.Supp. 854, 861 (S.D.N.Y.1983).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Here, Plaintiff alleges that its chairman has been the target of illegitimate criminal proceedings in Russia, and both he and Plaintiff's corporate president assert that they would not return to Russia to testify in this lawsuit for fear of further pursuit of criminal proceedings against them. As Judge Koeltl explained when presented with the same argument in *Base Metal*, this Court has no way of knowing whether putative criminal charges against a witness have merit, but the witness's refusal to return to Russia to answer the charges is not a sufficient basis for retaining the action in this Court. *See id.* at 711. Plaintiff also argues that third-party witnesses claim to have been victimized by the alleged armed takeover of Yugraneft and therefore refuse to return to Russia. (Murray Decl. ¶¶ 128, 323-24.) These assertions, even if credited fully, neither demonstrate that a critical number of crucial witnesses to the facts underlying Plaintiff's claims would be effectively unavailable in the Russian forum, nor, in light of the factors discussed extensively above, do they shift the overall balance of convenience toward the American forum. Indeed, in light of Plaintiff's assertion that Russian courts do not typically entertain live testimony, the unwillingness of witnesses to travel physically to Russia is a neutral factor in the analysis at best.

Because the core allegations are based on Russian events, however, the availability of witnesses and the cost for them to attend trial tips at least somewhat in favor of the Russian forum. Finally, the Court notes Plaintiff's assertion that many of the Defendant companies regularly do business in, and/or have representatives who travel frequently to, the United States. (Pltf. Opp'n. at 44-45; Murray Decl. ¶¶ 287-300.) Even taken as true, this does not undermine the clear indications--apparent from the allegations set forth in Plaintiff's Complaint and RICO statement-- that the evidentiary center of gravity of this litigation is located in Russia. On the whole, the availability of witnesses, *584 the cost to transport even willing witnesses to provide testimony in New York, the location of documents, and the need for interpretation of Russian-language testimony and documents if the matter were to be litigated in New York, weigh significantly in favor of the Russian forum.

## CONCLUSION

The Court is persuaded that both the public and private interest factors, considered in their entirety, strongly favor the Russian forum and finds that Defendants have met their burden of showing that Russia provides an adequate alternate forum. Therefore, Defendants' Motion to Dismiss is granted on grounds of *forum non conveniens*. Plaintiff's Motions to Strike the Declarations of Defendants' Experts Paul B. Stephan, III and Alexey Kostin are denied. The pending motions are denied as moot in all other respects. The Clerk of Court is directed to enter judgment dismissing this litigation on *forum non conveniens* grounds and close this case.

304 F.Supp.2d 570, RICO Bus.Disp.Guide 10,680

Motions, Pleadings and Filings (Back to top)

• 1:02CV01499 (Docket) (Feb. 26, 2002)

END OF DOCUMENT