**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**NOREX PETROLEUM LIMITED**

         **Petitioner,**

    **v.**

**CHUBB INSURANCE COMPANY OF**
**CANADA**
      **et al**

         **Respondents.**

**No.   1:04-MC-00281-CKK**

**DECLARATION OF ALEX ROTZANG**

    I,  Alex Rotzang, pursuant to the provisions of 28 U.S.C. §1746, hereby declare as follows:

    1.   I am the Chairman of Norex Petroleum Limited, the plaintiff in an action filed in the Alberta courts against Chubb Insurance Company of Canada ("Chubb"), Ingosstrakh Insurance Company, Ltd ("Ingosstrakh"), and Great Northern Insurance Company ("Great Northern") ("Canadian Litigation").

    2.   I make this declaration to respond to the filing which BP America Inc. ("BP") made in opposition to Norex's motion to compel enforcement of a subpoena and cross-motion to quash in the instant matter ("BP Opposition").

**BP's Close Cooperation with Norex**

    3.   BP was an investor in and managed Sidanco, an oil company which controlled Chernogorneft, another oil company of which Sidanco was the majority owner.

    4.   In 1999 TNK instigated the bankruptcy of Chernogorneft.

5.   BP and Norex closely cooperated during and after the bankruptcy of Chernogorneft, which included the exchange of documents and information.

6.   Throughout the Chernogorneft bankruptcy to about 2001, Norex's and BP's interests were aligned in that they were both harmed by TNK's corruption of Russian governmental officials and courts.

7.   BP's and Norex's representatives frequently met and discussed developments and exchanged information, including the exchange of documents.

8.   For example from 1999 to 2001, I had numerous meetings with BP executives including Dr. Samuel M. Bennett, Peter A. Charow, Edward Whitehead, Alistair Graham, Howard Chase and Robert Shepard.   During these meetings we discussed various issues related to Chernogorneft bankruptcy as well as developed strategy to deal with corrupt Russian court proceedings.

9.   During these meetings, I was advised by BP representatives that any information that Norex provided to BP would be used for the then ongoing political and media campaign organized in Washington to prevent TNK from obtaining a $500 million loan guarantee from the Export Import Bank of the United States ("Ex-Im Bank") in order to exert pressure on TNK to stop corrupting Russian court proceedings.

10. I was further advised by BP that it provided information about TNK's wrongdoing to various agencies of the United States government including the Central Intelligence Agency ("CIA").  I believe that the document received from the CIA as the result of Freedom of Information Act Request, (Norex's Motion to Compel (the "Motion"), Ex I) is based on the information provided to the CIA by BP.

**BP's Knowledge of TNK is Directly Related to Norex' Loss**

11. Contrary to the BP's contention that Norex's loss is unrelated to the information in the hands of BP, (BP Opposition at 15, 16), the information in the hands of BP is relevant not only to the issue of corrupt court proceedings but also to the value and location of the equipment at question in the Canadian Litigation.

12. Subsequently to TNK's armed seizure of Yugraneft in June 2001, I met with Robert Shepard, a BP executive with whom I maintained close contact since the commencement of Chernogorneft bankruptcy in 1999 and informed him of the seizure.

13.  At that time, BP was still in the process of negotiating with TNK the return of Chernogorneft's assets, which included its shares in Yugraneft, in a complex restructuring deal involving *inter alia* the Ex-Im Bank guarantee.

14. At the meeting, Mr. Shepard suggested that Norex file an action against BP in London because BP would have control over Yugraneft and its assets including the equipment at issue in the Canadian Litigation.  Mr. Shepard stated that BP would not object to such action because it was covered by indemnity from TNK, which would have to settle the claim.

15. Norex then retained lawyers to prepare an action to claim lost assets against BP for which BP provided certain documents and information.

16. Shortly thereafter, when I told Mr. Shepard that Norex was now in a position  to start legal action against BP in London he informed me that TNK decided not to include Chernogorneft's shares in Yugraneft in the deal with BP and, as such, BP would not attain control over Yugraneft and litigation in London would now be impractical .

