**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NOREX PETROLEUM LIMITED** | |
| **Petitioner,** | No.  1:04-MC-00281-CKK |
| **v.** | |
| **CHUBB INSURANCE COMPANY OF CANADA** et al | |
| **Respondents.** | |

<u>**DECLARATION OF GENE M. BURD**</u>

Gene M. Burd hereby declares as follows:

1.   I am an attorney with Marks & Sokolov, LLC, counsel for petitioner Norex Petroleum Limited ("Norex") in the above captioned action.

2.   I make this declaration to present to the Court documents relied upon by petitioner in support of its Motion to Compel the Production of Documents directed to BP America, Inc. ("BP") and opposition to BP's Cross-Motion to Quash.

3.   Annexed hereto as Exhibit "A" is a copy of BP p.l.c press release dated August 29, 2003.

4.   Annexed hereto as Exhibit "B" is a copy of Judge Kevin Nathaniel Fox's Memorandum and Order dated March 20, 2003 in a matter *Norex Petroleum Limited v. Access industries, Inc., et al.*,. Docket No. 02 Civ. 1499 (LTS)(KNF)(S.D.N.Y).

5.   Annexed hereto as Exhibit "C" is a copy of Judge Laura Taylor Swain's Memorandum Order dated August 7, 2003 in a matter *Norex Petroleum Limited v. Access industries, Inc., et al.*,. Docket No. 02 Civ. 1499 (LTS)(KNF)(S.D.N.Y).

6.   Annexed hereto as Exhibit "D" is a copy of Judge Letitia Z. Clark's Memorandum Opinion dated December 16, 2004 in a matter *Yukos Oil Company v. Russian Federation, et al., (In re Yukos),* Case No. 04-47742-H3-11, Adv. No. 04-3952 (Bankr. S.D.Tx).

7.   Annexed hereto as Exhibit "E" is a copy of the Order dated September 22, 2004 in a matter *Norex Petroleum Ltd., v. Access Industries, Inc, et al.*, 04-1357-CV (2d. Cir.).

8.   Annexed hereto as Exhibit "F" is a copy of a web page from the BP, p.l.c.'s Internet as accessed on December 21, 2004.

9.   Annexed hereto as Exhibit "G" is a copy of Norex's Motion to Supplement the Record submitted in a matter *Norex Petroleum Ltd., v. Access Industries, Inc, et al.*, 04-1357-CV (2d. Cir.).

I declare under penalty of perjury that the foregoing is true and correct.

Date: _12/21/04_

_Gene M. Burd_

Gene M. Burd

# EXHIBIT "A"



Site Index  |  Contact us  |  Reports and publications  |  BP worldwide  |  Home

Search: [                    ]  Go

| About BP | Environment and society | Products and services | Investors | **Press** | Careers |

▶ BP Global    Press

Browse by theme

## BP And AAR Close Russian Transaction, And Agree To Include Slavneft In New Company

Release date: 29 August 2003

BP and the Alfa Group and Access-Renova (AAR) today announced that they have completed the deal to combine their Russian and Ukrainian oil and gas businesses. The completion is the final step in the creation of TNK-BP, a new company owned and managed 50:50 by BP and AAR.

BP said it would pay AAR an immediate $2.6 billion in cash for its stake in the new company, together with three annual tranches of $1.25 billion in BP shares payable on the anniversaries of today's closing.

In addition, BP said it had reached agreement with AAR to incorporate AAR's 50% interest in Slavneft into TNK-BP in return for a cash payment by BP of $1.35 billion, subject to adjustments.

BP said the main transaction did not for the moment include its share of the Sakhalin interest, which it originally intended to contribute to TNK-BP. The formation of a Sakhalin joint venture with licence partner Rosneft was still under negotiation and the Sakhalin interest could be contributed to TNK-BP at a later date.

BP said the exclusion of Sakhalin, together with interest and other minor adjustments, accounted for the slight rise in its initial cash payment to AAR to $2.6 billion, up from the $2.4 billion estimate announced in June.

Completion of the Slavneft deal, which is subject to the approval of the regulatory authorities of the EU, Russia and Belarus, is expected before the end of the year. The deal will be effective from 1 May, 2003.

Commenting on the new company, BP chief executive Lord Browne said: "The creation of TNK-BP represents great progress towards meeting BP's long-term commitment to Russia. In just seven months, a truly major oil and gas company has emerged as an operating and competitive reality. The addition of the Slavneft interest into TNK-BP represents an important step in the building of the future of the company."

TNK-BP is Russia's third largest oil and gas company, producing some 1.2 million barrels a day from its main oil fields in West Siberia and the Volga Urals. Completion of the Slavneft acquisition will increase TNK-BP's production by some 160,000 barrels a day.

**Notes to Editors:**

- The completion of the transaction makes BP the world's second largest private-sector producer of oil and gas, with TNK-BP alone the tenth largest.

**Slavneft:**

- As of 31 December, 2002, under Russian accounting standards, the Slavneft group reported total net assets of $890 million, and 2002 profit after tax (before exceptional items and minority interest) of $430m.
- TNK/AAR holds an approximately 50% interest in the Slavneft group. The Slavneft interest is held jointly with Sibneft and was acquired through a number of transactions, including the Slavneft privatisation in December 2002.

**Further enquiries:**

Peter Henshaw, BP Russia, Moscow: + 7095 787 6009BP press office,
London, tel: +44 (0)20 7496 5256/4708/4324/4827/4358

**ADDITIONAL DATA**

TRANSACTION CONTEXT

- The largest transaction in Russian corporate history
- The largest foreign direct investment in Russia.

**ASSETS:**

**TNK-BP (excluding Slavneft)**

- Workforce of approximately 113,000 people
- Proven resources of 5.2 billion barrels of oil equivalent (710 million tonnes) of which 3.2 billion barrels are expected to be recovered prior to lease renewal
- Production of 1.2 million barrels of oil a day (60 million tonnes a year)
- Rising output - up 8 per cent in 2002, up 11% in 2003 (quarter-on-quarter basis)
- Main fields output: West Siberia (Samotlor, Nizhnevartovskoye Nefedobyvaushee Predpriyatie, Nyagan), about 800,000 barrels a day (40 million tonnes a year); Volga Urals (Orenburgneft), about 400,000 barrels a day (20 million tonnes a year)
- Strong export base - this year more than 50% of total production has been exported as crude and 15% as refined product
- Five refineries in Russia and Ukraine (including Ryazan and Lisichansk), with throughput of 500,000 barrels a day (25 million tonnes a year)
- More than 2,100 retail filling stations in Russia and Ukraine
- More than 20% share of the Moscow retail market.

**Slavneft (100% - owned 50/50 with Sibneft)**

- Proven resources of some 1.6 billion barrels of oil of which some 1 billion barrels are expected to be recovered prior to lease renewal
- Production of 294,000 barrels of oil a day in 2002
- Rising output - up 17 per cent in 1Q 2003 over 1Q 2002
- Two refineries in Russia (Yaroslavl) and interest in Mozyr refinery (Belarus) with total throughput of 384,000 barrels a day
- More than 570 retail filling stations in Russia.

**STRUCTURE**

- TNK-BP is a single new holding and operating company, registered in the British Virgin Islands
- President and chief executive officer, Robert Dudley; executive director, German Khan; chief operating officers, Victor Vekselberg and Larry McVay (deputy); chief financial officer, Kent Potter

TNK-BP has a ten-member board of directors - with five members appointed by AAR and five by BP. TNK-BP chairman is Mikhail Fridman and Rodney Chase is deputy chairman.

▲ back to top

© 1999-2004 BP p.l.c.    |    Legal Notice    |    Privacy Statement

# EXHIBIT "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

NOREX PETROLEUM LIMITED,        :

                Plaintiff,        :         **MEMORANDUM and ORDER**

         -against-        :         02 Civ. 1499 (LTS)(KNF)

ACCESS INDUSTRIES, INC., ET AL.,   :

            Defendants.     :
------------------------------------------------------X

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

## INTRODUCTION

Plaintiff Norex Petroleum Limited ("Norex") has requested that the Court lift the stay of discovery imposed by the assigned district judge so that Norex might use the discovery tools found in the Federal Rules of Civil Procedure to obtain information that it contends is needed to demonstrate that the defendants' outstanding motion, made pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss plaintiff's complaint on the grounds of forum non conveniens, res judicata, collateral estoppel and international comity should not be granted. The defendants maintain that discovery is not necessary in order for Norex to respond to the motion they have made; consequently, they urge the Court to deny plaintiff's request that the stay of discovery be lifted.

## BACKGROUND

In this action, plaintiff has made claims against the defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq. In particular, Norex alleges that its majority stake in the control of an oil company was seized through a pattern of racketeering as part of a comprehensive illegal scheme of the defendants to gain

dominance over the Russian oil industry. Plaintiff alleges that to effect the object of the scheme, the defendants engaged in mail and wire fraud, laundered money, engaged in acts of extortion and bribery and corrupted Russian judicial proceedings.

In an order dated August 9, 2002, the assigned district judge denied a request made by Norex for limited discovery pertinent, inter alia, to the defendants' outstanding Fed. R. Civ. P. 12(b)(6) motion. Although the assigned district judge denied Norex's request for limited discovery, Norex was given leave to renew the request and has now done so.