17. However, Mr. Shepard further informed me that there was another deal "in the wind" where BP would attain control over all of the TNK's assets including Chernogorneft's shares in Yugraneft and then Norex would be able to prosecute its claim against BP.

18. Subsequently, BP stopped cooperating with Norex in late 2001.

19. Contrary to BP's contention "that TNK and BP p.l.c. settled their differences over the bankruptcy proceedings at the end of 1999," (BP Opposition at 2), the final agreement over 1999 Chernogorneft bankruptcy was concluded only in the summer of 2001.  (Exhibit "A".)

20. Ultimately, the joint venture between BP and TNK was not consummated until late 2003.

21. I am informed that BP continued to conduct due diligence of TNK the final agreement between BP and TNK required TNK to indemnify BP for any loss suffered as a result of Norex's claims.

22. BP controls the equipment at issue in the Canadian Litigation through its ownership in TNK-BP, a joint venture which ultimately owns Yugraneft.

**Norex's Petition Was Not Filed in the United States Until May 2004
Because the Canadian Litigation was Held in Abeyance at the Instance of Chubb**

23.  BP alleges that Norex "waited two years" from the time the Canadian Litigation commenced to the time the petition at issue was filed, referencing the "belated nature" of the petition.  (BP Opposition at 7, 18).  This is incorrect.

24. Norex put Chubb and Ingosstrakh on notice of a potential claim in connection with the subject-matter of the Canadian Litigation, and provided them with sworn Proofs of Loss in connection therewith, as set forth in the Statement of Claim in the Canadian Litigation (Motion, Ex. C ¶¶ 17, 18).

25. The Canadian Litigation was commenced on June 28, 2002.  At Chubb's request, from July, 2002 through February, 2004 the Canadian Litigation did not move forward in order that

Chubb could "investigate" Norex's claim.  Chubb advised Norex that it had a duty to co-operate with Chubb in the "investigation" of the claim pursuant to the insurance policy, and Norex did co-operate with Chubb in its "investigation" of Norex's claim during this time frame.

26. This co-operation included a number of meetings between the parties and their counsel as well as the provision of many records by Norex to Chubb.  In addition, I personally provided Chubb with the names and contact numbers of lawyers and suggested investigators who could assist Chubb with its "investigation" in Russia.   Moreover, I provided Chubb with introduction letters to former Norex and Yugraneft employees who were supposed to be contacted by Chubb in the course of its "investigation" but never were.

27. After Chubb's "investigation" was complete in early 2004, it reaffirmed its denial of coverage.

28. Chubb produced its records in the Canadian litigation in April of 2002.  This production contained 244 documents and I have reviewed these documents.  The types of documents which Norex is seeking in the petition at issue are not included in this production.

29. Norex then filed the instant petition in May, 2004.

30. In October, 2004 Chubb produced an additional 171 documents.  I have reviewed these documents and they do not include the types of documents which Norex is seeking in the instant petition.

31. Examinations for Discovery as between Norex and Chubb were scheduled to proceed in November, 2004.  However, they were cancelled due to the fact that counsel for Ingosstrakh wished to observe them and he had a conflict with the dates.

32. The Canadian Litigation has now been put into case management and the initial case management conference has been scheduled for January 21, 2005.  It is anticipated that at that

time the case management judge will prescribe deadlines for Examinations for Discovery as well
as for the various steps to be taken with respect to Ingosstrakh's *forum non conveniens*
application, which is described in more detail below.

### The Documents Regarding TNK's Corruption of Russian Proceedings Are Highly Relevant to Opposing Ingosstrakh's Motion to Dismiss for *Forum Non Conveniens*

33. Although Ingosstrakh filed its statement of defense on August 12, 2002, it still has not
produced its records in the Canadian Litigation.  Instead, in June of 2004 it filed an application to
dismiss or stay the Canadian Litigation as against itself on the basis of *forum non conveniens*.