The defendants' pending motion contains alternative theories under which they contend this action should be dismissed; they include: the doctrines of forum non conveniens, collateral estoppel and res judicata, as well as principles of international comity.

Norex alleges that pervasive corruption within the Russian judicial system makes Russia an inadequate forum in which to present its claims for adjudication. The degree to which the Russian judicial system has been compromised, and the extent to which, if at all, the defendants have contributed to undermining that judicial system can best be demonstrated to the court, Norex maintains, if it is permitted to submit interrogatories to, and to obtain documents from, the defendants and 61 corporate entities Norex says are associated with them, and to obtain deposition testimony from three experts (Paul A. Stephan, III, Alexei Kostin and Vladimir Kuznetsov), whose affidavits on Russian law and the adequacy of the Russian forum were submitted to the court by the defendants in support of their outstanding motion to dismiss. Norex also contends that in addition to addressing the corrupt Russian judicial system, the discovery it seeks through the instant request will enable it to show the court that the doctrines of res judicata and collateral estoppel, as well as the principles of international comity do not justify granting the

defendants' motion because Norex did not participate in the vast majority of judicial proceedings upon which the defendants rely in urging the court to grant their motion on these grounds.

## DISCUSSION

*Forum Non Conveniens*

Generally, a motion to dismiss premised upon a claim of forum non conveniens is decided based upon affidavits solely.  See <u>Transunion Corp. v. PepsiCo, Inc.</u>, 811 F.2d 127, 130 (2d Cir. 1987)(citation omitted); <u>Alcoa Steamship Co. v. M/V Nordic Regent</u>, 654 F.2d 147, 158 (2d Cir. 1980); <u>Beekmans v. J.P. Morgan & Co.</u>, 945 F. Supp. 90, 95 (S.D.N.Y. 1996).  This is so because, as the Supreme Court has noted, "[r]equiring extensive investigation would defeat the purpose" of such a motion.  <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 258, 102 S. Ct. 252, 267 (1981).  While a motion to dismiss, based upon forum non conveniens, does not typically require a detailed development of the entire case through discovery, <u>see</u> <u>Fitzgerald v. Texaco, Inc.</u>, 521 F.2d 448, 451 n.3 (2d Cir. 1975), there are occasions when limited discovery on that issue is appropriate.  <u>See</u> <u>Base Metal Trading S.A. v. Russian Aluminum, et al.</u>, No. 00 Civ. 9627, 2002 WL 987257, at *3 (S.D.N.Y. May 14, 2002).

Although styled as a request that the stay of discovery be lifted so that Norex might pursue "limited" discovery directed solely at the outstanding motion to dismiss, "Annex A" attached to Norex's application to the Court describes 13 categories of documents and areas for exploration through interrogatories that Norex wishes to present to the defendants for disclosure and response in order that it might attempt to defeat the motion.  This extensive demand for discovery seeks such information as the identity of the legal and beneficial owner(s) of each of

the defendants and the 61 associated corporate entities referenced above, for a six-year period commencing in 1997. Norex's request also seeks the identity of all officers and directors of each of the defendants and the 61 associated corporate entities during the same six-year period. In addition, Norex seeks six years of banking and other financial data from each defendant and each of the 61 corporate entities. While Norex attempts to persuade the Court that each category of information it has identified for pursuit through discovery pertains solely to matters that will help it demonstrate that the defendants' motion to dismiss should be denied, it appears to the Court, from the scope of the discovery demanded, that Norex is seeking to do indirectly what it cannot do directly: obtain discovery germane to the merits of the underlying action.

The Court finds that Norex's application, insofar as it is directed to discovery on that branch of the defendants' motion which speaks to the issue of forum non conveniens, is not reasonably and narrowly focused upon matters pertinent to the defendants' motion to dismiss. As crafted, the request runs afoul of the proscription against permitting a party to engage in extensive discovery that develops details going to the entire case when a motion to dismiss for forum non conveniens is being entertained by a court. See Piper and Fitzgerald, supra.

However, after reviewing the submissions made by the parties in support of and in opposition to Norex's application that the stay of discovery be lifted, the Court finds that some utility exists in permitting Norex to depose the experts who have submitted affidavits in support of the defendants' motion to dismiss, that address the adequacy of the Russian forum and issues of Russian law. Therefore, to the extent not heretofore disclosed, the defendants shall provide to Norex, expeditiously, information pertaining to the background and experience of each of the experts and the bases for his opinion. The defendants shall also identify the published writings,

if any, of each expert, any proceedings at which he has given expert testimony and the compen-

sation each has or will receive in connection with the instant litigation.  See, passim, Fed. R. Civ.

P. 26(a)(2).  Within 21 days of service of the expert-related data upon Norex, Norex shall depose

the experts.  The parties are directed to confer and thereafter to select a time and place for taking

the depositions that is mutually convenient to the parties.

*Res Judicata, Collateral Estoppel*
*and International Comity*

Res judicata and collateral estoppel are separate and distinct legal concepts.  "Under res

judicata, a final judgment on the merits of an action precludes the parties or their privities from

relitigating issues that were or could have been raised in that action. . . . Under collateral

estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision

may preclude relitigation of the issue in a suit on a different cause of action involving a party to

the first case."  Allen v. McCurry, 449 U.S. 90, 94, 101 S. Ct. 411, 414-415 (1980).  "Comity . . .

is the recognition which one nation allows within its territory to the legislative, executive or

judicial acts of another nation, having due regard both to international duty and convenience, and

to the rights of its own citizens, or of other persons who are under the protection of its laws."

Hilton v. Guyot, 159 U.S. 113, 163-164, 16 S. Ct. 139, 143 (1895).

In the case at bar, "Annex B" to Norex's application, that the Court lift the stay of

discovery, identifies 12 judicial proceedings for which Norex seeks from the defendants the

"complete court files."  Norex alleges that these materials are needed in order for it to establish

that the doctrines of res judicata and collateral estoppel, as well as the principles of international

comity do not warrant the court's granting the defendants' motion to dismiss.  In addition, in that

same annex to its application, Norex demands that the defendants disclose similar material with respect to any other proceeding to which the defendants point in asserting that res judicata, collateral estoppel and/or comity bar Norex from asserting the claims that comprise its complaint.

With respect to the doctrine of res judicata, the Court finds that plaintiff's request is curious, since Norex maintains that it was not a participant in nine of the 13 judicial proceedings upon which the defendants rely in support of their contention that res judicata, collateral estoppel and international comity bar plaintiff from maintaining this action. If Norex was not a participant in nine of the judicial proceedings relied upon by the defendants, it is not clear to the Court why disclosure of the "complete court files" is necessary for Norex to establish that fact; alternative methods are available. For example, Norex has submitted documents to the Court that purport to show that Russian officials denied it access to court files because Norex was not a party to the pertinent judicial proceedings.

Similarly, in the remaining four proceedings, about which Norex makes no claim that it was not a participant, disclosure of the "complete court files" does not appear to the Court to be needed by Norex in order for it to explain why those proceedings do not provide the defendants a basis for asserting that the doctrine of res judicata is applicable to this case. Having participated in the subject proceedings, Norex should be able to present competent evidence to the court, through an affidavit from its counsel in those proceedings or through some other means, that shows the court why the judgments obtained in those proceedings do not prevent Norex from litigating the claims it has made in this action.

Furthermore, with respect to the defendants' claim that collateral estoppel should bar Norex from asserting the claims it has made in this action, Norex's assertion that a corrupt judicial system in Russia prevents parties from receiving a full and fair opportunity to litigate there can be established without resort to the many court files Norex seeks to have the defendants disclose to it.  First, Norex had to have a good faith basis for asserting that the Russian judicial system is susceptible to corruption and, thus, is not an adjudicatory system in which a party can expect to receive a full and fair opportunity to litigate a dispute.  Whatever factual information Norex relied upon in determining to make that assertion must, independent of Norex's receipt of the documents it has identified in and requested through "Annex B," provide a basis upon which it can show that the Russian judicial system does not afford its litigants a full and fair opportunity to have their disputes adjudicated.  In addition, the depositions that Norex will take of the experts upon whom the defendants have relied in connection with their motion should, if necessary, enable Norex to supplement the factual information it already possesses concerning the corruption it maintains pervades the Russian judicial system.  Moreover, the expert depositions to be taken by Norex should also enable it to respond appropriately to the arguments urged on the court by the defendants that the principles of international comity should be upheld, and that the court should recognize the judicial actions taken in prior Russian litigation as a bar to plaintiff's prosecuting this action in this court.

Accordingly, the Court finds that Norex's request, that the defendants produce to it the "complete court files" for the judicial proceedings referenced in "Annex B" to the plaintiff's application to lift the stay of discovery, must be denied.

## CONCLUSION

For the reasons set forth above, Norex's request, that the stay of discovery previously imposed by the assigned district judge be lifted, is granted to the limited extent of permitting Norex to obtain expert discovery as outlined above.