34. Ingosstrakh's *forum non conveniens* application was supported by a number of affidavits.
Cross-examinations on these affidavits commenced in September, 2004 and are anticipated to
continue in early 2005.

35. The documents obtained from BP as the result of the instant petition are intended in part
for use by Norex at these cross-examinations.  In particular, the documents sought are relevant to
opposing Ingosstrakh's motion to dismiss because they may evidence that Russian courts are
susceptible to corruption, as BP repeatedly alleged during the time period of its dispute with
TNK.

### The Documents Regarding TNK's Corruption of Russian Proceeding Are Highly Relevant to Proving the Merits of the Case

36. The documents obtained from BP as the result of the instant petition are also intended for
use by Norex in the context of its claim against both Chubb and Ingosstrakh.

37. BP asserts that the documents are unrelated to the merits of the case because Norex's
theory of liability is allegedly based solely on the "Sudden and Unexpected" event, i.e. the
seizure of the oil equipment.  (BP Opposition at 3).   BP also alleges that the documents sought
are not relevant because the 1999 bankruptcy of Chernogorneft is not causally related to Norex's

loss (BP Opposition at 3-4) and that the 1999 bankruptcy is "peripheral" and "has practically nothing to do with the theory of liability set forth in the Canadian litigation."  (BP Opposition at 15).   This is incorrect.

38. First, while loss under the Ingosstrakh policy is based on a "Sudden and Unexpected" event, this would include both the corrupted court proceeding and physical seizure in 2001. (Exhibit "B" at 1.)  Norex brought claim against Ingosstrakh to satisfy Chubb's policy requirement that it vigorously pursue Ingosstrakh, the first insurer.

39. With respect to Chubb, Norex seeks to recover for "direct physical loss of or damage to the insured property."  (Motion, Ex. C, ¶15, Exhibit "C" at 1.)

40. The "direct physical loss of or damage to the insured property" was the result of the fraudulent and illegal scheme described in paragraphs 8 through 10 of the Statement of Claim. (Motion, Ex. C, ¶15).

41.  The 1999 Chernogorneft bankruptcy is an integral part of the "fraudulent and illegal scheme" by TNK, which claimed to obtain an interest in Yugraneft in February 2000, purportedly reduced Norex's interest in Yugraneft from 97.64% to 60% in April 2001, and, ultimately, took over Yugraneft through corrupted court proceedings and physical force in June-July 2001.  (Motion, Ex. C ¶¶8-11).

### The Documents Regarding the Oilfield Equipment are Highly Relevant to Proving Damages and Other Aspects of the Claim

42. BP completely ignores that the subpoena also seeks documents evidencing the value, insurance coverage, and location of the Oilfield Equipment.  (Motion, Ex. A, Rider at 2.)  These documents are highly relevant to proving damages and other aspects of the claim against Chubb.

**Norex's Position is that it is Not Required to Commence an Action
in Russia in Order to Sustain its Claim Against Chubb**

43. BP suggests that Norex will be required to institute action in Russia against Ingosstrakh if this claim against it is dismissed on *forum non conveniens* grounds.  (BP Opposition at 18).  It also calls this a "threshold issue."  (BP Opposition at 18).   Norex disputes this.

44. Norex's position is that a *forum non conveniens* dismissal of Norex's claim against Ingosstrakh would create a right to claim against Chubb because, as BP admits, "coverage was not available or paid on the Ingosstrakh Policy."  (Motion, Ex. E at 17, 18)

45. Norex's position is that it will have satisfied the "vigorous pursuit" of Ingosstrakh required under the Chubb coverage.  Norex takes the position that it is not required to commence an action against Ingosstrakh in Russia for many reasons, including (a) Russian courts are inadequate, (b) Norex's witnesses will not to go to Russia because of past physical force; (c) I will not go there because of the threat of false arrest; (d) Norex should not be required to assert claims in more than one jurisdiction; and (e) Norex should not be required to litigate a claim under a policy issued in Canada in another jurisdiction.