Dated:   New York, New York          SO ORDERED
         March 20, 2003


_____
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

Sent copies via facsimile
and mail to:

Harris N. Cogan, Esq.
Blank, Rome, Tenzer, Greenblatt, L.L.P.
405 Lexington Avenue
New York, NY  10174

Bruce S. Marks, Esq.
Marks & Sokolov, LLC
1835 Market Street
28th Floor
Philadelphia, PA  19103

Herbert F. Kozlov, Esq.
Reed Smith LLP
529 Fifth Avenue
New York, NY  10017

Kim Koopersmith, Esq.
Akin, Gump, Strauss, Hauer & Feld, LLP
590 Madison Avenue
New York, NY  10022

Mark P. Lander, Esq.
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY  10104

Owen C. Pell, Esq.
White & Case
1155 Avenue of the Americas
New York, NY 10036-2787

John Cambria, Esq.
Salans
620 Fifth Avenue
New York, NY 10020

Turner P. Smith, Esq.
Curtis, Mallet-Prevost, Colt
  & Mosle LLP
101 Park Avenue
New York, NY 10178

Eric J. Grannis, Esq.
Law Offices of Eric J. Grannis
620 Fifth Avenue
New York, NY 10020

# EXHIBIT "C"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Norex Petroleum Limited,

              Plaintiff,

       -against-

Access Industries, Inc., et al.,

              Defendants.

No. 02 Civ. 1499 (LTS)(KNF)

---

### MEMORANDUM ORDER

Plaintiff Norex Petroleum Limited ("Norex" or "Plaintiff") brings this action against Defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. section 1961, et seq. Plaintiff specifically alleges that its majority stake in the control of an oil company was seized through a pattern of racketeering as part of a comprehensive illegal scheme of the Defendants to gain dominance over the Russian oil industry. Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, Plaintiff objects to Magistrate Judge Fox's March 20, 2003 order and April 8, 2003 order, denying reconsideration of the March 20, 2003 order, and denying, in part, Plaintiff's request for limited discovery to oppose Defendants' Motion to Dismiss on the grounds of forum non conveniens, res judicata, collateral estoppel and comity.

Plaintiff's discovery requests to Magistrate Judge Fox included: disclosure of the identity of the corporate Defendants' officers, directors and beneficial owners during the time period of the alleged illegal scheme and their last known location in connection with the forum non conveniens motion to dismiss; and the court pleadings in the so called "Know How" case

norex1.wpd version 080703

1

which Defendants assert is binding on Norex as part of the res judicata, collateral estoppel and comity arguments of the motion to dismiss.

The Court has carefully considered Plaintiff's motion pursuant to Rule 72(a). For the following reasons, Plaintiff's motion is denied.

As an initial matter, Defendants argue that Plaintiff has waived any objection to Magistrate Judge Fox's denial of limited discovery because it did not object within the ten-day period specified by Rule 72(a). See Fed. R. Civ. P. 72(a). Plaintiff, in turn, asserts that the time to file any objections to Magistrate Judge Fox's discovery decision was stayed pending resolution of the motion for reconsideration.

Magistrate Judge Fox ruled on the discovery motion on March 20, 2003. On March 27, 2003, Plaintiff filed a motion to reconsider. April 3, 2003 was the deadline for filing any objections to Magistrate Judge Fox's order. On April 8, 2003, Magistrate Judge Fox rendered his decision on the motion for reconsideration. Plaintiff filed the instant objection to Magistrate Judge Fox's March and April orders on April 22, 2003.

While the Federal Rules do not directly address this question, courts in this District have found that, during the pendency of a motion for reconsideration before a magistrate judge, the time for filing an objection to the District Court is tolled. See, e.g., Yurman Design Inc. v. Chaindom Enterprises., No. 99 civ 9307 (JFK), 2000 WL 1871715, at *1 (S.D.N.Y. Dec. 20, 2000); Equal Employment Opportunity Commission v. Venator Group Specialty, Inc., No. 99 Civ. 4758 (AGS), 2001 WL 246376, at *4 (S.D.N.Y. March 12, 2001). This Court concurs with this reasoning. Thus, the Court is not persuaded by Defendants' argument that Plaintiff waived any objection to Magistrate Judge Fox's denial of discovery by failing to object within the ten-

day period. Because the ten-day period within which a party may file objections to Magistrate

Judge Fox's order was tolled while the motion to reconsider that order was pending, this Court is

not barred from considering Plaintiff's Objection to Magistrate Judge Fox's March 20, 2003

order. Moreover, tolling is not at issue with regards to the Objection to the April 8, 2003 order,

as it was filed within the ten-day period.

     The Court turns to the merits of Plaintiff's Objection to Magistrate Judge Fox's

March and April orders. When a party files an objection to a magistrate judge's order on a

nondispositive matter, the district judge "shall modify or set aside any portion of the . . . order

found to be clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a). Factual findings by

magistrate judges on nondispositive matters, including discovery rulings, are subject to review

for clear error and should be upheld unless "the reviewing court on the entire evidence is left with

the definite and firm conviction that a mistake has been committed." Dubai Islamic Bank v.

Citibank, N.A., 211 F. Supp. 2d 447, 448 (S.D.N.Y. 2001) (citation omitted). An order on a

nondispositive matter may also be reversed where it is contrary to law, and "fails to apply or

misapplies relevant statutes, case law or rules of procedure." Catskill Dev., L.L.C. v. Park Place

Entm't Corp., 206 F.R.D. 78, 86 (S.D.N.Y. 2002) (citation omitted); see also Thomas E. Hoar,

Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir. 1990) (magistrate's ruling on discovery subject

to review by district court under "clearly erroneous or contrary law" standard). Moreover, it is

well-settled that "[a] magistrate judge's resolution of discovery disputes deserves substantial

deference." Surles v. Air France, 210 F. Supp. 2d 502 (S.D.N.Y. 2002).

     Magistrate Judge Fox's determinations were neither clearly erroneous or contrary

to law. As to Plaintiff's forum non conveniens discovery requests, "[t]he general standard is that

parties are entitled to obtain discovery regarding any matter which is relevant to the subject matter involved in the pending action . . . [A] motion to dismiss for forum non conveniens does not call for a detailed development of the entire case; rather discovery is limited to the location of important sources of proof." Fitzgerald v. Texaco, Inc., 521 F.2d 448, 451 n.3 (2d Cir. 1975). Indeed, "[a] [m]otion to dismiss for forum non conveniens may be decided on the basis of affidavits . . . '[r]equiring extensive investigation would defeat the purpose of [the] motion.'" Transunion Corp. v. Pepsico, Inc., 811 F.2d127, 130 (2d Cir. 1987) (quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 258 (1981)).  Similarly, Plaintiff's request for the Know-How Dispute court file to address Defendants' motion to dismiss based on international comity, collateral estoppel and res judicata was not in accordance with applicable law, as discovery requests concerning such issues should be narrowly construed.  Extensive discovery would defeat the purpose of motions to dismiss asserting international comity, collateral estoppel and res judicata. See Base Metal Trading S.A. v. Aluminum, No. 00 Civ. 9627 (JGK) (FM), 2002 WL 987257, at *3 (S.D.N.Y. May 14, 2002).  Magistrate Judge Fox's decisions were well within the discretion afforded courts by Federal Rule of Civil Procedure 26(b).

        Accordingly, Plaintiff's Rule 72(a) motion is denied.  Magistrate Judge Fox's orders are hereby affirmed.


        SO ORDERED.

Dated: New York, New York
        August 7, 2003


                                                    _____
                                                    LAURA TAYLOR SWAIN
                                                    United States District Judge


norex1.wpd version 080703                                                            4

# EXHIBIT "D"

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

United States Courts
Southern District of Texas
ENTERED

DEC 1 6 2004

Michael N. Milby, Clerk of Court

|  |  |  |
|---|---|---|
| IN RE | ) | |
| | ) | |
| YUKOS OIL COMPANY, | ) | CASE NO. 04-47742-H3-11 |
| | ) | |
| Debtor, | ) | |
| | ) | |
| YUKOS OIL COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | ADV. NO. 04-3952 |
| | ) | |
| RUSSIAN FEDERATION, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM OPINION

The court has held a hearing on the "Plaintiff's
Verified Emergency Motion for Temporary Restraining Order and
Preliminary Injunction" (Docket No. 2).

It appears from the evidence before the court that the
series of events within Russia which has led to the notice of an
auction of the principal producing assets of Yukos Oil Company
("Debtor") is inconsistent with the regular application of
Russian law within Russia.  The proceeding before this court is
an injunctive proceeding, in which Debtor seeks, inter alia, to
avert a sale on Sunday, December 19, 2004 of those assets.  The
harm to Debtor would be irreparable, and there is no evidence
before the court that the harm to the seller would be
significant; it is undisputed that the underlying assets,

primarily oil and gas in the ground, cannot easily be alienated
without the consent of the Russian government.

The following are the Findings of Fact and Conclusions
of Law of the court. A separate conforming Temporary Restraining
Order will be entered. To the extent any of the Findings of Fact
are considered Conclusions of Law, they are adopted as such. To
the extent any of the Conclusions of Law are considered Findings
of Fact, they are adopted as such.

### Jurisdiction

Yukos Oil Company ("Debtor") filed a voluntary petition
under Chapter 11 of the United States Bankruptcy Code on December
14, 2004. Debtor is an "open joint stock company" organized
under the laws of the Russian Federation ("Russia"). Bruce K.
Misamore, Debtor's chief financial officer, testified that a
subsidiary of Debtor has approximately US$2 million in funds in
an account at Southwest Bank of Texas, a bank located within the
Southern District of Texas. In addition, Debtor has deposited
approximately US$6 million to the trust account of its attorneys,
Fulbright & Jaworski, L.L.P., as a retainer to be applied to the
payment of legal fees and administrative expenses incurred in
connection with this case. These funds represent Debtor's
principal assets in the United States. Misamore additionally
testified that approximately 15 percent of Debtor's shares are
held by United States institutional investors.