**Chubb's Allegations Regarding Norex's Motives Have No Record Support**

46. BP's claim that Chubb has submitted evidence of Norex's bad faith is false. (BP Opposition at 8, 19).

47. Chubb has only made allegations of bad faith on the part of Norex in its Statement of Claim, and has not produced a single document supporting these allegations.

**Norex's Willingness to End the Canadian Litigation**

48. Norex is willing to accept payment of its claim in full to end the Canadian litigation.

I declare outside of the United States under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct.

Date: _Dec 21 / 2004_

# EXHIBIT "A"



**bp**

Site Index | Contact us | Reports and publications | BP worldwide | Home

Search: [                    ] Go

About BP | Environment and society | Products and services | Investors | **Press** | Careers

▶ BP Global    Press

Browse by theme

## BP Welcomes Return Of Chernogorneft Assets To Sidanco

Release date: 02 August 2001

The following press release has been issued today by BP in Moscow.

BP is pleased to announce it has signed a Memorandum of Understanding (the MOU) with Novy Petroleum (owners of the TNK Group), for the return to Sidanco of the assets formerly held by its Chernogorneft subsidiary.

The MOU expands on the Heads of Agreement of December 1999 between the Sidanco shareholders and Alfa - TNK, and follows the more recent agreement reached between certain affiliates of Interros Holdings (Interros) and Novy and several companies associated with Novy, for the acquisition by Novy of a 44% equity interest in Sidanco.

The MOU outlines the arrangements under which BP will retain its 10% equity interest in Sidanco and will continue to lead the management of the holding company and its subsidiaries. It also provides for Novy representation on the Sidanco management team. It sets out terms and conditions under which BP's equity and management interests will be assured. Once completed this transaction will considerably increase Sidanco's financial and production base. Sidanco production will about double to approximately 330,000 barrels a day.

BP's Group Vice President, Upstream, Mr Ralph Alexander said: "Securing the return of the Chernogorneft assets to Sidanco has been an important issue for BP and Sidanco for some time. This agreement now provides the commitment and the terms under which that will happen; so it is a very positive development. We anticipate closure of this transaction in a matter of days. A financially strong and well-run Sidanco has been crucial in getting the assets returned. Sidanco is a better managed company than ever before. It has been returned to robust health and will now have the materiality to again become a leading domestic player in Russia."

**Notes:**

    a.   Novy Petroleum owns Tyumen Oil Company (TNK). In turn Novy Petroleum is owned by Alfa Group (50%), Access (25%) and Renova (25%).

    b.   BP is one of the largest foreign investors in the Russian Federation with total investments to date of over $1.5 billion.

        Principal BP interests in Russia are:

        A 10% equity interest in OAO Sidanco.

        A 28% equity interest in RUSIA Petroleum, following license unification.

        A 14% equity interest in Caspian Pipeline Consortium (owned through LukArco), which translates to BP financing 28% of this internationally important pipeline project designed to connect the Tengiz oil field in Western Kazakhstan to the Novorosisk marine terminal on the Russian Black Sea coast.

        A network of 31 world-class gasoline retail stations in Moscow.

        Joint bidding agreements with Rosneft and Sakhalinmorneftegas for the potential exploration of Sakhalin 4 and 5.

        Established, successful and growing Oil Trading and Lubricants

# EXHIBIT "B"



# GENERAL CONDITIONS
## FOR INSURING INDUSTRIAL AND COMMERCIAL ENTERPRISES
### ("ALL RISKS")

1. Property Covered;
2. Perils Insured Against;
3. Valuation Clause;
4. Insured Territory;
5. Policy Insurance;
6. Premium Payment;
7. Policy Inception;
8. Policy Cancellation;
9. Alterations and Use Clause;
10. Violation of Safety Standards;
11. Other Insurance;
12. Third Party Insurance;
13. Duties in the Event of a Loss;
14. Concealment, Fraud, or Gross Negligence;
15. Loss Payable Clause;
16. Form of Documentation;

## 1. Property Covered.

The insured can either be the Russian or foreign juridical and physical person that has legal interest towards the property insured.