2

Under 28 U.S.C. § 1334(a), the district courts have
original and exclusive jurisdiction of a case under Title 11.

For a foreign corporation to qualify as a debtor under
11 U.S.C. § 109(a), courts have required that nominal amounts of
property be located in the United States.  The courts have noted
that there is "virtually no formal barrier" to having federal
courts adjudicate foreign debtors' bankruptcy proceedings.  In re
Globo Comunicacoes E Participacoes S.A., 2004 WL 2624866,
(S.D.N.Y. 2004), citing In re Aerovias Nacionales de Colombia
S.A. (In re Aviance), 303 B.R. 1 (Bankr. S.D.N.Y. 2003); In re
Global Ocean Carriers, Ltd., 251 B.R. 31 (Bankr. D. Del. 2000).
Misamore testified that he for years has maintained a home in
Houston, Texas, and has also resided in Moscow, Russia.  He
testified that he presently remains in the United States because
he has been advised that he would be in danger of arrest if he
were to return to Russia.  The court concludes, based on the
testimony of Misamore, that Debtor maintains significant assets
in the Southern District of Texas, and that Debtor has standing
to be a debtor under Chapter 11 of the Bankruptcy Code.  The
court finds the testimony of Misamore credible.  The court
concludes that the instant case was properly commenced.  Thus,
the court concludes that it has jurisdiction with respect to the
instant Chapter 11 case.  The court concludes that venue of the
instant Chapter 11 case is proper, in light of the presence

3

within the Southern District of Texas of Debtor's principal
assets located in the United States.

Under 28 U.S.C. § 1334(b), the district courts have
original but not exclusive jurisdiction of all civil proceedings
arising under Title 11, or arising in or related to cases under
Title 11.  Under 28 U.S.C. § 157(b)(1), bankruptcy judges may
hear and determine all cases under Title 11, and all core
proceedings arising under Title 11, or arising in a case under
Title 11, referred to the bankruptcy judges.  The United States
District Court for the Southern District of Texas has entered a
general order referring to the bankruptcy judges all bankruptcy
cases and all proceedings arising under Title 11, or arising in
or related to a case under Title 11.  District Court General
Order 2002-2.

In the instant adversary proceeding, Plaintiff (the
Chapter 11 Debtor) seeks generally the entry of an injunction
prohibiting Defendants from enforcing judgments obtained in the
courts of Russia prepetition against property asserted by
Plaintiff to be property of the bankruptcy estate.  In the
instant motion, Plaintiff seeks entry of a temporary restraining
order and a preliminary injunction enjoining Defendants from
conducting or participating in an auction sale of Debtor's
interest in its subsidiary, Yuganskneftegas ("YNG"), which is
presently scheduled to take place on Sunday, December 19, 2004.

4

The relief requested in the instant adversary proceeding and in the instant motion are core proceedings.   See 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(E), 157(b)(2)(K), and 157(b)(2)(O).   The court concludes that it has jurisdiction to hear and determine the instant adversary proceeding, and the instant motion.

<u>Service and Notice</u>

Plaintiff filed a certificate of service reflecting that notice of the hearing on the instant motion was served on Defendant Russia by facsimile through its Ministry of Justice, in Moscow, Russia, its Consul General, in Houston, Texas, and its Embassy to the United States, in Washington, D.C.   The certificate of service reflects service by facsimile on Defendants Gazpromneft, Deutsche Bank AG, and J. P. Morgan Chase, through attorneys who appeared in court on December 15, 2004 on behalf of those entities.   The certificate of service reflects service on the remaining Defendants through their chief legal officers.   The certificate of service additionally reflects service on the United States Attorney General, the Texas Secretary of State, and the United States Department of State.

Service upon a foreign state shall be effected pursuant to 28 U.S.C. § 1608.   Fed. R. Civ. P. 4(j), as made applicable by Fed. R. Bankr. P. 7004(a).   That section provides in pertinent part:

5

(a) Service in the courts of the United States and of
the States shall be made upon a foreign state or
political subdivision of a foreign state:

>    (1) by delivery of a copy of the summons and
>    complaint in accordance with any special
>    arrangement for service between the plaintiff and
>    the foreign state or political subdivision; or
>
>    (2) if no special arrangement exists, by delivery
>    of a copy of the summons and complaint in
>    accordance with an applicable international
>    convention on service of judicial documents; or
>
>    (3) if service cannot be made under paragraphs (1)
>    or (2), by sending a copy of the summons and
>    complaint and a notice of suit, together with a
>    translation of each into the official language of
>    the foreign state, by any form of mail requiring a
>    signed receipt, to be addressed and dispatched by
>    the clerk of the court to the head of the ministry
>    of foreign affairs of the foreign state concerned,
>    or
>
>    (4) if service cannot be made within 30 days under
>    paragraph (3), by sending two copies of the
>    summons and complaint and a notice of suit,
>    together with a translation of each into the
>    official language of the foreign state, by any
>    form of mail requiring a signed receipt, to be
>    addressed and dispatched by the clerk of the court
>    to the Secretary of State in Washington, District
>    of Columbia, to the attention of the Director of
>    Special Consular Services--and the Secretary shall
>    transmit one copy of the papers through diplomatic
>    channels to the foreign state and shall send to
>    the clerk of the court a certified copy of the
>    diplomatic note indicating when the papers were
>    transmitted.

28 U.S.C. § 1608(a).

The provisions for service under Section 1608 are
hierarchical, such that a plaintiff must attempt the methods of
service in the order they are addressed in the statute.  Magness

6

v. Russian Federation, 247 F.3d 609 (5th Cir. 2001).

In the instant case, there is no evidence with respect
to a special arrangement for service.

Under the Hague Convention on the Service Abroad of
Judicial and Extrajudicial Documents in Civil or Commercial
Matters, November 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638,
service on "contracting States" (entities which are parties to
the Convention) may be made by "forwarding" the documents to a
Central Authority designated by the government to receive
requests for service coming from persons authorized to provide
service under the law of the contracting State from which the
documents originate.

Under Fed. R. Civ. P. 65(b), as made applicable by Fed.
R. Bankr. P. 7065, a temporary restraining order may be granted
without written or oral notice to the adverse party or that
party's attorney only if (1) it clearly appears from specific
facts shown by affidavit or by the verified complaint that
immediate and irreparable injury, loss, or damage will result to
the applicant before the adverse party or that party's attorney
can be heard in opposition, and (2) the applicant's attorney
certifies to the court in writing the efforts, if any, which have
been made to give the notice and the reasons supporting the claim
that notice should not be required.

A preliminary injunction requires at least five days' notice, and an opportunity to be heard. Parker v. Ryan, 960 F.2d 543 (5th Cir. 1992).

Whether the submission of documents to a foreign government by facsimile is sufficient to provide notice of a preliminary injunction hearing is a question of first impression in this jurisdiction.

Due process demands "notice reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

In the absence of designation by Russia's Central Authority pursuant to the Hague Convention to receive service by facsimile, facsimile transmission is not sufficient for service of process. See Mayoral-Amy v. BHI Corp., 180 F.R.D. 456 (S.D. Fla. 1998). The court concludes that, as to Defendant Russia, the requested temporary restraining order must proceed, if at all, under the standards applicable to granting of a temporary restraining order without notice.

With respect to Defendants Gazpromneft and Deutsche Bank AG, due process is satisfied where the parties have notice and an opportunity to be heard. Matthews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In the hearing on the

8

instant request for temporary restraining order, Gazpromneft and
Deutsche Bank AG appeared through counsel.   Counsel for Defendant
J. P. Morgan Chase has appeared in connection with the instant
Chapter 11 case, but did not appear with respect to the instant
request for temporary restraining order.   The court concludes
that those parties have sufficient notice with respect to the
instant request for temporary restraining order.[1]   With respect
to the other Defendants named in the instant adversary
proceeding, the rules applicable to entry of a temporary
restraining order without notice apply.

Standards Applicable to Requests for Temporary Restraining Order

        Under 11 U.S.C. § 105(a), the court may issue any order
that is necessary or appropriate to carry out the provisions of
Title 11.

        When determining whether to issue a temporary
restraining order or preliminary injunction pursuant to
11 U.S.C. § 105(a), the bankruptcy court must consider the
traditional inquiries which have a bearing on preliminary
injunctions issued pursuant to Rule 65, Fed. R. Civ. P.   Feld v.
Zale Corp. (In re Zale Corp.), 62 F.3d 746 (5th Cir. 1995).

---

        [1]The court additionally notes that, because Gazpromneft and
Deutsche Bank AG entered a general appearance at the hearing on
the instant request for temporary restraining order, it appears
substantially likely that Gazpromneft and Deutsche Bank AG are
subject to the personal jurisdiction of this court.