The present General Conditions are integral part of the insurance policy, but can be amended or changed in certain points while signing the policy as well as during the period of insurance.

1.1. Unless specifically described in the insurance policy or by endorsement, insured property is that which is fully owned by the Insured. Also, insured is that property which purchased by the Insured on credit and which serves as collateral to that credit.

1.2. The following items are not covered unless specifically declared in the insurance policy:

1.2.1. Cash, either in Roubles or foreign currency;
1.2.2. Shares, government bonds and other valuable papers;
1.2.3. Manuscripts, blueprints, drawings and other documents, as well as accounting books and ledgers;
1.2.4. Models, specimen samples, casts, etc.;
1.2.5. Precious metals in bullion and unmounted precious stones;
1.2.6. Storage, media for computer and similar systems, in particular, magnetic tapes and cassettes, magnetic discs, hard discs, etc.;
1.2.7. Stamps, coins, bills and currency, drawings, paintings, sculptures and other collections and works of art;
1.2.8. Explosives;

1.2.9. Goods accepted by the insured for storage or consignment;
1.2.10. Means of transportation, moving construction, agriculture or other machines; any equipment for off-shore oil exploration or that of other resources;
1.2.11. Property on the insured premises which is not owned by the insured;
1.2.12. Property rented, leased, or hired by the insured, as well as that temporarily under the insured's control.
1.2.13. The above-mentioned items (1.2.) are insurable by endorsement by two parties. The insurance policy, in the case, should contain a special clause thereof.

## 2. Perils Insured Against.

2.1. Ingosstrakh will insure against damages to or loss of insured property caused as a result of a sudden and unexpected event.

2.2. Irrespective of cause, the present policy will not cover damages to or loss of insured property due to the following:
2.2.1. War or military actions of any kind and consequences thereof, irrespective of whether it was a declared or an undeclared war, as well as attacks of armed forces of either lawful or unlawful government coming from land, air or sea, or an immediate threat thereof;
2.2.2. Use of nuclear energy of any kind and consequences thereof;
2.2.3. Use or storage of bombs, mines, shells or other weaponry;

**ИНГОССТРАХ**
*Ingosstrakh*

2.2.4. Civil wars, armed uprisings, mutinies, actions of armed rebels or terrorists, as well as actions of the authorities directed to their suppression;

2.2.5. Confiscation, requisition, arrest, destruction of damage to property resulting from order of military or civil authorities, or other reactions of administrative bodies;

2.2.6. Fines, forfeits or other similar monetary sanctions applied to the insured or his employees in accordance with the legislation or other actions of authorities in force on the insured territory;

2.2.7. Indirect losses resulting, in particular, from goods delivery delays, production slow-down, business interruption, loss of profit, reduction of the amount of goods and services being produced, even if such losses resulted from events after which Ingosstrakh should have covered them under the present general insurance conditions;

2.2.8. Insured property natural wear or gradual loss of properties;

2.2.9. Corrosion, oxidation, fermentation, rotting or other natural properties or insured items;

2.2.10. International or gross negligence on the part of the insured or his employees;

2.2.11. Setting, cracking, compression, expansion or bulging of streets or sidewalks, as well as basements, walls, supporting structures of buildings, if they did not result from sudden of unpredictable external action;

2.2.12. Defects and faults in insured buildings and structures that they had at the time of the policy issuance and that should have been known to the insured and his management.