9

The traditional prerequisites for issuance of a
preliminary injunction are: (1) a substantial likelihood that the
movant will prevail on the merits; (2) a substantial threat that
the movant will suffer irreparable injury if the injunction is
not granted; (3) that the threatened injury to the movant
outweighs the threatened harm an injunction may cause the party
opposing the injunction; and (4) that the granting of the
injunction will not disserve the public interest.  <u>Zale Corp.</u>, 62
F.3d, at 764, <u>citing</u> <u>Commonwealth Life Ins. Co. v. Neal</u>, 669 F.2d
300 (5th Cir. 1982).

### Likelihood of Plaintiff's Prevailing on the Merits

In the instant adversary proceeding, Plaintiff contends
that agencies of the Russian government wrongfully assessed
US$27.5 billion in taxes against it since 2000, after having
audited and approved Plaintiff's taxes for those years.
Plaintiff contends that the tax claims were assessed in violation
of Russian law regarding taxation of Russian companies, as
regularly applied in Russia.  Plaintiff also contends that
Russian agencies selectively and retroactively reinterpreted
Russian law in a manner that could not have been anticipated when
the transactions took place, and in a manner inconsistent with
treatment of other taxpayers.  Misamore testified that Plaintiff
has appealed to a higher court the assessment of its taxes, and
that the appeal remains pending.  He testified that, despite the

10

appeal, various governmental agencies in Russia have continued
preparation for the auction of YNG on Sunday, December 19, 2004.

Plaintiff contends that various functionaries utilized
a remedy improper under Russian law by freezing all of
Plaintiff's assets, seizing Plaintiff's shares in its
subsidiaries, and freezing the assets of the subsidiaries.

Plaintiff contends that Russia has waived its sovereign
immunity (thus making it subject to this court's jurisdiction),
and has consented to the submission of its tax dispute to
arbitration, by its adoption of a law governing foreign
investment which contains a provision for international
arbitration.

Plaintiff contends that, in contravention of Russian
law, Russian agencies have scheduled an auction of Plaintiff's
stock in YNG, an entity from which Plaintiff derives
approximately sixty percent of its oil and gas production, and
has instructed Gazprom, an entity 40 percent owned by the Russian
government, to make an initial bid of US$8.6 billion.  Plaintiff
contends that the value of Plaintiff's interest in YNG is in
excess of US$15.8 billion.

Plaintiff's contentions with respect to the anticipated
sale are supported by the evidence.  Plaintiff's Exhibits 7 and 8
represent opinions of investment bankers Dresdner Kleinwort
Wasserstein ("DrKW") and J. P. Morgan plc ("JPM") as to the value

11

of YNG.  DrKW opines that the value is between US$18.6 billion
and US$21.1 billion, without consideration of the tax
liabilities.  If DrKW were to assume that tax liabilities would
be judicially upheld, in DrKW's opinion, the range of values
would decrease to between US$14.7 billion and US$17.3 billion.
(Plaintiff's Exhibit 7).  JPM opines that YNG has a fair range of
enterprise value between US$19.0 billion and US$25.0 billion, and
a fair range of equity value between US$16.1 billion and US$22.1
billion.  (Plaintiff's Exhibit 8).[2]

         The announcement for the auction contains provisions
for the auction's terms.  The terms announced include that the
starting price is RuR246,753,447,303.18.  The announcement
further provides that, if no bidder bids after the first bid is
announced, the stock will be sold to the first bidder, at the
starting price.  (Plaintiff's Exhibit 14).  Misamore testified
that, based on the current exchange rate between the Ruble and
the Dollar, the resulting starting price, expressed in dollars,
is approximately US$8.6 billion.

         In the instant adversary proceeding, Plaintiff does not
ask this court to determine that the tax assessments by Russian
agencies are erroneous.  Plaintiff seeks only determination that

---

[2]The court makes no finding as to the actual value of the
enterprise or stock of YNG.  The court's consideration of the
DrKW and JPM opinions is limited to a comparison of those
reported values to the proposed beginning auction price.

12

the remedy of seizure and sale of YNG is improper, and that Plaintiff is entitled to arbitration of the tax claims.

The weight of the evidence supports a finding that it is substantially likely that the assessments and manner of enforcement regarding Plaintiff's taxes were not conducted in accordance with Russian law. The court is mindful of the need for deference to the judicial determinations of another jurisdiction. This is important when the jurisdiction in question is that of a state of the United States; and of exceptional importance when it involves that of agencies of another sovereign state. However, in the instant case, the Plaintiff has made a showing that it needs a short additional time to hold its shareholder meeting scheduled for December 20, 2004, and may elect to file for bankruptcy under Russian law in order to proceed with a more orderly adjustment of its assets and debts in accordance with Russian law or to continue to seek international arbitration.[3]  The court concludes that Plaintiff has demonstrated a substantial likelihood of success on the merits, with respect to Defendants other than Russia.

With respect to Russia, the court finds that Plaintiff has presented insufficient evidence to support a finding that Russia has waived its sovereign immunity with respect to the

---

[3]The court makes no determination as to whether Plaintiff is entitled to arbitration, international or otherwise.

13

instant adversary proceeding.

### Substantial Threat of Irreparable Injury

James Piers Gardner, an attorney representing Plaintiff
with respect to the appeal of the underlying tax actions,
testified that, on the date on which the taxes were assessed, the
taxing authorities applied for ex parte, and received, an order
from the Moscow Court of Arbitration to freeze all of Plaintiff's
assets, and that this freezing of assets was done without
allowing the thirty day period for appeal common under Russian
law.  He testified that Plaintiff's bank accounts remain subject
to the freeze.  In addition, three days before the appeal was to
be heard, the tax authorities disclosed the materials upon which
they relied to establish the tax liability.  Gardner testified
that tens of thousands of pages of documents were disclosed in
the three days immediately prior to commencement of the appeal on
June 18, 2004.  He testified that Plaintiff was not permitted to
fully present its first appeal, but rather was interrupted in the
midst of arguing the appeal, and a ruling was delivered
immediately for the tax authorities.

Gardner testified that Debtor had assets other than YNG
from which to begin to satisfy the amount assessed by the tax
authorities, as commonly permitted under Russian law.  He
testified that the authorities refused to consider other assets,
and insisted on the sale of YNG.  The court found the testimony

14

of Gardner to be extremely credible and competent.

      The court finds that there is a substantial threat of injury to Plaintiff in the instant case.  The evidence supports a finding of the likelihood that Plaintiff's shares of YNG will be sold for approximately half the value estimated by two different investment bankers.  It has been argued that these same investment bankers are among those who propose to finance the purchase at auction.  It additionally appears that sale of Plaintiff's primary asset would be irreversible.

<u>Balance of Harms</u>

      In the instant case, there is no evidence of harm to the parties against whom a temporary restraining order is sought, for a temporary delay in conduct of the sale.  Thus, the overwhelming weight of harm, in losing its primary asset, rests upon Plaintiff in the instant case.

<u>Public Interest</u>

      The citizens of Russia, the United States, and elsewhere have a public interest in the ordinary progress of the rule of law.  It is upon this foundation that the conduct of trade among nations, and among businesses based in these nations, rests.  Participants in international commerce, in Russia, in the United States, and elsewhere, need to have an expectation that when they invest in foreign enterprises they may do so without fear that their investments may be the subject of confiscatory

15

action by agencies of the foreign government.   In the instant
case, the appearance to Plaintiff, and its investors, of such a
confiscation, is created by what appears, on the evidence before
this court, to be the inconsistent application of Russian law
within the Russian legal system.   The court concludes that the
public interest will not be disserved by entry of a temporary
restraining order.

Conclusion

        Based on the foregoing, the court concludes that a
temporary restraining order should issue, enjoining sale of YNG,
with respect to each of the named defendants except Russia.

        Signed at Houston, Texas on this _____ *16* _____
day of _____ *Dec* _____, 2004 *at 7:01 pm.*

                              _____
                              LETITIA Z. CLARK
                              UNITED STATES BANKRUPTCY JUDGE

16

# EXHIBIT "E"

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse at Foley Square    40 Centre Street, New York, NY 10007    Telephone: 212-857-8500

## MOTION INFORMATION STATEMENT

Docket Number(s): __04-1357-CV__

Motion for: __to Supplement the Record__

Set forth below precise, complete statement of relief sought:
__Motion to supplement the record with the__
__attached factual exhibits, and place before the Court__
__the narrow legal argument based on those exhibits contained in__
__the attached memorandum.__

Caption [use short title]

Norex Petroleum Ltd.,

Plaintiff-Appellant,

–v–

Access Industries, Inc., et al.,

Defendants-Appellees

MOVING PARTY: __Norex Petroleum Ltd.__

☒ Plaintiff  ☐ Defendant
☒ Appellant/Petitioner  ☐ Appellee/Respondent

OPPOSING PARTY: __Access Industries Inc., et al.__

MOVING ATTORNEY: __Peter J.W. Sherwin, Esq.__
[name of attorney, with firm, address, phone number and e-mail]
__Proskauer Rose LLP__
__1585 Broadway__
__New York, N.Y. 10036__
__(212) 969-3000__
__psherwin@proskauer.com__

OPPOSING ATTORNEY [Name]: __Kim Koopersmith, Esq.__
[name of attorney, with firm, address, phone number and e-mail]
__Akin, Gump, Strauss, Hauer & Feld LLP__
__590 Madison Avenue__
__New York, N.Y. 10022__
__(212) 877-1000__
__kkoopersmith@akingump.com__

Court-Judge/Agency appealed from: __Southern District of New York – Hon. Laura Taylor Swain__

Please check appropriate boxes:

Has consent of opposing counsel:
A. been sought?  ☐ Yes  ☒ No
B. been obtained?  ☐ Yes  ☒ No

Is oral argument requested?  ☐ Yes  ☒ No
(requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?  ☒ Yes  ☐ No
If yes, enter date __October 26, 2004__

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:
Has request for relief been made below?  ☐ Yes  ☐ No

Has this relief been previously sought
in this Court?  ☐ Yes  ☐ No

Requested return date and explanation of emergency:

Signature of Moving Attorney:

Date: __9/20/04__

Has service been effected?  ☒ Yes  ☐ No
[Attach proof of service]

## ORDER

IT IS HEREBY ORDERED THAT the motion is **GRANTED** DENIED.