2.3. The following losses are covered, if they resulted directly from

- fire, lighting;

- explosion (except 2.2.);

- fallen piloted objects, or ground vehicles that drove into insured buildings;

2.3.1. Contamination of insured property with harmful substance;

2.3.2. Damages to insured property resulting from construction, assembly, restructuring or renovation work in insured buildings;

2.3.3. Unexplained disappearance of insured property, its absence during inventory, pilferage or theft (without breaking into insured premises);

2.3.4. Damages to insured property resulting from rain, snow or other precipitation, changes in temperature, humidity or other natural factors typical for climatic conditions of territory, as well as changes in colour, odor, weight or insured property, or its shrinking, drying, stretching, leakage or evaporation;

2.4. Unless added by endorsement, Ingosstrakh does not cover losses that incurred;

2.4.1. As a result of national disturbances, strikes or lock-outs;

2.4.2. During transportation of insured property within the insured premises;

2.4.3. As a result of damages to machines and equipment, if they were not caused by sudden and unpredictable external events of occurred during assembly, adjustment, reconstruction, maintenance or repair;

2.4.4. As a result of errors in design or planning;

2.4.5. As a result of product defects or flawed materials.

2.5. There should be a separate endorsement regarding coverage of losses listed in 2.4. in the insurance agreement.

2.6. Ingosstrakh does not cover losses incurred as a result of the following, unless added by endorsement:

2.6.1. Expenses connected with territory clean-ups from remnants of insured buildings and structures or their demolition;

2.6.2. Expenses connected with services of professional or volunteer fire-fighting brigades or other organisations which, in accordance with legislation or their own regulations, have to do everything possible to put out a fire or prevent it.

if the policy covers any of the above-mentioned expenses, there should be an added endorsement thereabout in it.

2.7. Losses resulting from an earthquake are covered, only if the insured proves that the seismogeological conditions of the area where building and structures are located.

2.8 Losses resulting from landslides, ground settling or other ground movement are covered, only if they were not caused by explosions, earthdigging or other earth work, as well as mining of solid, liquid or gaseous resources.

2.9. Losses resulting from storms, blizzards, hurricanes, tornadoes or other air movements caused by natural processes in the atmosphere are covered, only if the velocity of the wind that caused damages was not less than 60 km/hour. Wind velocity is confirmed by reports of the corresponding offices of the Hydrometcentre.
Losses resulting from rain, snow, hail or dirt getting into insured buildings through open windows, doors or other openings are not covered, unless these openings resulted from storms, blizzards, hurricanes or tornadoes.

2.10. If one of the causes of damages to or destruction of insured buildings or structures was their old age, partial collapse or flaws due to prolonged use, Ingosstrakh is entitled not to cover the losses to the extent their old age



affected the size of damage. If the Insured proves that their old age did not affect the extent of damage, Ingosstrakh will cover the losses.

### 3. Valuation Clause.

3.1. Insurance cannot serve as a source of unwarranted enrichment for the insured. The amount of recovery is based on the actual cash value of the insured property at the time of loss and is to be calculated on the basis of replacement value less depreciation.

3.2. The actual cash value is determined as follows:
3.2.1. For equipment, machines, inventory, domestic and personal property: replacement cost less depreciation;
3.2.2. For buildings and structures: new construction of like kind and quality, on the same location, less depreciation and taking into account the operational condition;
3.2.3. For goods manufactured by the Insured (both finished and unfinished): manufacturer's costs to replace the lost or damaged goods, but not exceed their retail value;
3.2.4. For retail goods and raw materials: replacement costs, but not to exceed the price at the time of the loss. The actual cost is based on prices on the day of the loss.

3.3. The insured value amount for each insured item should correspond to its actual cost.

3.4. If the insured value stated in the insurance policy is less than the actual cost of the insured property at the time of the loss, payment for the losses stated in 3.6. will be made on the basis of the relation of the insured value to the actual cost of the insured property.
This will be determined individually for each insured item or on group basis.

3.5. If the insured value exceeds the actual cost of insured property considerably, both Ingosstrakh and the insured can request that the insured value be lowered and premiums recalculated.

3.6. Under present policy only reasonable and purposeful expenses incurred by the insured for the sake of prevention of decrease of losses, as well as resulting from attempts to save the insured property, are covered.