Date: __September 22, 2004__

FOR THE COURT,
Roseann B. Mackechnie rt

Alfredo E. Galan
Deputy Clerk

SEP 22 2004

Form T-1080 (Revised 10/31/02).

# EXHIBIT "F"

bp

Site Index   |   Contact us   |   Reports and publications   |   BP worldwide   |   Home

Search: sixth largest   Go

| **About BP** | Environment and society | Products and services | Investors | Press | Careers |

▶ BP Global   ▶ About BP   ▶ Where we operate   ▶ BP worldwide   United States

Whiting Refinery

Texas City Refinery

## United States



Following a series of mergers and acquisitions with Amoco, ARCO, Burmah Castrol and Vastar, by 2001 BP had become the largest oil and gas producer and one of the largest gasoline retailers in the United States. At the end of 2001, we had nearly $40 billion of fixed assets in the U.S., with operations in almost every state and 42,000 U.S.-based employees.

In May 2002 BP was, overall, the sixth largest company by market capitalization on the New York Stock Exchange. U.S. investors own some 35 percent of the company's shares.

BP's major operations consist of oil and gas exploration and production, oil refining and products marketing, petrochemicals, natural gas trading and solar energy. As America's largest producer of oil and natural gas, BP is working to meet the country's growing energy needs with major exploration and production operations in the Gulf of Mexico and Alaska. During 2001,BP produced from its U.S. operations some 750,000 barrels a day of oil and more than 3.5 billion cubic feet a day of natural gas, and we marketed eight billion cubic feet of natural gas per day to third parties in North America.

Every day in 2001, BP's US refining operations processed 1.5 million barrels of crude oil and BP's daily marketing effort sold more than 1.1 million barrels of gasoline, 267,000 barrels of aviation fuel, 387,000 barrels of distillate and nearly 100,000 barrels of fuel oil. BP's U.S. chemical operations produce approximately 12 tonnes of petrochemicals per year which are the raw materials for a wide range of plastics used in food and beverage packaging, automotive components and such fabrics as polyester.

BP had more than 15,000 BP, Amoco and ARCO retail stations in the US at the end of 2001. In 2000, BP redefined the future of convenience retailing with the launch of BP Connect, offering consumers "innovative mobility." Distinguishing features include Internet kiosks for maps and directions, speed payment options, online access at the pump, high-quality fresh foods at the counter and solar-paneled canopies generating power for the station.

BP Pipelines is the second largest liquids pipeline company in the United States. It operates nearly 15,000 miles of pipelines in 30 states, and is a partner in many others. It annually transports more than 450 million barrel-miles of oil, refined products, natural gas liquids, carbon dioxide and chemicals - roughly 9% of the total U.S. pipeline liquids volume.

Air BP Americas supplies aviation fuels and specialized lubricants to a variety of customers. BP Shipping operates and contracts a fleet of ships and barges that transport crude oil and refined products to ports along the East and West Coasts.

BP Marine Americas is a world-leading supplier of fuels, lubricants and technical services to the global marine industry.

BP's goal is to meet America's growing demand for energy while minimizing harm to the environment. After pledging to cut CO2 emissions from its own operations by 10 percent from 1990 levels, BP beat its target by 8 years. Going forward, we aim to keep emissions flat to 2012 and BP globally aims to grow its production by 5.5 percent annually. We also refine and market low sulfur fuels in 42 cities in the United States. BP is the leading manufacturer of solar panels in the world. We are also one of the largest consumers of solar power. We are working with several automakers to develop a hydrogen fuel cell car as part of

our commitment to re-inventing energy.

## Further information

If you select one of the following links, you may leave bp.com and be directed
to BP businesses that comprise separate trading entities. Your use of those
sites will be subject to your acceptance of the terms and conditions in the
LEGAL NOTICE on those sites.

## BP Amoco Ultimate

BP Amoco offers a range of quality fuels in all of its markets. NEW BP Amoco
Ultimate has been improved with enhanced cleaning power and is available in
Cleveland, Indianapolis and Memphis.

▸ BP Amoco Ultimate

▲ back to top

© 1999-2004 BP p.l.c.   |   Legal Notice   |   Privacy Statement

# EXHIBIT "G"

# 04-1357-cv

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT

NOREX PETROLEUM LIMITED,

*Plaintiff-Appellant*,

— v. —

ACCESS INDUSTRIES, INC., RENOVA, INC., LEONARD BLAVATNIK, VICTOR VEKSELBERG, ALFA GROUP CONSORTIUM, CROWN FINANCE FOUNDATION, CTF HOLDINGS, LTD., ALFA FINANCE HOLDINGS, S.A., CROWN LUXEMBOURG HOLDINGS, S.A., ELLIOT SPITZ, TYUMEN OIL COMPANY, SIMON KUKES, JOSEPH BAKALEYNIK, LT ENTERPRISES LIMITED, SANDWELL ENTERPRISES LIMITED, EASTMOUNT PROPERTIES LIMITED, AND ASTONS CORPORATE MANAGEMENT,

*Defendants-Appellees*.

—————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## MOTION OF PLAINTIFF-APPELLANT
## TO SUPPLEMENT THE RECORD

Bruce S. Marks                         Peter J.W. Sherwin
MARKS & SOKOLOV, LLC                    PROSKAUER ROSE LLP
1835 Market Street                     1585 Broadway
Philadelphia, Pennsylvania  19103      New York, New York  10036
215-569-8901                           212-969-3000

*Of counsel*:  George C. Pratt

*Attorneys for Plaintiff-Appellant*

# **Table of Contents**

Page

Table of Authorities .................................................................................i

PRELIMINARY STATEMENT ...........................................................1

SUPPLEMENTAL FACTS ..................................................................3

A.   The New Information Regarding Defendants' Trading with
Iraq .................................................................................................5

B.   The New Information Regarding Defendants' Trading with
Cuba ................................................................................................7

1.   The Cuba "REZ" Program .................................................7

2.   The Cuba "Oil for Sugar" Program ..................................11

ARGUMENT ......................................................................................11

CONCLUSION ...................................................................................15

0460/54112-001 NYLIB1/1800015v6                                                    09/20/2004 05:24 PM

# Table of Authorities

## CASES

Page(s)

*Courtenay Communs. Corp. v. Hall,*
    334 F.3d 210 (2d Cir. 2003) ...................................................................14

*Dickerson v. Alabama,*
    667 F.2d 1364 (11th Cir. 1982) ...............................................................12

*Gatewood v. United States,*
    209 F.2d 789 (D.C. Cir. 1953) .................................................................12

*Gulf Oil Corp. v. Gilbert,*
    330 U.S. 501 (1947) .................................................................................14

*Mangini v. United States,*
    314 F.3d 1158 (9th Cir. 2003) .................................................................12

*Singleton v. Wulff,*
    428 U.S. 106 (1976) .................................................................................12

*United States v. Aulet,*
    618 F.2d 182 (2d Cir. 1980) ....................................................................12

*United States v. Rowan,*
    663 F.2d 1034 (11th Cir. 1981) ...............................................................12

## STATUTES

31 C.F.R. 515.201 (2004) ...........................................................................13

18 U.S.C. §1956 (c)(7)(D) ..........................................................................14

50 U.S.C. APPX. §5(b)..................................................................................13

FED. R. APP. P. 10(e) ...................................................................................12

0460/54112-001  NYLIB1/1800015v6                                    09/20/2004 05:24 PM

## PREIMINARY STATEMENT

Appellant Norex Petroleum Limited moves to supplement the record with 11 exhibits attached to the accompanying Declaration of Philip Murray – the existence or relevance of which only became known after the recent public disclosure of the corruption of the United Nations' Iraqi "Oil for Food" program – in order to advance a narrow yet significant legal argument based on documents already of record.  These documents and argument further demonstrate the strong public interest the U.S. has in hearing this case, which involves a worldwide racketeering scheme that seven Americans operate from New York and that has now been revealed to have involved serious threats to America's national interests regarding Iraq and Cuba.  Because this legal factor is a significant part of the *forum non conveniens* analysis presented in the pending appeal, this Court should grant the motion and consider both this information and the legal argument contained herein.

Following public disclosure in April 2004 of the corruption of the United Nations' Iraqi "Oil for Food" program, Norex renewed its private investigation of Defendants.  Norex thereafter obtained information establishing that Defendants earned substantial profits from the corrupted Iraqi program.  It also identified an internal document of the Defendants indicating that they paid a bribe to a shell company in Liechtenstein in connection with that program.  In addition,

with respect to Cuba, Norex obtained information establishing that Defendants provided proceeds from the sale of oil to Cuba as payment on behalf of Russia for a Cuban facility used for electronic surveillance of the U.S. and earned windfall profits on the Cuba "Oil for Sugar" program.  Norex also identified documents that set forth Cuba-related "very important and secret" payments to shell companies, payments that were undoubtedly bribes to Russian and/or Cuban officials.