3.7. In no event shall payment of claims, including those in 3.6., exceed the policy limit.

3.8. After payment is made, the policy limit will be decreased by the amount of payment and will be effective as the date of the loss. Upon replacement of the damaged property, the initial policy limit may be reinstated for an additional premium.

### 4. Insured Territory.

4.1. If there is no additional endorsement, movable property is considered insured only if on the premises stated in the insurance policy (insurance territory). If the property is moved, it is not covered by the policy.

4.2. Insured territory is the territory of the country or countries as well as other administrative divisions, determined by the two parties and stated in the insurance policy.
If the insured property is moved beyond the insured territory, it is not covered.

### 5. Policy Issuance.

5.1. The insurance policy will be issued after written application is received from the insured.
This written application must include all necessary information about items and articles to be insured. Upon its receipt by Ingosstrakh, the application becomes part of the insurance policy.

5.2. At the time of application submission, the insured must inform Ingosstrakh of any circumstances that would significantly affect the risk to be insured. The insured must answer every question in order to determine the degree of risk of property to be insured.
Failure on the part of the insured to meet these requirements will give Ingosstrakh the right to cancel the policy and it will be absolved of all further liability.

5.3. The insurance policy goes into effect upon written confirmation by Ingosstrakh.
The insured is then issued an insurance policy. At the time of issuance of the insurance policy, all documents issued earlier by Ingosstrakh are superseded.

### 6. Premium Payment.

6.1. If the insurance policy does not state otherwise, the insured must pay the first instalment of the premium immediately upon receipt of the Policy and invoice from Ingosstrakh. Subsequent payments must be made before the beginning of each insurance period.

6.2. In the event of non-payment of the premium by the insured in the time, as defined in the insurance policy, the Ingosstrakh has the right to cancel the policy before the premium is paid

6.3. If the insurance premium for the corresponding period has not been paid when a loss occurs, Ingosstrakh has the right to decline payment of the claim.

# EXHIBIT "C"



**CHUBB**

# International Commercial Property/Income Insurance Covered Causes of Loss

**COVERAGE**

We will pay for direct physical loss of, or damage to, each Subject of Insurance when a Limit of Insurance is stated in the Declarations, except as stated in Limitations or Exclusions.

**EXCLUSIONS**

We will not pay for loss of, or damage to, any Subject of Insurance caused by or resulting from any of the following:

**WAR AND MILITARY ACTION**

1. war, including undeclared or civil war;

2. warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign power or other authority using military personnel or other agents;

3. insurrection, rebellion, revolution, usurped power, or action taken by governmental authority, whether de jure or de facto, in hindering or defending against any of these;

4. any direct or indirect loss that results from war or military action even wazzu if the resulting loss would otherwise be covered; or

5. any such direct or indirect loss or damage caused by, resulting from, contributed to or made worse by **acts or decisions or planning, design, materials or maintenance.**

**GOVERNMENTAL ACTION**

1. seizure, confiscation, expropriation, nationalization or destruction of **property** by order of governmental authority, whether de jure or de facto;

2. any direct or indirect loss that results from governmental action even if the resulting loss would otherwise be covered; or

3. any such direct or indirect loss or damage caused by, resulting from, contributed to or made worse by **acts or decisions or planning, design, materials or maintenance.**



**BUT**

**EXCLUSIONS**

this exclusion does not apply to acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this insurance.

**NUCLEAR HAZARD**

1. nuclear reaction or radiation, or radioactive contamination, however caused; or
2. any such direct or indirect loss or damage caused by, resulting from, contributed to or made worse by **acts or decisions or planning, design, materials or maintenance.**

**BUT**

this exclusion does not apply to any ensuing direct physical loss or damage by fire.

**DISHONESTY**

fraudulent, dishonest or criminal acts or omissions committed alone or in collusion with others by:

1. you;
2. your employees; or
3. anyone authorized to act for you.