This information now permits Norex to argue that American Defendants were involved in criminal activity in regard to Iraq and Cuba based on Defendants' own trading documents, already of record, the significance of which was not apparent on their face at the time of argument below.  This illegal activity constitutes additional predicate acts of racketeering in Defendants' overall illegal scheme, as well as violations by the seven U.S. Defendants of the Trading with the Enemy Act and other U.S. criminal statutes.

The new information offers further proof that the U.S. has a compelling interest in hearing this case under the *Gilbert* "public-interest" *forum non* factors, particularly given the overwhelming interest in permitting "private attorney generals" under RICO to prosecute seven U.S. Defendants engaged in criminal conduct that threatens national security, and the fact that Russia has no interest in prosecuting Americans who further Russia's concerns contrary to U.S. interests.  The motion should be granted.

## SUPPLEMENTAL FACTS

During the regime of Saddam Hussein, Iraq was permitted to trade oil for food as part of a humanitarian program the United Nations operated out of its New York headquarters.  In April 2004, it became publicly known that this program had been massively corrupted, as evidenced by the testimony of Joseph A. Christoff, Director, International Affairs and Trade of the U.S. General Accounting Office, before the Senate Committee on Foreign Relations, on April 7, 2004:

> From 1997 through 2002, **we estimate that the former Iraqi regime acquired $10,1 billion in illegal revenues related to the Oil for Food program – $5,7 billion in oil smuggled out of Iraq and $4,4 billion in surcharges on oil sales and illicit charges from suppliers exporting goods to Iraq**. . . .  Iraq government negotiated contracts directly with purchasers of Iraqi oil and suppliers of commodities, which may have been one important factor in allowing Iraq to levy illegal surcharges and commissions. . . .  Interviews by U.S. investigators with high-ranking Iraq regime officials, including the former oil and finance ministers, confirmed that the former regime received a 10 percent commission from commodity suppliers.

(Exhibit 1 to the accompanying Appeal Declaration of Phillip Murray (emphasis added).)[1]

This testimony was widely corroborated in numerous media reports that described the scheme.  For example:

> Officially, all Iraq's oil revenues went through UN escrow account, which was then used to pay for the import of goods to Iraq. But **the price at which Baghdad sold its oil was below the price at which the purchaser could subsequently sell it. The margin created could be used to generate funds for the regime, or compensate friends, away from UN prying eyes**… .

---

[1]     All exhibits referenced herein are attached to the Murray Declaration.

3

> Paying commissions wasn't difficult. All you need to do was to make it seem as though you used the services of an agent in a third country, and then pay the commissions to that agent, the executive explains. The "agents" were recommended by [Iraqi state oil company] SOMO… . According to the Italtech executive, the company was asked to pay 25 cents per barrel of Kirkuk, a blend of oil, and 30 cents for Basra light. The commission, he said, was split between different payers.

*Dealings with Suddam's Regime: How Fortunes Were Made in Iraq through the UN's Oil-for-Food Programme*," THE FINANCIAL TIMES, April 8, 2004 (Exhibit 2) (emphasis added).

In January 2004, an independent Iraqi newspaper published an Iraqi governmental edict that listed worldwide participants in the Iraqi "Oil for Food" scheme.  (Exhibit 3.)  Therein, Alfa-Eco, a subsidiary of Defendant Alfa Group, is implicated by name, as are numerous powerful Russian interests, including major political parties.[2]

Although the district court denied Norex's requests for limited fact discovery related to *forum non conveniens*, Norex obtained, through private investigation, various non-public documents including materials from litigation in London related to an English subsidiary of Defendant Crown Finance Foundation

---

[2]     Although Norex cannot provide specific proof without discovery, it is now common knowledge in the Russian oil industry that many of the persons in Russia, including government officials, to whom Iraq allotted the right to purchase oil "sold" those rights to oil producers including Defendants; such payments to government officials and political parties were effectively bribes.

4

and its former employees (the "Crown London Litigation").[3]  The Crown London

Litigation documents included Defendants' oil trading position papers, as well as

sham invoices, that demonstrate that tens of millions of dollars from the sale of

Russian oil were laundered through slush fund companies, such as Defendants LT

Enterprises Limited and Sandwell Enterprises Limited, and were used to bribe

officials through what Defendants called the "Budget of Business Support."

A.6519-25,6564-67.  The creation of the massive slush fund was detailed in the oil

trading report of Norex's expert Helmar Schank, of record below, which attaches

Defendants' trading papers as exhibits.  A.7021-351.

Based on the recent public announcements that Iraqi oil trading was

also corrupted, Norex renewed its private investigation of Defendants, which

ultimately established their intertwined Iraqi and Cuban criminal activity.

**A.     The New Information Regarding Defendants' Trading with Iraq**

Norex has now obtained the Supplementary Expert Report of Charles

L. Daly, filed in the Crown London Litigation (Exhibit 4).  In his report, Daly

analyzed the Iraqi oil trading in 1999 of Defendant TNK and subsidiaries of

Defendants Crown Financial Foundation and the Alfa Group and determined they

made a gross profit of $6,961,000 on this trading, almost *ten times* their budgeted

profit of $700,000.  Specifically, the report stated:

---

[3]         Court files in England are not open to the public.

|  | Iraq |
|---|---|
| Volumes bbls | 35,057,007 |
| Gross profit $ | 6,961,000 |
| Budgets $ | 700,000 |
| Gross profit after Budgets $ | 6,251,000 |
| Gross profit per barrel ($/bbl) | 0.98 |
| Gross profit after Budgets per barrel ($bbl) | 0.82 |

(Exhibit 4 at 2.)

In addition, Norex has identified an internal Crown/Alfa Eco telefax

dated January 13, 1999 from Vladimir Plouzhnikov to A. Kuzmichev, who co-

managed Defendant Crown's London subsidiary, which provides:

> 1.     Please pay for the "Cuba oil sugar" program 130,000 MT Cr. O *
> 50/100 USD.  Payments to agents.
> Information:
>
>> OZERLA BUSINESS corp.
>> LGT Bank in Lichtenstein AG
>> Postfach 85
>> FL – 9490 Vaduz
>> Account #0101037 AC USD
>
> Please make a separate file and a folder for recording payments and
> instructions for this program.  Maybe it would be necessary to form a special
> budget.
>
> 2.     **Please make a payment for the IRAQ program.**  Work on the UN
> resolution.

(Exhibit 6 (emphasis added).)

The plain inference from the Daly Report is that Defendants made

excess profits through the corrupted Iraqi program by purchasing oil below market

and selling it at market, as described in The Financial Times.  And Defendants'

6

internal memorandum strongly indicates that, from their Iraqi profits, Defendants

paid a bribe related to Iraq and another related to the Cuba "Oil for Sugar"

program, described below.  The U.S. has called for an investigation of the Iraqi

program to be headed by Paul Volker (*see* Exhibit 7), and Russia opposes that

investigation (*see* Exhibit 8).

**B.      The New Information Regarding Defendants' Trading with Cuba**

With the new understanding that Defendants were involved in illegal

conduct involving Iraq, and noting the link between Cuba and Iraq in the January

13, 1999 Crown-Eco telefax, Norex also renewed its private investigation of

Defendants' trading with Cuba.  Previously, the national security significance of

the "Cuba REZ" and "Oil for Sugar" programs could not be apprehended; those

references are now revealed to be highly relevant to the U.S. interest in the

American Defendants' illegal activities.

**1.      The Cuba "REZ" Program**

Norex recently learned that "Cuba REZ" refers to a facility used as a

"radio electronic center" in Lourdes, Cuba, which the U.S. Government described

as follows:[4]

> The Lourdes signals intelligence (SIGINT) facility near Havana, Cuba
> is the largest Russian SIGINT site abroad. The strategic location of Lourdes
> makes it ideal for gathering intelligence on the United States . . . .

---

[4]      In Cyrillic, the first letters of "radio electronic center" are "r," "e," and "tz"; hence, the
acronym "REZ."  Thus, it was not understood that this referred to the radio electronic center at
Lourdes.

From this key facility, first the Soviet Union and now Russia have historically monitored U.S. commercial satellites, and sensitive communications dealing with U.S. military, merchant shipping, and Florida-based NASA space programs . . . .  Russia is said to obtain 75 percent of its military strategic information from Lourdes. . . .

In addition to its military strategic value, Lourdes will increasingly be used to support the Russian economy, a current FAPSI priority.  In addition to unprotected commercial information, personal information about U.S. citizens in the private and government sectors also can be snatched from the airwaves and used by Russian intelligence to identity promising espionage recruits in these sectors.

In October 1995, Cuba and Russia produced an agreement on the continued functioning of the site until the year 2000.

*U.S. Defense Intelligence Agency Response to Questions of the Feb. 22, 1996 hearing on the Worldwide Threat to the U.S. National Security Interests before the Select Committee on Intelligence of the U.S. Senate* (Exhibit 9).