**BUT**

**EXCLUSIONS**

this exclusion does not apply to:

1. acts of vandalism;
2. acts committed by carriers for hire or anyone claiming to be a carrier for hire; or
3. any ensuing direct physical loss or damage by **fire or lightning, explosion, smoke, leakage, wing or hail or riot or civil commotion.**

**WEAR AND TEAR**

wear and tear or gradual deterioration.

**BUT**

this exclusion does not apply to any ensuing direct physical loss or damage by a Covered Cause of Loss.

**ERRORS IN SYSTEMS PROGRAMMING**

errors in systems programming.

**BUT**

this exclusion does not apply to any ensuing direct physical loss or damage by **fire or lightning, explosion, smoke, leakage, wind or hail, riot or civil commotion, vandalism or burglary or hijack.**



**CHUBB**

**MISTAKES**

EXCLUSIONS

errors, other than errors in systems programming, that result in loss of, or damage to, **personal property** being worked on, altered or repaired if the loss or damage results from that work.

**BUT**

this exclusion does not apply to any ensuing direct physical loss or damage by a Covered Cause of Loss.

**INSECTS OR VERMIN**

EXCLUSIONS

insects or vermin.

**BUT**

this exclusion does not apply to any ensuing direct physical loss or damage by a Covered Cause of Loss.

**EARTHQUAKE**

1.   earthquake; or
2.   any such direct or indirect loss or damage caused by, resulting from, contributed to or made worse by **acts or decisions** or **planning, design, materials or maintenance.**

**BUT**

this exclusion does not apply to:

1.   any ensuing direct physical loss or damage by **fire or lightning, explosion, smoke, leakage, wind or hail, mine subsidence, riot or civil commotion, vandalism or burglary or hijack**; or
2.   **personal property** in transit.

**FLOOD**

1.   flood; or
2.   any such direct or indirect loss or damage caused by, resulting from, contributed to or made worse by **acts or decisions** or **planning, design, materials or maintenance.**

**BUT**

this exclusion does not apply to:

1.   any ensuing direct physical loss or damage by **fire or lightning, explosion, smoke, leakage, wind or hail, mine subsidence, riot or civil commotion, vandalism or burglary or hijack**; or
2.   **personal property** in transit.

**CONTAMINANTS OR POLLUTANTS**

EXCLUSIONS

discharge, dispersal, release or escape of **contaminants or pollutants** unless the discharge, dispersal, release or escape of **contaminants or pollutants** is itself caused by any of the **named causes of loss** or by **volcanic action.**

**BUT**

this exclusion does not apply to:





1. any ensuing direct physical loss or damage by a **named cause of loss**; or

**EXCLUSIONS**

2. **personal property in transit.**

**SETTLING**

settling, cracking, shrinkage or expansion of pavements, foundatins, walls, floors, ceilings or swimming pools.

**BUT**

this exclusion does not apply to:

1. any ensuing direct physical loss or damage by a Covered Cause of Loss; or
2. personal property in transit.

**DISAPPEARANCE**

mysterious disappearance or inventory shortage.

**BUT**

this exclusion does not apply to **personal property in transit.**

**DELAY IN TRANSIT OR LOSS OF MARKET**

delay in transit or loss of market.

**ELECTRIC ARCING**

electric arcing to property.

**BUT**

this exclusion does not apply to:

1. any ensuing direct physical loss or damage by a Covered Cause of Loss; or
2. personal property in transit.

**MECHANICAL BREAKDOWN**

mechanical breakdown of property.

**BUT**

this exclusion does not apply to:

1. any ensuing direct physical loss or damage by a Covered Cause of Loss; or
2. **personal property in transit.**

**STEAM BOILER**

loss of, or damage to, any steam boiler, steam pipe, steam turbine or steam engine you own, operate or lease by any condition or occurrence within that steam boiler, steam pipe, steam turbine or steam engine.

**BUT**

this exclusion does not apply to:

1. any ensuing direct physical loss or damage by a Covered Cause of Loss; or
2. **personal property in transit.**