The 1995 "Cuba REZ" agreement was designed for Russia to pay rent to Cuba for the facility.   Specifically, Russia arranged for Russian banks to provide letters of credit to a Cuban state trading company known as "Tecnoimport." Defendant TNK and other Russian oil companies "sold" oil to Tecnoimport and then arranged for their related trading entities – for TNK, Crown Trade and Finance, a subsidiary of Defendant Crown Finance Foundation – to "repurchase" the same oil from Tecnoimport, using a French oil company, Total, as an additional middleman to obscure the transaction.  The proceeds from the trading entity's purchase of the oil were, of course, paid to Tecnoimport, and the Russian Ministry of Finance, in accord with the Ministries of Defense and Energy, covered

Tecnoimport's letters of credit, ostensibly for the purchase of oil for "governmental purposes." (*See* Murray Decl.)   In short, Defendants provided Cuba with the proceeds from the sale of oil for which Cuba never paid.

By example, in trade no. 214, TNK "sold" oil to "Tecnoimport," which sold to Total, which sold to Crown Trade & Finance Limited, which then sold to the end buyer.  A.7253.  TNK was the seller in 30 Cuba REZ trades to Tecnoimport in 1999 and 2000; *every single sale* then passed through Total to Crown Trade & Finance Limited for sale to the ultimate end user.  Although at first glance it appears that Defendant TNK was selling oil to Cuba, the presence of the related entity on the other side of the "sandwich" on *every* deal shows that the trading was designed to mask rental payments to Cuba; it was not for normal commercial purposes because the oil was never delivered to Cuba.  The recently obtained Daly Report, as well as the underlying trading position papers, reflect that Defendants sold over 5.7 million barrels of oil through the Cuba REZ program in 1999 (Exhibit 4 at 2), and 1.1 million barrels in 2000, providing over $100 million to Cuba.  A.7253-54.

In addition, Norex has identified an undated Crown telefax to Vladimir Plouzhnikov that provides for payment related to the Cuba REZ program:

1.     Please make payment to Cuba 100,000 USD.  Advance for 1.5 million tons of crude oil.

Pay to:
Aletar Company, Inc.
Konto Nr.: P4-6588910 USD
UBS AG.
Paradeplatz 6
8098 Zurich
BLZ: 0230
SWIFT: SBCOCH ZH 80A

**This Payment is very important and secret; I think it should be made through a SP Co.**

2.      Besides, 150,000 (One hundred fifty thousand) USD for Cuba, Protocol of 1995, Ministry of External Economic Relations.  Beneficiary Kelland.

These expenditures were not taken into account earlier.  Necessary to raise the issue at subholding about them.  **Please inform Whitehead and E. Spitz and write a separate letter to subholding.**

Bank confirmations are required.

(Exhibit 5 (emphasis added).)

This document demonstrates that Defendants, including American Spitz, were directly involved in trading oil to Cuba as part of the Cuba REZ program.  The reference to "very important and secret" payments to Aletar, a B.V.I. company, *see* A.5600,7015-20, and Kelland, an Isle of Man company, *see* A.5588-90, involving the use of a "SP[itz]" company, *i.e.*, a company controlled by Defendant Spitz, undoubtedly reflect bribes to either Cuban or Russian government officials.[5]

---

[5]      Aletar was organized by Morgan & Morgan Trust Corporation Limited in the B.V.I., and Kelland was organized by Defendant Aston in the Isle of Man.  A.5600,7015-20,5588-90.

10

## 2.    The Cuba "Oil for Sugar" Program

In addition to the "Cuba REZ" program, Defendants participated in the "Oil for Sugar" program with Cuba.  The Daly Report reflects the following data on the Cuba "Oil for Sugar" transactions in 1999:

| | |
|---|---:|
| Volumes bbls | 13,219,233 |
| Gross profit $ | 12,896,000 |
| Budgets $ | 2,023,000 |
| Gross profit after Budgets $ | 10,873,000 |
| Gross profit per barrel ($/bbl) | 0.98 |
| Gross profit after Budgets per barrel ($bbl) | 0.82 |

This report reflects incredible windfall profits of almost $1 per barrel on the program, in contrast to only $0.17 on the Cuba REZ transactions.  The obvious inference is that the Cuba Sugar program was designed to provide special profits to Defendants for participating in the Cuba REZ program.   As set forth above, the January 13, 1999 telefax provides payment to Ozerla in Liechenstein related to the Cuba "Oil for Sugar" program.  Defendants are bribing a Russian official for permitting them to participate in the lucrative Cuba "Oil for Sugar" and Iraqi programs.

### **ARGUMENT**

Courts of appeals may supplement the record on the suggestion of a party or their own initiative either under Rule 10(e) of the Federal Rules of Appellate Procedure or the court's inherent equitable powers.  *United States v.*

---

Morgan and Aston organized and managed many of Defendants' slush fund companies. A.5600,5588-92,5608-09,6641-6775.

*Aulet*, 618F.2d182,187(2dCir.1980) (ordering supplementing of record under Rule 10(e)); *Dickerson v. Alabama*, 667F.2d1364,1367n.5(11thCir.1982) (ordering supplementing of record under court's inherent equitable powers); *United States v. Rowan*, 663F.2d1034(11thCir.1981) (granting motion to supplement record for "newly discovered evidence"); *Mangini v. United States*, 314F.3d1158,1161(9th Cir.2003) (same); *Gatewood v. United States*, 209F.2d789, 793n.5(D.C.Cir.1953) (ordering supplementing of record in interest of "due administration of justice").[6] In the instant case, the interests of justice plainly support Norex's motion.

First, the district court denied all of Norex's narrow requests for fact discovery related to the motion to dismiss, including the documents related to the Crown London Litigation, the disclosure of the beneficial owners of the various entities related to Defendants, including Aletar, Kelland, and Ozerla, and the depositions of Messrs. Plouzhnikov and Kuzmichev, both residents of London. A.1282-95,1505-13,1517-19. If its limited discovery requests had not been denied, Norex would have earlier obtained documents and information explaining the true and related nature of the Cuba REZ and "Oil for Sugar" programs. Norex would then have been able to show that the U.S. Defendants were involved in "selling"

---

[6]   *Cf. Singleton v. Wulff*, 428U.S.106,121(1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual casts . . . . Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below . . . where 'injustice might otherwise result.'") (quoting *Hormel v. Helvering*, 312U.S.552, 557(1941)).

12

oil to Cuba to assist Russia in paying for surveillance of the U.S. and were

approving secret payments to Russian and/or Cuban government officials, while,

incredibly, Defendant TNK was obtaining loan guaranties from the Export-Import

Bank.

Second, Norex had no previous basis to know that the Iraqi "Oil for

Food" program, run by the United Nations, was corrupted.  As soon as that

information came to its attention this Spring, Norex acted with diligence to

establish Defendants' involvement in the program and connection to improper

payments.

Third, Defendants' conduct in regard to Iraq constitutes additional

predicate acts of mail and wire fraud, money laundering, illegal transactions in

monetary instruments, and bribery.  The seven U.S. Defendants' conduct both with

Saddam Hussein's Iraq and with Cuba also violates the Trading with the Enemy

Act, 50 U.S.C. APP. 5(b), and implementing regulation, 31 C.F.R. 515.201(2004),

which generally prohibit Americans from participating in trade with Iraq and Cuba,

as well as numerous other criminal statutes.  Their conduct further supports

predicate acts of money laundering and of illegal transactions in monetary

instruments on the new grounds of violations of the Trading with the Enemy Act,

which constitutes "specified unlawful activity."  18 U.S.C. §1956(c)(7)(D).

13

In short, this new information, which Defendants cannot refute,[7] in combination with Defendants' trading documents already of record, further supports the U.S.'s compelling public interest in retaining jurisdiction under RICO over a civil action prosecuting seven U.S. Defendants in connection with illegal oil trading with Iraq, including the illegal payments to benefit Saddam's regime, and assisting Russia in paying Cuba for intelligence activities directed at the U.S.  In contrast, Russia opposes the investigation into the Iraqi oil scandal and has long supported Fidel Castro's totalitarian regime.

The Court should grant the motion and permit supplementation of the record.  The current record strongly supports litigation of this dispute here, but, with this additional argument, there can be no question that the *Gulf Oil Corp. v. Gilbert*[8] public-interest factors favor litigation of this case in the U.S., which has compelling policy and national security interests in resolving the instant claims against seven American Defendants.

---

[7]    Even if Defendants were to contest this information, at this stage of the pleadings, on a motion to dismiss, the truth of Norex's allegations must be assumed and all reasonable inferences must be made in its favor.  *Courtenay Communs. Corp. v. Hall*, 334F.3d210,213(2d Cir.2003).

[8]    330U.S.501,508(1947).

## **CONCLUSION**

Therefore, Norex respectfully requests this Court to supplement the record and to consider the supplemental information and legal argument contained herein in determining the appeal pending before it.

Bruce S. Marks
MARKS & SOKOLOV, LLC
1835 Market Street
Philadelphia, Pennsylvania  19103
215-569-8901

Peter J.W. Sherwin
PROSKAUER ROSE LLP
1585 Broadway
New York, New York  10036
212-969-3000

*Of counsel*:
George C. Pratt
FARRELL FRITZ, P.C.
EAB Plaza
Uniondale, New York  11556
516-227-0700

*Attorneys for Plaintiff-Appellant*

September 20, 2004